# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION** | **MDL No. 2592**<br><br>**Section L**<br>**Judge Eldon E. Fallon**<br>**Magistrate North** |
| **THIS DOCUMENT RELATES TO:**<br><br>*Louisiana Health Services and Indemnity Co. d/b/a Blue Cross and Blue Shield of Louisiana, et al. v. Janssen Research & Development, LLC, et al.*<br><br>Case No. 2:15-cv-3913 | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PURSUANT TO FEDERAL RULE 12(b)(6) AND 9(b)**

## TABLE OF CONTENTS

I.    INTRODUCTION ....................................................................................................1

II.   FACTUAL ALLEGATIONS ...................................................................................3

     A.    The defendants misrepresented findings from several clinical studies and concealed critical information about those studies. ..................................5

          1.    The defendants touted the RECORD study as showing Xarelto's superiority to other blood thinners, but did not disclose that the study showed an increased risk of gastrointestinal bleeds, or that flaws in the study design rendered the study's findings meaningless. ............................5

          2.    The defendants touted the ROCKET AF study's finding that Xarelto was non-inferior to warfarin, but they concealed increased risks, significant flaws in study design, and the FDA's recommendation for blood monitoring. ...................................................................................................6

          3.    The defendants concealed that the EINSTEIN studies showed an increased risk of serious adverse events. ...................................................................7

     B.    The defendants falsely marketed Xarelto as a "one size fits all," once-daily medication that did not require blood monitoring based on that cherry-picked information. ...........................................................................................................8

     C.    The defendants' false representations concerning the safety and efficacy of Xarelto induced physicians to prescribe Xarelto, and induced pharmacy benefit managers to place Xarelto on the formularies of drugs reimbursed by third-party payors. ................................................................................................................10

     D.    Because the defendants induced physicians to prescribe, and pharmacy benefit managers to recommend, Xarelto, third-party payors paid for more Xarelto, and paid higher prices for Xarelto, due to the defendants' fraud. ................................11

III.   ARGUMENT ........................................................................................................11

     A.    Federal Rule of Civil Procedure 9(b) does not require a plaintiff to be omniscient: the payors' allegations of fraud in the complaint suffice to support their fraud claims. ...............................................................................................................12

     B.    The complaint alleges that the defendants' fraudulent marketing of Xarelto proximately caused the payors to pay more for Xarelto. .......................................17

          1.    The Supreme Court has expressly rejected the first-party reliance requirement that the defendants urge this Court to adopt. .........................17

          2.    The causal link between the defendants' fraud and the payors' injuries is sufficiently direct to satisfy the requirement of proximate cause. .............19

          3.    In the context of drug fraud claims, courts that have adhered to *Bridge*'s holding have found that misrepresentations to physicians and pharmacy benefit managers can proximately injure payors. .....................................22

4.      The payors allege neither that pharmacy benefit managers are their "agents," nor that causation in this case turns on an impermissible "fraud on the FDA" theory....................................................................25

5.      These same proximate cause principles defeat the defendants' bid to dismiss the payors' state law claims. .........................................................26

C.      The payors have not alleged a "fraud on the market" theory of causation. ...........27

D.      The payors have adequately alleged the defendants' Xarelto marketing scheme violated RICO. ....................................................................................30

E.      The plaintiffs' claims under the state consumer protection and unfair trade practices statutes do not warrant dismissal on the alternative grounds advanced by defendants. ..................................................................................................33

1.      The defendants' choice of law arguments are premature. ........................33

2.      Allied sufficiently pleads its claims under the ICFA, including damages and proximate cause....................................................................................35

3.      LABC's (BCBSLA) and HMO Louisiana's claims under LUTPA should stand. .......................................................................................................37

4.      Plaintiffs have stated a claim under the NJCFA, which requires the Court to interpret the statute liberally. .............................................................41

5.      The LPLA does not govern the plaintiffs' claims and therefore the exclusivity provisions under the LPLA do not bar the common law claims as pleaded in Counts I, II, III, and V.........................................................43

6.      The payors have stated a claim in redhibition. ........................................44

7.      The plaintiffs have stated unjust enrichment claims under the laws of Illinois, Louisiana, and New Jersey. ......................................................46

IV.      CONCLUSION.............................................................................................................49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All the Way Towing, LLC v. Bucks Cty. Int'l, Inc.*,
   236 N.J. 431 (2019) ........................................................................................42

*Am. Inter-Fid. Corp. v. M.L. Sullivan Ins. Agency, Inc.*,
   No. 15-cv-4545, 2017 WL 2506393 (N.D. Ill. June 9, 2017).................................48

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997).........................................................................................35

*In re Amerijet Int'l, Inc.*,
   785 F.3d 967 (5th Cir. 2015) ............................................................................50

*Andretti Sports Mktg. Louisiana, LLC v. Nola Motorsports Host Comm., Inc.*,
   147 F. Supp. 3d 537 (E.D. La. 2015) ..................................................................38

*Anza v. Ideal Steel Supply Co.*,
   547 U.S. 451 (2006)....................................................................................20, 21

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)....................................................................................12, 34

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..........................................................................................12

*Bible v. United Student Aid Funds*,
   799 F.3d 633 (7th Cir. 2015) ............................................................................33

*Blanchard & Co. v. Contursi*,
   No. 99-cv-1758, 2000 WL 574590 (E.D. La. May 11, 2000) .................................34

*Boyle v. United States*,
   556 U.S. 938 (2009)..........................................................................................31

*Bridge v. Phoenix Bond Co.*,
   553 U.S. 639 (2008)..................................................................................*passim*

*Byes v. Telecheck Recovery Servs., Inc.*,
   No. 94-cv-3182, 1997 WL 736692 (E.D. La. Nov. 24, 1997).........................38, 40

*Capiccioni v. Brennan Naperville, Inc.*,
   791 N.E.2d 553 (2003)......................................................................................36

*Carlson v. Champion Mortg. Co.*,
  No. 20-cv-2323, 2020 WL 7123067 (N.D. Ill. Dec. 4, 2020).................................................47

*Carter v. United States*,
  547 F.2d 258 (5th Cir. 1977) ........................................................................................50

*Castano v. Am. Tobacco Co.*,
  84 F.3d 734 (5th Cir. 1996) ..........................................................................................35

*Cates v. Int'l Tel. & Tel. Corp.*,
  756 F.2d 1161 (5th Cir. 1985) ......................................................................................17

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*,
  295 F. Supp. 3d 927 (N.D. Cal. 2018) ...............................................................28, 29, 30

*Cleary v. Phillip Morris Inc.*,
  656 F.3d 511 (7th Cir. 2011) ...................................................................................47, 48

*Cuvillier v. Sullivan*,
  503 F.3d 397 (5th Cir. 2007) ........................................................................................12

*De Bouse v. Bayer AG*,
  235 Ill.2d 544 (Ill. 2009).............................................................................................30

*Desiano v. Warner-Lambert Co.*,
  326 F.3d 339 (2d Cir. 2003)..........................................................................................46

*U.S. ex rel. Doe v. Dow Chemical Co.*,
  343 F.3d 325 (5th Cir. 2003) ........................................................................................13

*Ducote Jax Holdings LLC et al. v. Bradley*,
  No. 04-1943, 2007 WL 2008505 (E.D. La. Jul. 5, 2007) ........................................33

*Erie Railroad Company v. Tompkins*,
  304 U.S. 64 (1938).........................................................................................................33

*Forth v. Walgreen Co.*,
  No. 17-cv-2246, 2018 WL 1235015 (N.D. Ill. Mar. 9, 2018) .................................37

*Gil Ramirez Group LLC v. Houston Indep. Sch. Dist.*,
  No. 10-cv-4872, 2017 WL 3236110 (S.D. Tex. July 31, 2017) ..............................31

*Global Oil Tools v. Barnhill*,
  No. 12-cv-1507, 2012 WL 5866139 (E.D. La. Nov. 19, 2012)................................32

*Grogan v. Platt*,
  835 F.2d 844 (11th Cir. 1988) ......................................................................................21

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014)...................................................................................27

*Hamm v. Rhone-Poulenc Rorer Pharms. Inc.*,
  187 F.3d 941 (8th Cir. 1999) .....................................................................21

*Hart v. Bayer Corp.*,
  199 F.3d 239 (5th Cir. 2000) ...............................................................13, 17

*Health Care Service Corp. v. Pfizer Inc.*,
  No. 10-cv-221, 2011 WL 4591913 (E.D. Tex. Sept. 2, 2011)................25

*Health Care Servs. Corp. v. Pfizer, Inc.*,
  No. 10-cv-221, 2012 WL 2505555 (E.D. Tex. Apr. 23, 2012)...............25

*Hemi Grp. LLC v. City of New York*,
  559 U.S. 1 (2010)......................................................................17, 19, 20, 21

*Holmes v. Secs. Inv'r Prot. Corp.*,
  503 U.S. 258 (1992) ....................................................................... *passim*

*IberiaBank v. Broussard*,
  907 F.3d 826 (5th Cir. 2018) .....................................................................38

*Int'l Union of Operating Eng'rs. Local 68 Welfare Fund v. Merck & Co.*,
  192 N.J. 372 (N.J. 2007) ............................................................................31

*Jefferson v. Lead Indus. Ass'n, Inc.*,
  930 F. Supp. 241 (E.D. La. 1996).............................................................44

*Kavky v. Herbalife Intern. of America*,
  820 A.2d 677 (N.J. Super. A.D. 2003) .....................................................43

*Klaxon Co. v. Stentor Electric Man. Co.*,
  313 U.S. 487 (1941)....................................................................................33

*LeBlanc v. Texas Brine Co.*,
  LLC, No. CV 12-2059, 2015 WL 7451196 (E.D. La. Nov. 23, 2015) ...33

*In re Lidoderm Antitrust Litig.*,
  No. 14-md-2521, 2017 WL 679367 (N.D. Ca. Feb. 21, 2017)...............35

*Lincoln v. Danner*,
  No. 14-cv-393, 2015 WL 5307709 (E.D. La. Sept. 10, 2015)................32

*Louisiana v. Merck & Co. (In re Vioxx Prods. Liab. Liitg.*,
  MDL No. 1657, 2010 WL 11570867 (E.D. La. Mar. 31, 2010)...........30, 45, 46, 47

*In re Lupron Mktg. & Sales Practices Litig.*,
    295 F. Supp. 2d 148 (D. Mass. 2003) .................................................................32

*Mendoza v. Zirkle Fruit Co.*,
    301 F.3d 1163 (9th Cir. 2002) ...........................................................................30

*Morton v. Mancari*,
    417 U.S. 535 (1975)...........................................................................................26

*Mylan Labs., Inc. v. Matkari*,
    7 F.3d 1130 (4th Cir. 1993) ...............................................................................26

*In re Neurontin Marketing and Sales Practices Litigation*,
    712 F.3d 21 (1st Cir. 2013).............................................................22, 23, 24, 29

*In re Nexium (Esomeprazole) Antitrust Litig.*,
    297 F.R.D. 168 (D. Mass. 2013)........................................................................35

*O'Brien v. Nat'l Property Analysts Partners*,
    936 F.2d 674 (2d Cir.1991)................................................................................17

*Official Stanford Inv'rs Comm. v. Breazeale Sachse & Wilson LLP*,
    No. 11-cv-0329, 2015 WL 13740747 (N.D. Tex. Mar. 24, 2015).........................34

*Oil Mop. LLC v. Chem. S. Transp., Inc.*,
    No. 20-cv-1073, 2020 WL 7234644 (W.D. La. Nov. 23, 2020)......................48, 49

*Oliveira v. Amoco Oil*,
    201 Ill. 2d 134 (2002) .......................................................................................37

*Oliver v. Davis*,
    679 So. 2d 462 (La. App. 1st Cir. 1996)............................................................34

*Oscar v. Univ. Students Co-op Ass'n*,
    965 F.2d 783 (9th Cir. 1992) .............................................................................21

*Oshana v. Coca-Cola Co.*,
    472 F.3d 506 (7th Cir. 2006) .............................................................................36

*Our Lady of the Lake Medical Center v. Cropper*,
    401 So. 2d 403 (La. App. 1st Cir. 1981).............................................................49

*Painters & Allied Trades District Council 82 Health Care Fund v. Takeda
    Pharmaceuticals Co. Ltd.*,
    943 F.3d 1243 (9th Cir. 2019) .............................................................22, 23, 24

*PECO Pallet, Inc. v. Northwest Pallet Supply Co.*,
    No. 15-cv-6811, 2018 WL 10601988 (N.D. Ill. Oct. 29, 2018) ............................47

*POM Wonderful LLC v. The Coca-Cola Co.*,
  573 U.S. 102 (2014).................................................................................26

*Ragsdale v. Classroom Teachers of Dallas, et. al.*,
  No. 06-cv-863, 2006 WL 3392192 (N.D. Tex. Nov. 15, 2006) ...............................50

*Raintree Homes, Inc. v. Vill. of Long Grove*,
  209 Ill. 2d 239 (Ill. 2004)..........................................................................47

*In re Ranbaxy Generic Drug Application Antitrust Litig.*,
  No. 19-md-02878, 2019 WL 6341298 (D. Mass. Nov. 27, 2019)..........................26

*In re Relafen Antitrust Litig.*,
  221 F.R.D. 260 (D. Mass. 2004)..................................................................35

*In re Rezulin Prods. Liab. Litig.*,
  392 F. Supp. 2d 597 (S.D.N.Y. 2005)......................................................26, 40

*In re Rezulin Prods. Liab. Litig.*,
  524 F. Supp. 2d 436 (S.D.N.Y. 2007)............................................................30

*United States ex rel. Riley v. St. Luke's Episcopal Hosp.*,
  355 F.3d 370 (5th Cir. 2004) ...............................................................15, 16

*In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*,
  No. 06-cv-5774, 2009 WL 2043604 (D.N.J. July 10, 2009) .................................43

*Sergeants Benevolent Association Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*,
  806 F.3d 71 (2d Cir. 2015)..........................................................................24

*Sidney Hillman Health Center of Rochester v. Abbott Laboratories*,
  873 F.3d 574 (7th Cir. 2017) ......................................................................21

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
  No. 14-md-2503, 2017 WL 4621777 (D. Mass. Oct. 16, 2017).............................35

*Southeast Laborers Health & Welfare Fund v. Bayer Corp.*,
  44 F. App'x 401 (11th Cir. 2011) ............................................................24, 25

*St. Germain v. Howard*,
  556 F.3d 261 (5th Cir. 2009) ......................................................................31

*St. Paul Mercury Ins. Co. v. Williamson*,
  224 F.3d 425 (5th Cir. 2000) ......................................................................33

*Stevens v. Interactive Fin. Adv'rs., Inc.*,
  No. 11-cv-2223, 2015 WL 791384 (N.D. Ill. Feb. 24, 2015)................................48

*In re Testosterone Replacement Therapy Prods. Liab. Litig.*,
No. 2545, 2019 WL 652217 (N.D. Ill. Feb. 14, 2019) ....................................................25, 26

*Thompson v. Bayer Healthcare Pharm., Inc.*,
No. 13-cv-3702, 2013 WL 5375441 (E.D. La. Sept. 24, 2013)...............................................12

*Tipton v. Northrup Grumman Corp.*,
No. 08-cv-1267, 2009 WL 2914365 (E.D. La. Sept. 2, 2009)..................................................32

*Turner v. Pleasant*,
663 F.3d 770 (5th Cir. 2011) ..................................................................................................12

*UFCW Local 1776 v. Eli Lilly & Co.*,
620 F.3d 121 (2d Cir. 2010).....................................................................................................30

*Young v. Scruggs*,
No. 09-cv-669, 2010 WL 2301641 (S.D. Miss. June 7, 2010)................................................32

*Zodiac 21, Inc. v. Oyo Hotels, Inc.*,
No. 20-cv-63, 2020 WL 6479160 (M.D. La. Nov. 3, 2020)....................................................34

## Statutes

18 U.S.C. § 1964(c) ......................................................................................................................21

La. Civ. Code, art. 2439................................................................................................................45

La. Civ. Code, art. 2520................................................................................................................45

La. Civ. Code, art. 3542................................................................................................................34

La. Stat. § 51:1405........................................................................................................................38

La. Stat. § 51:1409.................................................................................................................38, 41

N.J. Stat. § 56:8-1(d)....................................................................................................................42

N.J. Stat. § 56:8-2.........................................................................................................................42

## Other Authorities

11th Cir. Local R. 36-2 ................................................................................................................24

9 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure §2363
(3d ed.)..................................................................................................................................50

Fed. R. Civ. P. 8(d) ......................................................................................................................49

Fed. R. Civ. P. 9(b) ......................................................................................................................13

Fed. R. Civ. P. 23 .................................................................................................................... 35

## I.       INTRODUCTION

The defendants—members of the Janssen family of pharmaceutical companies and the Bayer family of pharmaceutical companies—heralded their prescription anticoagulant, Xarelto, as a one-size-fits all blood thinner, superior to the existing therapies in that it could safely be prescribed once a day without the need for monitoring blood tests. But the defendants did not disclose serious risks associated with Xarelto. The defendants did not disclose that Xarelto caused a higher incidence of dangerous gastrointestinal bleeding; they did not disclose that it caused a higher incidence of bleeding severe enough to require blood transfusions; they did not disclose that Xarelto was safer as a twice-daily medication, and instead recommended once-daily dosing for the marketing optics; they did not disclose that Xarelto should require blood monitoring; and they did not disclose that, should a bleeding event occur, there was no antidote for Xarelto's potentially deadly effects.

By claiming that Xarelto was safe and effective without disclosing these significant risks, the defendants induced physicians to prescribe more Xarelto than they would have had they known the true risks. They induced pharmacy benefit managers (the entities responsible for determining which drugs to recommend a health plan reimburse) to place Xarelto on their formulary of recommended or approved drugs. And they caused payors, like the plaintiffs here—Blue Cross and Blue Shield of Louisiana, HMO Louisiana Inc., and Allied Services Division Welfare Fund—to pay for prescriptions of Xarelto that would never have been prescribed or reimbursed in the absence of the defendants' fraud. The defendants' conduct violated the federal Racketeer Influenced and Corrupt Organization Act's prohibition on racketeering, and several states' consumer protection laws.

Now, the defendants ask this Court for a free pass for this fraud—they try one tactic after another in a bid to dismiss the payors' complaint. But they fail to raise any valid basis to dismiss this action.

The defendants try to invoke Federal Rule of Civil Procedure 9(b)'s requirement of a heightened pleading standard in cases alleging fraud—but the payors have met that standard. The complaint alleges in sufficient detail the particulars of the payors' fraud claims against the defendants: it alleges what was omitted, from which communications, and how those omissions rendered the defendants' statements about Xarelto misleading. Nothing more is required.[1]

Next, the defendants derive a requirement that the payors, and not just the physicians and pharmacy benefit managers, received and relied upon the defendants' misleading statements. But not only is this first-party reliance requirement nowhere to be found in the cases the defendants invoke—it was expressly rejected by the Supreme Court in *Bridge v. Phoenix Bond Co.*,[2] a case involving a theory of causation analogous to the one alleged by the payors here. Contrary to the defendants' assertions, those courts that faithfully apply the Supreme Court's binding *Bridge* holding find that, in circumstances indistinguishable from those here, payors can establish their injuries were proximately caused by a pharmaceutical company's fraud when the defendants direct their deceitful marketing messages to physicians and pharmacy benefit managers.[3]

Then, the defendants try to rewrite the payors' claims—suggesting the plaintiffs rely on a theory that the pharmacy benefit managers were the payors' agents (they do not),[4] or that the payors rely on a presumption of fraud on the market reserved for the securities-law context (they

---

[1] *See infra* III.A.

[2] 553 U.S. 639 (2008).

[3] *See infra* III.B.

[4] *See infra* III.B.4.

do not),[5] or that the payors advance a theory of causation premised impermissibly on a "fraud on the FDA" (again, they do not).[6] The payors' well-pleaded allegations allege a direct causal link to the defendants' misrepresentations sufficient to withstand dismissal.

The defendants' cause-of-action-specific arguments fare no better. The payors have adequately alleged the three core elements of a RICO claim: (1) RICO persons (the defendants) engaged in (2) a RICO enterprise (the defendants' Xarelto marketing enterprise) conducted through a (3) pattern of racketeering activity (the misrepresentations concerning the safety and efficacy of Xarelto). These allegations suffice to state the core elements of a RICO claim.[7] And the plaintiffs have adequately alleged violations of various states' consumer protection laws[8] and unjust enrichment.[9]

The defendants' spaghetti strategy—throw everything at the wall and see what sticks—offers no valid basis to dismiss the plaintiffs' claims and free them from the consequences of their years-long fraud. Accordingly, the motion to dismiss should be denied.[10]

## II.    FACTUAL ALLEGATIONS

For years, warfarin was the anticoagulant (or blood thinner) used in the treatment of individuals who may be at an increased risk of developing blood clots.[11] It was established as a

---

[5] *See infra* III.C.

[6] *See infra* III.B.5.

[7] *See infra* III.D.

[8] *See infra* III.E.

[9] *See infra* III.F.6.

[10] In the alternative, should the Court agree with any of the defendants' arguments, the plaintiffs respectfully request leave to amend the complaint to meet the Court's concerns. The plaintiffs had intended to amend their complaint prior to this case—which had been paused pending the personal injury litigations in this MDL. The defendants' unilateral resumption of this case in November deprived the payors of the opportunity to do so.

[11] First Amend. Class Action Compl. ("Compl.") ¶ 78.

safe, effective treatment for preventing stroke or embolism,[12] but required regular blood monitoring and multiple daily doses to avoid unexpected bleeding.[13]

In 2011, the defendants, the Janssen family of companies and the Bayer family of companies,[14] heralded the approval of their new drug Xarelto for the prophylactic treatment of deep vein thrombosis (DVT) and pulmonary embolism (PE) in patients undergoing hip or knee replacement surgery, and for preventing stroke or systemic embolism in patients with non-valvular atrial fibrillation.[15] And in 2012, the defendants began marketing Xarelto for preventing recurrent DVT or PE.[16] But the benefits the defendants touted—the convenience of once-daily dosing, the lack of any need for routine blood monitoring, and the lack of dietary restrictions—were premised on misrepresentations of the data in the defendants' files.[17]

That data showed that "[t]he use of Xarelto without appropriate blood monitoring, dose adjustment, and twice a day dosing can cause major, life-threatening bleeding events."[18] And it showed that (unlike warfarin-related bleeding) bleeding caused by Xarelto had no antidote: if a patient experienced a Xarelto-induced bleed, there was "no available reversal agent."[19]

---

[12] *Id.* ¶ 80.

[13] *See id.* ¶¶ 3, 98.

[14] *See id.* ¶¶ 15-68. The Janssen family includes Janssen Research & Development LLC, Janssen Pharmaceuticals, Inc., and Johnson & Johnson. The Bayer family includes Bayer Health Care Pharmaceuticals, Inc., Bayer Pharma AG, Bayer Corporation, Bayer Healthcare LLC, and Bayer Healthcare AG. *Id.* ¶ 274.

[15] *Id.* ¶¶ 79, 83, 87.

[16] *Id.* ¶ 95.

[17] *Id.* ¶ 98.

[18] *Id.* ¶ 100.

[19] *Id.* ¶ 101.

**A.     The defendants misrepresented findings from several clinical studies and concealed critical information about those studies.**

The defendants cherry-picked their marketing materials from several clinical studies assessing the safety and effectiveness of Xarelto: those studies were known as the RECORD studies, the ROCKET AF study, and the EINSTEIN studies.[20]

**1.     The defendants touted the RECORD study as showing Xarelto's superiority to other blood thinners, but did not disclose that the study showed an increased risk of gastrointestinal bleeds, or that flaws in the study design rendered the study's findings meaningless.**

The defendants supported their initial application for the approval of Xarelto with a series of clinical trials known as the RECORD studies.[21] The defendants declared those studies showed that Xarelto was "superior" to another new oral anticoagulant against which Xarelto was compared. But, although that study showed that Xarelto caused "similar" rates of bleeding as other new oral anticoagulants, it also showed a "greater incidence with Xarelto of bleeding leading to decreased hemoglobin levels and [requiring] transfusion of blood."[22] The defendants omitted these findings from the Xarelto label, upon which physicians and pharmacy benefit managers rely when making decisions about whether to prescribe Xarelto or list it on the formulary.[23]

For a study to produce meaningful, valid results, the study must be designed and conducted according to rigorous scientific methods. The RECORD studies were not. They were plagued by gross departures from good clinical practices: "systemic discarding of medical records, unauthorized unblinding, falsification, and concerns regarding improprieties in

---

[20] *Id.* ¶ 97.

[21] *Id.* ¶ 84.

[22] *Id.*

[23] *Id.* ¶ 109(b), (i) (alleging defendants "failed to provide adequate warnings about the true safety risks associated with the use of Xarelto" uncovered in the RECORD study, including "the increased risk of gastrointestinal bleeds in those taking Xarelto . . . .").

randomization."[24] In other words, the defendants' clinical investigators rigged the study, destroyed the evidence of what the study actually showed, and made up data. These improprieties render the findings of RECORD clinically and scientifically meaningless, and undermined the claim that Xarelto was "superior" to competing products.

> **2.     The defendants touted the ROCKET AF study's finding that Xarelto was non-inferior to warfarin, but they concealed increased risks, significant flaws in study design, and the FDA's recommendation for blood monitoring.**

The defendants supported their application to market Xarelto for the prophylaxis of stroke and systemic embolism in patients with atrial fibrillation with the ROCKET AF study. The defendants claimed that the study showed that Xarelto was non-inferior to warfarin, and that it had a "similar risk of major bleeding."[25] However, the study *actually* showed that "bleeding from gastrointestinal sites, including upper, lower, and rectal sites, occurred more frequently in the [Xarelto] group, as did bleeding that led to a drop in the hemoglobin level that required transfusion."[26] The defendants omitted this information from Xarelto's label.[27]

The ROCKET AF study had substantial flaws. When a study compares patient groups taking different drugs, each group must be "well managed." ROCKET AF compared Xarelto to warfarin, a tricky drug to administer, so "if the warfarin group was poorly managed, it would be easy for Xarelto to appear non-inferior to warfarin."[28] ROCKET AF's warfarin group was "the worst managed warfarin study group in any previously reported clinical trial involving

---

[24] *Id.* ¶ 85.

[25] *Id.* ¶ 87.

[26] *Id.*

[27] *Id.* ¶ 109(j) (noting defendants "failed to provide adequate warnings regarding the increased risk of suffering a bleeding event requiring blood transfusions").

[28] *Id.* ¶ 88.

warfarin"[29]—so much so that the study's results were "not adequate" to show whether Xarelto

was effective, let alone how it compared to warfarin "when [warfarin] is used skillfully."[30]

The defendants had data from prior studies showing that "twice daily dosing," of Xarelto

"might have been associated with greater efficacy and/or a better safety profile."[31] But the

defendants limited the ROCKET AF study to examining *only* once daily dosing[32]—a dosing

regimen that, according to one expert in the field, seemed "selected more for a marketing

advantage rather than for the scientific data that was available."[33]

This marketing choice was made at the expense of patient safety: the ROCKET AF study

"demonstrated a linear correlation between [Xarelto] levels . . . and the risk of bleeding." The

higher the dosage of Xarelto, the higher the risk of bleeding—so taking a larger dose once a day,

rather than smaller doses twice a day, increased the risk of a Xarelto-related bleed. But, the FDA

noted, the defendants had "not chosen to utilize this information."[34] The defendants' Xarelto

label advised once-daily dosing and failed to recommend blood monitoring.[35]

### 3. The defendants concealed that the EINSTEIN studies showed an increased risk of serious adverse events.

The defendants supported their application to market Xarelto for preventing recurrent

DVT and PE on the EINSTEIN studies, concluding those studies showed that Xarelto was "non-

inferior" to other long-term prophylaxes.[36] But the EINSTEIN studies actually showed "an

---

[29] *Id.* ¶ 89.

[30] *Id.* ¶ 90.

[31] *Id.* ¶ 92.

[32] *Id.*

[33] *Id.* ¶ 93 (quoting Dr. Steven A. Nissin, FDA Advisory Committee member).

[34] *Id.* ¶ 94.

[35] *Id.* ¶ 109(c), (d), (k), (l).

[36] *Id.* ¶ 96.

increased risk of adverse events with Xarelto," including "prolonged hospitalization."[37] The

defendants' Xarelto label once again omitted this information.[38]

**B.**     **The defendants falsely marketed Xarelto as a "one size fits all," once-daily medication that did not require blood monitoring based on that cherry-picked information.**

The defendants marketed Xarelto by touting the supposed "Xarelto Difference"; *i.e.*, that

Xarelto was safe, effective, and could be taken "once a day" "without blood monitoring"[39]—

"with no regard to the accuracy and repercussions of their misleading advertising . . . ."[40]

In these marketing messages, the defendants heralded Xarelto as a "one size fits all" drug,

concealing "the necessity to routinely monitor any patient requiring a blood thinning agent."[41]

They "overstated the efficacy of Xarelto with respect to preventing stroke and systemic

embolism, failed to disclose the need for dose adjustments, failed to disclose the need for blood

monitoring, and failed to adequately disclose to patients that there is no drug, agent, or means to

reverse the anticoagulation effects of Xarelto."[42]

The defendants "consistently marketed Xarelto as not requiring regular blood monitoring

or frequent doctor follow-up, ignoring substantial concerns about the risk of stroke, bleeding, and

blood clots."[43] And they represented Xarelto as a "therapeutic simplification . . . because it did

not require patients to undergo periodic monitoring with blood tests . . . ."[44] These statements

---

[37] *Id.*

[38] *Id.* ¶ 109(b) (alleging defendants "failed to provide adequate warnings about the true safety risks associated with the use of Xarelto").

[39] *Id.* ¶¶ 114, 123.

[40] *Id.* ¶ 128.

[41] *Id.* ¶ 125.

[42] *Id.* ¶ 119.

[43] *Id.* ¶ 29; *see also id.* ¶ 120 (quoting defendants' marketing messages: "Xarelto is the first and only once-a-day blood thinner for patients with AFib not caused by a heart valve problem, that is proven to reduce the risk of stroke—without routine blood monitoring.").

[44] *Id.* ¶ 126.

omitted the ROCKET AF study findings that taking Xarelto once a day instead of twice a day increased the risk of bleeds and that this should compel blood monitoring.[45]

The defendants' falsehoods even forced the FDA to intercede. The FDA determined at least one print ad disseminated by the defendants was "false or misleading because it minimize[d] the risks associated with Xarelto and ma[de] a misleading claim" about the drug.[46] The FDA advised that the defendants' representations constituted "violation of FDA regulations," and directed the defendants to cease such advertising.[47]

An outside watchdog, the Institute for Safe Medication Practices (ISMP), uncovered evidence of significant adverse events in patients prescribed Xarelto—1,080 adverse events including at least 65 deaths (twice the fatality rate of warfarin) in the first 11 months on the market; and additional 2,081 adverse events including 151 deaths (three times warfarin's rate) the next year.[48] These adverse events supplied a "strong signal" regarding Xarelto's safety— "evidence of sufficient weight to justify an alert to the public and scientific community, and to warrant further investigation."[49] Yet when ISMP brought these findings to the defendants, the defendants "told [ISMP] that [they] had reviewed the same data and saw no signal of a safety issue that needed to be addressed."[50] The defendants neither issued warnings nor investigated further.[51]

---

[45] *Id.* ¶¶ 92, 94.

[46] *Id.* ¶ 129.

[47] *Id.*

[48] *Id.* ¶¶ 103-04.

[49] *Id.* ¶ 105.

[50] *Id.* ¶ 135 (quoting Ransdell Pierson, *Pradaxa and Xarelto: Top Heart Doctors Concerned over New Blood Thinners*, Huffpost Healthy Living (June 14, 2012)).

[51] *Id.* ¶ 108.

C.     **The defendants' false representations concerning the safety and efficacy of Xarelto induced physicians to prescribe Xarelto, and induced pharmacy benefit managers to place Xarelto on the formularies of drugs reimbursed by third-party payors.**

Through these "affirmative misrepresentations and omissions," the defendants "actively concealed" from physicians "the true and significant risks associated with Xarelto use."[52] They ensured that physicians were unaware of, and could not reasonably have learned about, the risks identified in the studies and from adverse event reports.[53] This "deceptive and misleading marketing scheme was calculated to ensure Xarelto was prescribed in great quantities by physicians for patients as a 'one size fits all' drug," and misinformed physicians about "the necessity of routinely monitoring any patient" taking Xarelto.[54]

The defendants deployed their false statements to dupe pharmacy benefit managers, too.[55] Pharmacy benefit managers are middlemen which prepare a formulary—a list of the drugs that are approved for coverage by their third-party payor clients.[56] Pharmacy benefit managers assess whether to list a drug on the formulary based on its clinical safety, efficacy, and cost effectiveness.

When a PBM finds that a drug has an advantage over competing drugs, that drug is given a preferred status on its formulary.[57] The level of preference on the formulary corresponds with the amount that a third-party payor must pay when a physician prescribes the drug to one of its insureds: the higher the preferential placement, the lower the insured's copay and the higher the proportion of the drug price the third-party payor must pay. And, because higher-preference

---

[52] *Id.* ¶ 148.

[53] *Id.* ¶ 149.

[54] *Id.* ¶ 151.

[55] *Id.* ¶ 148.

[56] *Id.* ¶ 162.

[57] *Id.* ¶ 162.

drugs have lower beneficiary co-pays, physicians are more likely to prescribe those drugs more often than lower-tier drugs.[58]

The defendants falsely promoted Xarelto as safe and effective—downplaying or hiding the risks uncovered in the RECORD, ROCKET AF, and EINSTEIN studies and borne out in post-marketing adverse event reports and hiding the need for routine blood monitoring—directly to pharmacy benefit managers.[59] The defendants' false statements induced pharmacy benefit managers to "place Xarelto on their formularies without any restrictions."[60]

**D.  Because the defendants induced physicians to prescribe, and pharmacy benefit managers to recommend, Xarelto, third-party payors paid for more Xarelto, and paid higher prices for Xarelto, due to the defendants' fraud.**

As a result of the defendants' false and misleading statements to physicians and pharmacy benefits managers (and to third-party payors themselves), third-party payors, including the plaintiffs in this case,[61] paid for Xarelto in greater quantities and at higher prices than they would have but for the defendants' misconduct.[62] These prescriptions would have been restricted or priced differently if pharmacy benefit managers and physicians had truthful and complete information about Xarelto.

## III.   ARGUMENT

"To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true "raise a right to relief

---

[58] *Id.* ¶ 163.

[59] *Id.* ¶ 166.

[60] *Id.* ¶ 165; *see also id.* ¶ 166.

[61] The plaintiffs paid for prescription drug benefits. They allege that they have paid and/or provided reimbursement for some or the entire purchase price for Xarelto during the proposed Class Period. Compl. ¶ 14.

[62] *Id.* ¶ 168.

above the speculative level."[63] So long as "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged,"[64] the allegations in the complaint "give rise to an entitlement to relief,"[65] and any motion to dismiss must be denied.

The standard is not a stringent one. As the Supreme Court has noted, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."[66] That is why, in the Fifth Circuit, "[a] motion to dismiss for failure to state a claim under Rule 12(b)(6) is disfavored in the law and rarely granted."[67]

A.    **Federal Rule of Civil Procedure 9(b) does not require a plaintiff to be omniscient: the payors' allegations of fraud in the complaint suffice to support their fraud claims.**

Federal Rule of Civil Procedure 9(b) requires that a plaintiff set forth the facts of a case with sufficient particularity so as to "provide defendants adequate notice of the nature and grounds of the claim."[68] So if a complaint merely enumerates the payments allegedly procured

---

[63] *Cuvillier v. Sullivan*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

[64] *Twombly*, 550 U.S. at 556.

[65] *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *see also Twombly*, 550 U.S. at 570.

[66] *Twombly*, 550 U.S. at 556.

[67] *Thompson v. Bayer Healthcare Pharm., Inc.*, No. 13-cv-3702, 2013 WL 5375441, at *1 (E.D. La. Sept. 24, 2013) (quoting *Thompson v. Goetzmann*, 337 F.3d 489, 495 (5th Cir. 2003)); *see also Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (citing *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)).

[68] *Hart v. Bayer Corp.*, 199 F.3d 239, 248 n.6 (5th Cir. 2000).

by fraud and does not identify any misrepresentations by the defendant whatsoever, dismissal may be warranted.[69] But nothing in Rule 9(b) requires a plaintiff to be omniscient.[70]

In this case, the payors have alleged that the defendants omitted critical information concerning the safety of Xarelto as a once-daily treatment and the extent to which physicians must monitor patients' Xarelto blood levels. Where the fraud alleged involves an omission of facts, Rule 9(b) "typically requires the [plaintiff] to plead the type of facts omitted, the place in which the omissions should have appeared, and the way in which the omitted facts made the misrepresentations misleading."[71] The payors have satisfied this standard.

The payors have alleged the types of facts omitted.[72] Specifically, the purchasers have alleged that the defendants omitted material information concerning:

- "[T]he true safety risks associated with the use of Xarelto";[73]

- "[T]he pharmacokinetic and pharmacodynamic variability of Xarelto and its effects on the degree of anticoagulation in a patient";[74]

- The fact that "it is difficult or impossible to assess the degree and/or extent of anticoagulation in patients taking Xarelto";[75]

- "[T]here is no drug, agent, or means to reverse the anticoagulation effects of Xarelto";[76]

---

[69] *See U.S. ex rel. Doe v. Dow Chemical Co.*, 343 F.3d 325, 329 (5th Cir. 2003) (affirming dismissal where "[a]t most, Doe's complaint listed the approximate time and place of the alleged [activities] that violated Dow Chemical's permits, but nothing else," and it was "unclear from the face of the complaint exactly what representations Dow Chemical was allegedly making").

[70] *See id.* (Rule 9(b) "may be relaxed" where, "for instance, the facts relating to the fraud are 'particularly within the perpetrator's knowledge.'" (quoting *U.S. ex rel. Russell v. Epic Healthcare Management Grp.*, 193 F.3d 304, 308 (5th Cir. 1999)).

[71] *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 381 (5th Cir. 2004) (internal quotations and citation omitted).

[72] *Cf. id.*

[73] Compl. ¶ 109(b).

[74] *Id.* ¶ 109(c).

[75] *Id.* ¶ 109(d).

[76] *Id.* ¶ 109(f).

13

- "[H]ow to intervene and/or stabilize a patient who suffers a bleed while taking Xarelto";[77]

- "[T]he increased risks of bleeding events associated with aging patient populations of Xarelto users";[78]

- "[T]he increased risk of gastrointestinal bleeds in those taking Xarelto";[79]

- "[T]he increased risk of suffering a bleeding event requiring blood transfusions in those taking Xarelto";[80]

- The need for blood monitoring to "assess renal functioning" and "hepatic functioning" in Xarelto patients;[81]

- The scientific evidence that Xarelto was safer (less likely to cause bleeding) if taken in smaller doses twice a day rather as marketed once a day;[82]

- The FDA's recommendation that Xarelto patients undergo periodic blood monitoring;[83] and

- The lack of an antidote to reverse unexpected bleeds in patients on Xarelto.[84]

The payors have also alleged where the omitted information should have appeared:[85] in Xarelto's label;[86] in the *Physicians' Desk Reference* monograph for Xarelto;[87] in marketing materials concerning the "Xarelto Difference";[88] in direct-to-consumer advertisements;[89] in

---

[77] *Id.* ¶ 109(g).

[78] *Id.* ¶ 109(h).

[79] *Id.* ¶ 109(i).

[80] *Id.* ¶ 109(j).

[81] *Id.* ¶ 109(k), (l).

[82] *Id.* ¶ 94.

[83] *Id.* ¶ 5.

[84] *Id.* ¶ 101.

[85] *Cf. Riley*, 355 F.3d at 381; *see* Compl. ¶ 180 ("These representations were made directly by Defendants, by sales representatives and other authorized agents of Defendants, and in publications and other written materials directed to physicians, medical patients, PBMs, third-party payors and the public, with the intention of inducing reliance and the prescription, purchase, and/or use of Xarelto.").

[86] Compl. ¶¶ 109, 181.

[87] *Id.* ¶ 181.

[88] *Id.* ¶¶ 98, 114.

[89] *Id.* ¶¶ 118-24.

scientific literature;[90] in "print advertisements, online marketing on their website, and video advertisements";[91] in the January/February 2013 issue of *WebMD* magazine;[92] in statements to ISMP;[93] in "false and misleading promotion efforts" aimed at physicians and other prescribers;[94] in statements directly to pharmacy benefit managers;[95] and in statements to the third-party payors themselves.[96] The payors have further alleged that these warnings should have been given a place of prominence in the defendants' Xarelto label: a "boxed warning," reserved for particularly severe risks associated with a drug.[97] Finally, the payors alleged that the defendants should have, but did not, issue a "Dear Doctor" letter—a communication to physicians about especially dangerous side effects—describing these risks.[98]

And the payors have alleged the way in which the defendants' omissions made their misrepresentations concerning Xarelto misleading.[99] For example, while the defendants touted Xarelto as safe and effective for once-daily use,[100] they did not disclose that once-daily dosing increased the risk for bleeds which, if they occurred, would be irreversible.[101] They also did not disclose that, although the overall rate of bleeds experienced with Xarelto was similar to the rate with warfarin, the incidence of Xarelto-related gastrointestinal bleeds or bleeds so serious that

---

[90] *Id.* ¶ 181.

[91] *Id.* ¶ 128.

[92] *Id.* ¶ 129.

[93] *Id.* ¶¶ 134-35.

[94] *Id.* ¶¶ 142, 180.

[95] *Id.* ¶¶ 165-66, 180.

[96] *Id.* ¶ 180.

[97] *Id.* ¶¶ 109(m), (n), 127.

[98] *Id.* ¶ 137.

[99] *Cf. Riley*, 355 F.3d at 381.

[100] *See* Compl. ¶ 94.

[101] *Id.* ¶ 101.

they required transfusion was actually meaningfully higher than warfarin.[102] Each representation that the defendants made that did not disclose this information overstated the safety of Xarelto while downplaying its significant, and sometimes deadly, risks.

Thus, the payors' allegations satisfy the requirements for fraud claims premised on omissions: the defendants' arguments to the contrary do nothing to erode that conclusion. The defendants take issue with the fact that the payors do not identify which *specific* doctors received misrepresentations; which *specific* misrepresentations were made to the PBMs; and which *specific* misrepresentations were made to the payors themselves.[103] But this misses entirely the point: the payors allege that the defendants *concealed* material information from *everyone*—physicians, other prescribers, pharmacy benefit managers, patients, and payors.[104] So the payors allege *every* statement by the defendants concerning Xarelto omitted material information.

These allegations—concerning the information omitted from the defendants' statements, the places in which this information should have been disclosed, and the way in which these omissions made the defendants' statements misleading—suffice to "provide defendants adequate notice of the nature and grounds of the claim."[105] Rule 9(b) requires nothing more.[106]

---

[102] *Id.* ¶ 87.

[103] *See* Defs. Mem. at 37-38.

[104] Compl. ¶¶ 136, 148, 154, 173(h), 183, 194, 199.

[105] *Hart*, 199 F.3d at 248 n.6.

[106] Even where a court dismisses a case for failure to meet Rule 9(b)'s pleading requirements, "such deficiencies do not normally justify dismissal of the suit on the merits and without leave to amend . . . ." *Cates v. Int'l Tel. & Tel. Corp.*, 756 F.2d 1161, 1180 (5th Cir. 1985); *see also O'Brien v. Nat'l Property Analysts Partners*, 936 F.2d 674, 675-76 (2d Cir.1991).

**B.    The complaint alleges that the defendants' fraudulent marketing of Xarelto proximately caused the payors to pay more for Xarelto.**

To plead proximate cause, a complaint must allege a "direct relation between the injury asserted and the injurious conduct alleged."[107] That is, proximate causation requires only a causal connection between the defendant's wrongful conduct and the plaintiff's injury that is not "'too remote,' 'purely contingent,' or 'indirec[t] . . . .'"[108]

Proximate cause "is a flexible concept that does not lend itself to 'a black-letter rule that will dictate the result in every case.'"[109] Yet the defendants ask this Court to apply what they cast as a settled rule requiring first-party reliance on the defendants' misstatements—a rule which the Supreme Court has already rejected,[110] and which, if adopted, "would ignore *Holmes*' instruction that proximate cause is generally not amenable to bright-line rules."[111]

**1.    The Supreme Court has expressly rejected the first-party reliance requirement that the defendants urge this Court to adopt.**

In *Bridge v. Phoenix Bond & Indemnity Co.*, a group of plaintiffs who purchased tax liens at a county auction brought RICO claims against other bidders. At those auctions, each bidder had to sign an affidavit stating that it would obey the "Single Simultaneous Bidder Rule," and would not deploy "apparent agents, employees, or related entities" to increase the likelihood of winning the auction.[112] The *Bridge* plaintiffs alleged that the defendants violated this rule to "fraudulently obtain[] a disproportionate share of liens."[113] The

---

[107] *Holmes v. Secs. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992).

[108] *Hemi Grp. LLC v. City of New York*, 559 U.S. 1, 9 (2010).

[109] *Bridge*, 553 U.S. at 654 (quoting *Holmes*, 503 U.S. at 272 n.20).

[110] *See* Defs.' Mem. at 14-30 (arguing that the payors' claims must be dismissed because the payors allege that physicians and pharmacy benefit managers, not the payors themselves, relied on the misrepresentations).

[111] *Bridge*, 553 U.S. at 659.

[112] *Id.* at 642-43.

[113] *Id.* at 643.

defendants sought dismissal on proximate cause grounds because the misrepresentations "were made to the county, not" the plaintiffs, so "the *county* may well have relied on [the defendants'] misrepresentations when it permitted them to participate in the action, but [the *plaintiffs*], never having received the misrepresentations, could not have done so."[114]

The Supreme Court rejected this argument forcefully. "If petitioners' proposed requirement of first-party reliance seems to come out of nowhere, there is a reason: Nothing on the face of the relevant statutory provisions imposes such a requirement."[115] A defendant commits mail fraud by "[u]sing the mail to execute or attempt to execute a scheme to defraud," a predicate racketeering act under RICO, "even if *no one* relied on any misrepresentation."[116] And nothing in the RICO statute itself—which provided "a right of action to '[a]ny person' injured by the violation"—could be "reconciled with an implicit requirement that the plaintiff show reliance in addition to injury."[117] Thus, the Court concluded, "a person can be injured 'by reason of' a pattern of mail fraud [or wire fraud] even if he has not relied on *any* misrepresentations."[118]

The defendants' argument for dismissal on proximate cause grounds here ignores the Supreme Court's holding in *Bridge*—and goes so far as to urge this Court to ignore *Bridge*'s holding and focus instead on dicta.[119] They claim it is "well settled" that RICO "imposes a proximate causation requirement," so because the "[payors] do not allege that *they* received, reviewed, or relied on Defendants' alleged misrepresentations," the payors' claims are

---

[114] *Id.* at 648.

[115] *Id.*

[116] *Id.* (emphasis added).

[117] *Id.* at 649.

[118] *Id.* (emphasis added).

[119] Defs.' Mem. at 25 (criticizing courts for "focusing solely on [*Bridge*'s] holding regarding first-party reliance rather than its views of the *Holmes* 'direct relationship' proximate causation requirement.").

"insufficient as a matter of law to establish proximate causation."[120] But not even the cases upon which they rely impose the first-person reliance requirement the defendants imagine.

### 2. The causal link between the defendants' fraud and the payors' injuries is sufficiently direct to satisfy the requirement of proximate cause.

Despite what the defendants contend,[121] nothing in *Holmes v. SIPC*, *Hemi Group LLC v. City of New York*, or *Anza v. Ideal Steel Supply Corp.* imposes the first-person reliance requirement that the defendants urge. These cases simply stand for the proposition that proximate cause requires "some direct relation between the injury asserted and the injurious conduct alleged" in order to ensure that the harm alleged is not "too remote" to allow for recovery.[122] A link that is "too remote," "purely contingent," or "indirec[t]" does not suffice.[123]

Even *Holmes* says the defendants cannot read a first-party requirement into the claims: the Supreme Court admonished that its "use of the term 'direct' should merely be understood as a reference to the proximate-cause enquiry that is informed by the concerns of justice and administrability."[124] These concerns, according to *Holmes*, were threefold. First, "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation"; second, "recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages . . . to obviate the risk of multiple recoveries";[125] and third, such machinations are unnecessary where "directly injured victims can

---

[120] Defs.' Mem. at 16 (emphasis in original).

[121] Defs.' Mem. at 17.

[122] *Holmes*, 503 U.S. at 268.

[123] *Id.* at 271; *Hemi*, 559 U.S. at 9.

[124] *Holmes*, 503 U.S. at 268.

[125] *Holmes*, 503 U.S. at 269.

generally be counted on to vindicate the law as private attorneys general."[126] Here, none of these concerns are implicated by the payors' claims.

The claims in *Holmes*, *Hemi*, and *Anza* failed because they were not brought by the most directly injured victim of the defendants' frauds. To the contrary, the plaintiffs in each case were remote and articulated complex and attenuated chains of causation.

- In *Holmes*, SIPC alleged that: (1) the defendants manipulated stock prices to create the appearance of a liquid market; (2) this induced two broker-dealers to buy the stock with their own money; (3) when the market discovered the fraud, prices plummeted; (4) the broker-dealers' losses affected their ability to meet their obligations to customers; so (5) the broker-dealers were liquidated; (6) the broker-dealers had insufficient funds to cover obligations to their customers; so (7) SIPC was statutorily obligated to pay nearly $13 million to settle all claims.[127]

- In *Hemi*, New York City sued an online cigarette merchant alleging (1) Hemi failed to disclose to New York State any residents who purchased cigarettes from the company; (2) therefore, New York State could not provide New York City with a list of Hemi's purchasers; (3) some of Hemi's purchasers in New York City did not pay the city's $1.50 cigarette tax; (4) without the State's list, New York City could not collect those taxes; and (5) New York City lost tax revenue.[128]

- In *Anza*, Ideal, a steel company, sued its competitor, alleging Anza (1) failed to collect New York State taxes; which (2) lowered its prices to customers; which (3) caused customers to choose Anza over Ideal; and (4) Ideal lost revenue.[129]

Here, by contrast, the payors allege a much more direct chain of causation: the defendants misrepresented the safety and efficacy of their drugs to physicians and pharmacy benefit managers, inducing physicians to prescribe Xarelto and pharmacy benefit managers to put Xarelto on their formularies: this caused the payors to pay for those prescriptions.[130] So here—

---

[126] *Id.* at 269-70.

[127] *Id.* at 262-63.

[128] *Hemi*, 559 U.S. at 5-6; *see also id.* at 9 ("The City's causal theory is far more attenuated than the one we rejected in *Holmes*.").

[129] *Anza v. Ideal Steel Supply Co.*, 547 U.S. 451, 453-54 (2006).

[130] *See, e.g.*, Compl. ¶¶ 119-20, 148-49, 151, 168.

like in *Bridge* and unlike in *Holmes*, *Anza*, and *Hemi*—the plaintiffs' injury was removed by only one link in the causal chain from the fraudulent conduct.[131] It is not, thus, "difficult . . . to ascertain the amount of a plaintiff's damages attributable to the violation."[132]

In each of *Holmes*, *Hemi*, and *Anza*, there was an entity more directly poised to sue to vindicate the defendants' wrongdoing. In *Holmes*, the broker-dealers could (and in fact did) sue.[133] And in both *Hemi* and *Anza*, New York State could have sued.[134] But here, as in *Bridge*, there is no more directly injured party that can seek to vindicate the financial losses wrought by the defendants' fraud.[135] The physicians who received the misrepresentations prescribed, but did not pay for, Xarelto. The pharmacy benefit managers who were misled listed Xarelto on their formulary, but did not pay for it. In this case, therefore, like in *Bridge*, "there is no risk of duplicative recoveries by plaintiffs removed at different levels of injury from the violation, and no more immediate victim is better situated to sue."[136]

---

[131] *Cf. Hemi*, 559 U.S. at 11 ("The City's theory thus requires that we extend RICO liability to situations where the defendant's fraud on the third party (the State) has made it easier for a fourth party (the taxpayer) to cause harm to the plaintiff (the City).").

[132] *Holmes*, 503 U.S. at 269.

[133] *Id.* at 273 ("[T]hose directly injured, the broker-dealers, could be counted on to bring suit for the law's vindication. As noted above, the broker-dealers have in fact sued . . . .").

[134] *Hemi*, 503 U.S. at 12 ("The State certainly is better situated than the City to seek recovery from Hemi. And the State has an incentive to sue . . . ."); *Anza*, 547 U.S. at 460 ("If the allegations are true, the State can be expected to pursue appropriate remedies. The adjudication of the State's claims, moreover, would be relatively straightforward . . . .").

[135] The defendants invoke *Sidney Hillman Health Center of Rochester v. Abbott Laboratories*, 873 F.3d 574 (7th Cir. 2017) to suggest that physicians and/or patients are more directly injured parties for purposes of the *Holmes* analysis, because "[p]atients suffer if they take [a drug] even though it is useless to them and may be harmful," and "[p]hysicians also may lose" because patients may "turn elsewhere' if the physicians "prescribe[] an ineffective medicine." *Id.* at 576. But RICO provides a remedy to those injured "in his business or property." 18 U.S.C. § 1964(c); *see Grogan v. Platt*, 835 F.2d 844, 846 (11th Cir. 1988) ("The words 'business or property' are, in part, words of limitation; if Congress had intended for the victims of predicate acts to recover for all types of injuries suffered, it would have drafted the statute to read: 'A person injured by reason of a violation of a section 1962 of this chapter may sue therefor . . . .'"). The personal injury to the patients and the reputational harm to physicians hypothesized by *Sidney Hillman* to not meet this standard. *See, e.g., Hamm v. Rhone-Poulenc Rorer Pharms. Inc.*, 187 F.3d 941, 953 (8th Cir. 1999) ("Damage to reputation is generally considered personal injury and thus is not an injury to 'business or property' within the meaning of 18 U.S.C. § 1964(c)."); *Oscar v. Univ. Students Co-op Ass'n*, 965 F.2d 783, 785 (9th Cir. 1992) ("[I]t is clear that personal injuries are not compensable under RICO.").

[136] 553 U.S. at 658; *cf. Holmes*, 503 U.S. at 269-70.

**3.     In the context of drug fraud claims, courts that have adhered to *Bridge*'s holding have found that misrepresentations to physicians and pharmacy benefit managers can proximately injure payors.[137]**

Two circuit courts have correctly applied the teachings of *Bridge* in the context of drug-fraud cases: the First and the Ninth.

In *In re Neurontin Marketing and Sales Practices Litigation*, the First Circuit affirmed a RICO verdict in favor of third-party payors. The First Circuit analyzed, relying on *Bridge*, whether the third-party payor was "'the primary and intended victim[ ] of the scheme to defraud,'" and whether harm to the third-party payor was the "'foreseeable and natural consequence' of Pfizer's scheme."[138] *Neurontin* answered both inquiries in the affirmative. *Neurontin* involved a theory of causation indistinguishable from this case: a drug company made misrepresentations to third parties (physicians) to induce those physicians to prescribe more Neurontin; and the third-party payors paid more as a result.[139] This "causal chain," the First Circuit noted, "is anything but attenuated."[140]

In *Painters & Allied Trades District Council 82 Health Care Fund v. Takeda Pharmaceuticals Co. Ltd.*, the Ninth Circuit applied the same reasoning to allegations that the defendants "actively concealed Actos's risk of causing bladder cancer to sell more Actos to unsuspecting persons, thereby increasing Actos's revenue," and as a result Painters "purchased Actos prescriptions for which they would not have paid . . ."[141] "Under the Supreme Court's *Bridge* precedent alone," the Ninth Circuit held, "Plaintiffs' allegations satisf[ied] the Supreme

---

[137] The defendants carve up their discussion of the misapplication of *Holmes* and its progeny in drug-fraud cases into sections about "alleged misrepresentations to physicians," Defs.' Mem. at 17-19, and "alleged misrepresentations to PBMs," *id.* at 20.

[138] 712 F.3d 21, 37 (1st Cir. 2013) (quoting *Bridge*, 553 U.S. at 650, 658).

[139] *Id.* at 26.

[140] *Id.* at 38.

[141] 943 F.3d 1243, 1251 (9th Cir. 2019).

Court's direct relation requirement," because "Plaintiffs were immediate victims of Defendants' alleged fraudulent scheme," so "the alleged RICO violation . . . has a direct relation to Plaintiffs' alleged harm."[142]

Both *Neurontin* and *Painters* thus hewed faithfully to the Supreme Court's teachings in *Bridge*. But both also went further, testing the allegations in those cases directly against *Holmes*' practical considerations, rather than just *Bridge*'s articulation of *Holmes*.[143]

The holdings of *Neurontin* and *Painters* simply reflect the application of *Bridge*'s—and yes, even *Holmes*'s—proximate causation principles in the context of the U.S.'s prescription drug scheme. As *Neurontin* noted, drug companies know that, "because of the structure of the American health care system, physicians would not be the ones paying for the drugs they prescribed," so "a fraudulent marketing plan, meant to increase its revenues and profits, only became successful once" the defrauding company "received payments for the additional Neurontin prescriptions it induced"—payments that "came from . . . [third-party payors]."[144] That is why, as *Painters* acknowledged, it "was perfectly foreseeable that physicians who

---

[142] *Id.*

[143] *Neurontin*, 712 F.3d at 37-38 ("None of the three functional problems that the *Holmes* test is meant to avoid are present in this case. To the contrary, the functional interests in justice and administrability work in Kaiser's favor. Because Kaiser was both the natural and foreseeable victim of the fraud and the intended victim of the fraud, there is no risk of duplicative recovery. Neither the individual physicians, nor the DIS members, nor the P & T Committee members—the parties to whom Pfizer directly made its misrepresentations—ever paid anything toward a Neurontin prescription, so there is no risk of multiple recoveries due to a suit by another of those actors. Kaiser is also in the best position to enforce the law because Kaiser is the party that directly suffered economic injury from Pfizer's scheme." (citing *Holmes*, 503 U.S. at 269-70)); *Painters*, 943 F.3d at 1251-52 ("The *Holmes* factors also weigh in favor of permitting Plaintiffs' RICO claims to proceed. The first *Holmes* factor tasks us with determining whether it would be too difficult to ascertain what damages are attributable to Defendants' alleged RICO violation, as opposed to factors . . . . [W]e are not persuaded that it is so difficult here that Plaintiffs should be denied the opportunity to prove their damages . . . . Second, we consider the risk of multiple recoveries by plaintiffs at different levels of injury from the defendants' acts. Here, like in *Bridge*, and unlike in *Anza* and *Hemi Group*, there is no concern of 'duplicative recoveries by plaintiffs removed at different levels of injury from the violation' . . . . Finally, under the third *Holmes* factor, we consider whether holding Defendants liable in this case justifies the general interest of deterring injurious conduct or whether there are more directly injured victims we can count on to hold Defendants liable. Here, patients and [third-party payors] who paid money for Actos are the most direct victims of those who suffered economic injury . . . . Thus, holding Defendants liable for Plaintiffs' alleged injuries advances the interest in deterring injurious conduct, without including others who did not suffer direct out-of-pocket losses." (citing *Holmes*, 503 U.S. at 269-70)).

[144] 712 F.3d at 38-39.

*prescribed* [the drug] would play a causative rule in Defendants' alleged fraudulent scheme to increase [the drug's] revenue."[145]

The defendants claim that this Court should instead follow some different rule announced in other cases; but that claim is based on a faulty premise: there is no other rule. *Sergeants Benevolent Association Health & Welfare Fund v. Sanofi-Aventis U.S. LLP* stands only for the proposition that the record *in that case* (post-discovery) did not permit Sergeants Benevolent to "prove third-party reliance, and thus causation, by generalized proof."[146] In fact, *Sergeants Benevolent* expressly contemplated that, in some other case (like this one), a plaintiff *could* proceed on similar claims.[147] Likewise, *Southeast Laborers Health & Welfare Fund v. Bayer Corp.*, was a fact-specific holding:[148] *in that case* the third-party payor plaintiffs argued that *they* had an "independent choice" of whether to pay for the drug, but "failed to explain how or why it made the choice to pay" for the drug, "and how or why Bayer's alleged concealment of the dangers of [the drug] led [the third-party payor] to pay for" it.[149] This factbound holding has no bearing on this case where the payors have explained how both they and the physicians and pharmacy benefit managers relied on the defendants' misrepresentations. And *Sidney Hillman*

---

[145] *Painters*, 943 F.3d at 1257 (emphasis in original).

[146] 806 F.3d 71, 97 (2d Cir. 2015).

[147] *Id.* at 88 (a plaintiff "may be able to prove class-wide causation based on first-party reliance *without* individualized inquiry into whether each class member relied on the defendant's misrepresentation if 'circumstantial evidence' generated a sufficiently strong inference" of uniform reliance (quoting *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 225 n.7 (2d Cir. 2008))); *id.* at 89 ("Just as in cases involving first-party reliance, the individualized nature of the reliance inquiry can make it difficult to prove causation using generalized proof. Nonetheless, it may be possible in certain circumstances . . . to prove causation . . . by offering sufficient circumstantial proof . . . to permit the reasonable inference that the third parties in question must have relied on the defendant's misrepresentation.").

[148] The fact that *Southeast Laborers* does not articulate any meaningful principle beyond the rote application of the law to the facts of that case is confirmed by the fact that it is not precedent. *See* 11th Cir. Local R. 36-2.

[149] 44 F. App'x 401, 410 (11th Cir. 2011).

24

misapplies both *Bridge* and, more fundamentally, the RICO statute itself, as explained above;[150] this Court is not bound to, nor should it, follow such flawed non-binding precedent.[151]

### 4. The payors allege neither that pharmacy benefit managers are their "agents," nor that causation in this case turns on an impermissible "fraud on the FDA" theory.

The defendants devote space to arguing that the payors' complaint is somehow deficient for failing to allege that the pharmacy benefit managers who set the formularies the payors' followed were the payors' agents.[152] But this argument is a strawman—a creature of the defendants' legally incorrect contention that the payors must prove first-party reliance. The payors need not prove that making misrepresentations to the pharmacy benefit managers was legally equivalent to making statements to the payors themselves, because the payors need not prove any misrepresentations were made to the payors.[153] In any event, the scant case law the defendants muster does not support their argument: one case can be distinguished on the facts,[154] and the other is an application of the Seventh Circuit's fatally flawed *Sidney Hillman* logic.[155]

---

[150] *See supra* note 135.

[151] The defendants' remaining cases—*Testosterone* and *Health Care Service*—cannot salvage their flawed arguments. The district court in *In re Testosterone Replacement Therapy Products Liability Litigation*, was bound to follow the flawed analysis in *Sidney Hillman*. MDL No. 2545, 2019 WL 652217, at *9 (N.D. Ill. Feb. 14, 2019) ("The governing principles in the Seventh Circuit require MMO to show, in order to survive summary judgment, that there are genuine disputes on whether it (1) received direct misrepresentations from defendants and (2) relied upon them to make formulary-related decisions about defendants' TRT drugs."). And *Health Care Service Corp. v. Pfizer, Inc.*, is factually distinguishable: in that case, as in *Southeast Laborers*, the plaintiff alleged that it had personally relied on misrepresentations, but failed to adduce any evidence of that fact at the summary judgment stage. The decision the defendants cite does not set forth any analysis on this issue, *see* No. 10-cv-221, 2012 WL 2505555 (E.D. Tex. Apr. 23, 2012) (*Health Care Service II*), but rather alludes to its earlier decision, which makes clear this factual distinction. *See Health Care Service Corp. v. Pfizer Inc.* (*Health Care Service I*), No. 10-cv-221, 2011 WL 4591913, at *2, 7 (E.D. Tex. Sept. 2, 2011) (noting that, although the plaintiff "alleges that it was injured . . . when *it* placed [the defendant's] drugs on its formulary," the plaintiff "fails to allege what misrepresentations, if any, were made directly to it and upon which it relied," and "fails to allege sufficiently how these representations caused [the plaintiff] harm.").

[152] Defs.' Mem. at 20-22.

[153] *See supra* III.B.1.

[154] *In re Rezulin Prods. Liab. Litig.*, 392 F. Supp. 2d 597, 607-08 (S.D.N.Y. 2005) (noting the plaintiffs alleged (yet failed to prove) that the PBM was their agent).

[155] *Testosterone*, 2019 WL 652217, at *9.

Likewise, the defendants invite this Court on a lark, suggesting that, simply because the complaint says that the defendants made misrepresentations to the FDA,[156] the plaintiffs' claims inextricably depend on proving fraud upon the FDA.[157] They do not. But even if they did, the fact that the Food Drug and Cosmetic Act does not create an independent, private right of action,[158] does not preclude private plaintiffs from seeking to vindicate harm through other federal statutory schemes like the Lanham Act, the Sherman Act, or, yes, RICO.[159] And the "fraud on the FDA" preemption doctrine articulated in *Buckman v. Plaintiffs' Legal Committee* does not bar state-law consumer protection claims, just because they intersect with the drug regulatory scheme: the payors' claims are not preempted because they "do not seek to remedy only FDCA noncompliance," and the defendants' misconduct—misleading consumers—is "independently proscribed under state law."[160]

## 5.    These same proximate cause principles defeat the defendants' bid to dismiss the payors' state law claims.

The defendants briefly suggest that their mis-reading of *Holmes* and its progeny applies to the payors' state law claims too. But this under-developed argument does nothing to support their bid for dismissal. The defendants simply note that the "same 'common law principles' of proximate causation and the remoteness doctrine addressed by the Court in *Holmes*" apply to

---

[156] *E.g.*, Compl. ¶ 160.

[157] Defs.' Mem. at 22-23.

[158] *Contra* Defs.' Mem. at 22.

[159] *See, e.g.*, *POM Wonderful LLC v. The Coca-Cola Co.*, 573 U.S. 102, 112-13 (2014) (holding that the FDCA does not preclude a private party from bringing a Lanham Act claim challenging a food label regulated by the FDA); *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1138 (4th Cir. 1993) (permitting to proceed RICO claims alleging that defendants obtained ANDA approval "through fraud . . . and that the data for the ANDAs or bioequivalence studies had been falsified or was seriously unreliable."); *see also Morton v. Mancari*, 417 U.S. 535, 551 (1975) (explaining that, so long as federal statutes "are capable of co-existence," the "courts are not at liberty to pick and choose" among statutes, and it is the "duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective").

[160] *See In re Ranbaxy Generic Drug Application Antitrust Litig.*, No. 19-md-02878, 2019 WL 6341298 (D. Mass. Nov. 27, 2019) (denying motion to dismiss third-party payors' state-law consumer protection claims on preemption grounds).

state-law claims. Quite right. But, as *Bridge* noted, "there is no general common law principle holding that a fraudulent misrepresentation can cause legal injury only to those who rely on it."[161] And the first-person reliance requirement they push appears nowhere in *Holmes*, *Anza*, *Hemi*, or *Bridge*.[162] So the defendants' cursory argument does not compel, or even suggest, the dismissal of the payors' state-law claims on proximate cause grounds.

**C.      The payors have not alleged a "fraud on the market" theory of causation.[163]**

"Fraud on the market" is a term of art peculiar to securities law cases referring to a rebuttable presumption of reliance where "the market price of shares . . . reflects all publicly available information, and, hence, any material misrepresentations."[164] In such cases, the Supreme Court has explained, a stock purchaser's "reliance on any public material misrepresentations may be presumed . . . ."[165]

Some courts "have used the phrase 'fraud on the market' to mean something else outside the context of securities fraud—as shorthand for a theory of overpayment that occurs when a seller's misrepresentations cause its goods or services to sell for an inflated price."[166] But, despite the defendants' arguments, not all cases in which a plaintiff alleges she would pay less (or not at all) for a product in the absence of fraud depend on a "fraud on the market" theory.

---

[161] *Bridge*, 553 U.S. at 656; *see also id.* ("The Restatement [(Second) of Torts] provision cited by petitioners certainly does not support that proposition. It provides only that the plaintiff's loss must be a foreseeable result of *someone's* reliance on the misrepresentation.").

[162] *See supra* at II.B.1-2.

[163] Much of the defendants' arguments styled as a "fraud on the market" critique are little more than a rehashing of their flawed proximate cause analysis that the payors address above. To the extent the defendants claim the fact that representations were made to physicians and PBMs rather than to payors directly somehow constitutes a basis to invoke the fraud on the market theory to block the plaintiffs' claims, this attempt fails for the same reasons articulated above.

[164] *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014).

[165] *Id.*

[166] *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*, 295 F. Supp. 3d 927, 970 (N.D. Cal. 2018).

In *In re Chrysler-Dodge Jeep Ecodiesel Marketing, Sales Practices, & Product Liability Litig.*, for example, plaintiffs sued car makers for fraudulently marketing "Ecodiesel" vehicles when the cars actually contained defeat devices that simulated low emission rates during tests. But for this deceit, the plaintiffs alleged, they would have paid less for the vehicles.[167] The defendants claimed that the plaintiffs impermissibly alleged a fraud-on-the-market theory of reliance.[168] But the court rejected this argument as "a strawman"—noting that "[s]uch a theory is not necessary nor is it invoked by Plaintiffs in the instant case for several reasons."[169]

First, *Chrysler-Dodge* noted, "reliance is not a necessary element of a RICO claim," so with respect to those claims (and the payors' RICO claims here), arguments about a presumption of reliance were simply irrelevant.[170] This observation stemmed from *Bridge*,[171] and was echoed by the First Circuit in *Neurontin*:[172] the defendants just hope this Court will ignore *Bridge*, *Neurontin*, and this binding rule.[173]

Second, *Chrysler-Dodge* found, critiques of the fraud-on-the-market theory have no bearing where plaintiffs "pin their damages claim not indirectly or derivatively on the fraud's general effect on market prices, but on" an articulable "premium they would not have paid had Defendants" not made the representations.[174] The *Chrysler-Dodge* plaintiffs articulated a specific amount of money they overpaid.[175] That was different from other cases the *Chrysler-Dodge*

---

[167] *Id.* at 941.

[168] *Id.* at 969.

[169] *Id.* at 970.

[170] *Id.*

[171] *Bridge*, 553 U.S. at 661.

[172] *Neurontin*, 712 F.3d at 36 n.9 ("We disagree with Pfizer's argument that 'attempting to prove non-party doctors' reliance through inferences from aggregate sales data invokes the fraud on the market doctrine . . . .'").

[173] Defs.' Mem. at 34-35 (arguing that the *Neurontin* court did not mean what it said when it said it was not relying on any fraud-on-the-market claim to affirm the RICO verdict).

[174] *Chrysler-Dodge*, 295 F. Supp. 3d at 970.

[175] *Id.* ("between $3,120 and $5,000").

court examined (and the cases cited by the defendants here) because in those other cases, the plaintiffs "were not able to identify their overpayment with specificity," so they "had to rely on a kind of proxy theory to prove their economic injuries—basing their damages indirectly on the effects the frauds had on market prices for the goods they purchased."[176]

Under the reasoning articulated in *Chrysler-Dodge*, the defendants' attempt to graft a "fraud on the market" theory onto the payors claims is a category error. The payors do not allege the defendants' misrepresentations infected the mix of information that set some consensus market price, as is the hallmark of a fraud-on-the-market reliance theory. Rather, they allege two theories, neither of which rely on some amorphous effect on a market-wide basis. Had the defendants not concealed Xarelto's severe risks, then either: (a) the payors would not have paid for Xarelto *at all*, because pharmacy benefit managers would not have put it on the formulary;[177] or (b) the pharmacy benefit managers *that set the plaintiffs' formularies* would have placed Xarelto in a disfavored tier on their formularies, decreasing the cost to the payors of the drug and deterring physicians from prescribing it.[178] In either circumstance, the payors allege, they would have paid for the more affordable, less dangerous drug, warfarin.[179] And the payors articulate the "premium" they paid as a result of the defendants' fraud:[180] "A one-month supply of Xarelto typically sells for between $340 and $400," whereas warfarin "has a typical retail price for a one-month prescription of approximately $5 [to] $15."[181] In other words, the payors have alleged that

---

[176] *Id.* at 970-71.

[177] Compl. ¶ 165 ("By directly and falsely promoting Xarelto as safe and effective to prescribe as a 'one size fits all' blood thinner, and by actively suppressing and failing to disclose negative data and results of drug studies . . . Defendants influenced PBMs to place Xarelto on their formularies without any restrictions."); *id.* ¶ 167 "PBMs, third-party administrators, and pharmacy and therapeutic committees detrimentally relied on Defendants' misrepresentations of Xarelto's safety and efficacy when approving and/or placing the drugs on formularies."

[178] *Id.* ¶¶ 163, 166.

[179] Compl. ¶¶ 161.

[180] *Cf. Chrysler-Dodge*, 295 F. Supp. 3d at 970.

[181] Compl. ¶ 161.

they overpaid by approximately $325 to $395 per prescription of Xarelto written. "The Court must take these allegations as true in considering the motions to dismiss."[182]

Can questions about the extent of damages in a case like this be complex? Sure. But, as the Ninth Circuit recognized when rejecting an attempt to invoke the spectre of "fraud on the market" to sweep away fraud claims at the pleadings stage, that is not a reason to dismiss the claims. Such questions are "best addressed by economic experts and other evidence at a later stage in the proceedings."[183] This common sense solution explains each of the cases upon which the defendants rely: each of them is a class certification or summary judgment decision.[184] The payors deserve the same chance here.

### D. The payors have adequately alleged the defendants' Xarelto marketing scheme violated RICO.

"Claims under RICO, 18 U.S.C. §1962, have three common elements: '(1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise.'"[185] As the Supreme Court has observed, "'proof of one'" of these elements "'does not *necessarily* establish the other.'"[186] But, despite the defendants' claims, that provides no reason to dismiss the payors' claims.

---

[182] *Chrysler-Dodge*, 295 F. Supp. 3d at 971.

[183] *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1171 (9th Cir. 2002).

[184] *See UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121 (2d Cir. 2010) (reversing class certification and the denial of summary judgment); *Louisiana v. Merck & Co. (In re Vioxx Prods. Liab. Liitg.*, MDL No. 1657, 2010 WL 11570867, at *7 (E.D. La. Mar. 31, 2010) (granting in part and denying in part summary judgment); *In re Rezulin Prods. Liab. Litig.*, 524 F. Supp. 2d 436 (S.D.N.Y. 2007) (granting summary judgment); *De Bouse v. Bayer AG*, 235 Ill.2d 544 (Ill. 2009) (reversing denial of summary judgment); *Int'l Union of Operating Eng'rs. Local 68 Welfare Fund v. Merck & Co.*, 192 N.J. 372 (N.J. 2007) (reversing class certification).

[185] *St. Germain v. Howard*, 556 F.3d 261, 263 (5th Cir. 2009) (quoting *Abraham v. Singh*, 480 F.3d 351, 355 (5th Cir. 2007)).

[186] *Boyle v. United States*, 556 U.S. 938, 947 (2009) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)) (emphasis added).

The payors have alleged an enterprise sufficiently distinct from the pattern of racketeering activity.[187] Although the existence of an enterprise and the pattern of racketeering activity by that enterprise are separate elements, "the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise 'may in particular cases coalesce.'"[188] In fact, the "evidence substantiating a pattern of racketeering activity" may even "heavily overlap[] with evidence showing an enterprise," so long as there is "an association beyond the predicate acts."[189] So it is possible that the existence of an enterprise may be inferred from evidence showing that persons associated with the enterprise engaged in a pattern of racketeering activity.[190]

The defendants cherry-pick a single paragraph of the payors' complaint as evidence that the payors allege the defendants associated *only* for the purpose of committing the predicate acts, *i.e.*, marketing Xarelto through fraudulent means and selling Xarelto at a premium price.[191] But the fraudulent marketing was not the only conduct in which the companies were alleged to have engaged jointly: they also "design[ed], research[ed], manufacture[ed], test[ed], . . . [sold] and distribute[d] the drug Xarelto" together.[192] This conduct is separate, legitimate conduct by the defendants, which establishes the enterprise separate from the racketeering activity.[193] Such

---

[187] *Contra* Defs.' Mem. at 38-40.

[188] *Boyle*, 556 U.S. at 947 (quoting *Turkette,* 452 U.S. at 583).

[189] *Gil Ramirez Group LLC v. Houston Indep. Sch. Dist.*, No. 10-cv-4872, 2017 WL 3236110, at *10 (S.D. Tex. July 31, 2017).

[190] *Boyle*, 556 U.S. at 947.

[191] *See* Defs.' Mem. at 39 (citing Compl. ¶ 274).

[192] *See* Compl. ¶¶ 20, 26, 32, 41, 50, 58, 68, 81; *see also id.* ¶ 83 (alleging the defendants jointly sought approval for their product).

[193] The cases cited from this Circuit by the defendants detract nothing from this conclusion: in each of those cases, one of two flaws existed. In some, the plaintiffs expressly conceded that they were alleging an enterprise that was coterminous with the pattern of racketeering activity. *See, e.g.*, *Lincoln v. Danner*, No. 14-cv-393, 2015 WL 5307709, at * 3 (E.D. La. Sept. 10, 2015) ("Plaintiff makes only the conclusory allegation that Defendants made agreements 'in illegal restraint of trade for price gouging and illegal billing with other New Orleans hotels and competitors in the hotel management and guest services industries.' Plaintiff provides no factual support for this

legitimate business activities, when undertaken by participants in a RICO enterprise, suffice to establish an association-in-fact enterprise distinct from the pattern of racketeering activity.[194]

Likewise, the enterprise is distinct from the defendants themselves.[195] "A RICO person is the defendant, while a RICO enterprise can be either a legal entity or an association-in-fact."[196] In this case, each of the defendants is a "RICO person," and the enterprise is the association-in-fact between the defendants for the purposes of designing, researching, manufacturing, testing, advertising, marketing, selling, and distributing Xarelto.[197] As this Court itself has previously noted, such a combination of various entities for co-promotion purposes suffices to establish the existence of a RICO enterprise distinct from the RICO persons.[198]

---

allegation. In addition, his case statement explicitly states that the "Danner Family Enterprise or association-in-fact ... does not appear to have any existence separate and apart from its pattern of racketeering activity."); *Tipton v. Northrup Grumman Corp.*, No. 08-cv-1267, 2009 WL 2914365, at *12 (E.D. La. Sept. 2, 2009) ("Having alleged that the association *existed for the purpose of carrying on the pattern of racketeering* they allege, the plaintiffs have failed to allege the existence of an enterprise separate and apart from the pattern of racketeering activity."). Or the plaintiffs *argued* that the association-in-fact enterprise engaged in "provid[ing] legal services and advice," but did not *allege* facts supporting this argument. *See, e.g.*, *Young v. Scruggs*, No. 09-cv-669, 2010 WL 2301641, at *7 (S.D. Miss. June 7, 2010) ("The statement that the [enterprise] provided legal services and . . . is belied by the Complaint's other allegations . . . . The plaintiffs do not allege that the [enterprise] . . . had any existence other than as a series of predicate acts . . . . Because the plaintiffs have failed to allege that the [enterprise] was a separate, ongoing, purposeful, continuing unit, they have failed to state a RICO claim against the defendants upon which relief may be granted. This shortcoming is also fatal to the plaintiffs' RICO claims."). Other cases cited by the defendant are wholly irrelevant. *Compare Global Oil Tools v. Barnhill*, No. 12-cv-1507, 2012 WL 5866139, at *11 (E.D. La. Nov. 19, 2012) (holding that "one discrete offense" does not suffice to state a RICO claim) *with* Compl. ¶ 281 (alleging "thousands of communications" using the mails and wires in furtherance of the fraudulent scheme).

[194] *See In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 171 (D. Mass. 2003) (denying motion to dismiss and holding that plaintiffs sufficiently pled their RICO claims wherein the joint venture not only engaged in the fraudulent activity, but also jointly defended the patents one company owned and the other licensed).

[195] *Contra* Defs.' Mem. at 40-41.

[196] *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 439 (5th Cir. 2000).

[197] *See* Compl. ¶¶ 20, 26, 32, 41, 50, 58, 68, 81; *see also id.* ¶ 83 (alleging the defendants jointly sought approval for their product).

[198] *Ducote Jax Holdings LLC et al. v. Bradley*, No. 04-1943, 2007 WL 2008505, at *5 (E.D. La. Jul. 5, 2007). Ignoring this direct precedent, the defendants focus on two Seventh Circuit cases. *See* Defs.' Mem. at 40-41. But the Seventh Circuit itself has stated those cases are distinguishable from cases where, as here, a plaintiff alleges "the entities do not operate as completely separate entities," and describes something more than a "run-of-the-mill commercial relationship where each entity acts in its individual capacity to pursue its individual self-interest, versus a truly joint enterprise where each individual entity acts in concert with the others to pursue a common interest." *Bible v. United Student Aid Funds*, 799 F.3d 633, 655-56 (7th Cir. 2015).

**E.      The plaintiffs' claims under the state consumer protection and unfair trade practices statutes do not warrant dismissal on the alternative grounds advanced by defendants.**

**1.      The defendants' choice of law arguments are premature.**

**a.      Choice of law issues are not ripe at this stage because the applicable choice of law analysis requires a fact-intensive analysis.**

Louisiana's choice of law rules apply to this case, as federal courts overseeing a matter on the basis of diversity must apply the substantive law that a state court in the forum state would apply.[199] Pursuant to Louisiana choice of law principles, consumer protection claims are "governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue."[200] This is a fact-intensive inquiry, which would include the weighing of the policies surrounding each pleaded states' consumer protection laws and how the facts of this case and the application of another state's laws affect those policies. This analysis requires an evaluation of

> the strength and pertinence of the relevant policies of the involved states in the light of: (1) the pertinent contacts of each state to the parties and the events giving rise to the dispute, including the place of conduct and injury, the domicile, habitual residence, or place of business of the parties, and the state in which the relationship, if any, between the parties was centered; and (2) the policies referred to in Article 3515, as well as the policies of deterring wrongful conduct and of repairing the consequences of injurious acts.[201]

Such a fact-intensive evaluation would be meaningless and inefficient at the motion to dismiss stage: the Court cannot consider facts outside of the pleadings; rather, the Court's analysis is

---

[199] *Klaxon Co. v. Stentor Electric Man. Co.*, 313 U.S. 487, 496 (1941); *Erie Railroad Company v. Tompkins*, 304 U.S. 64 (1938); *LeBlanc v. Texas Brine Co.*, LLC, No. CV 12-2059, 2015 WL 7451196, at *3 (E.D. La. Nov. 23, 2015) ("[I]n diversity cases a federal court must apply the same conflict of laws analysis that the state courts of the forum would use[.]").

[200] *See* La. Civ. Code, art. 3542; *Zodiac 21, Inc. v. Oyo Hotels, Inc.*, No. 20-cv-63, 2020 WL 6479160, at *7 (M.D. La. Nov. 3, 2020); Defs.' Mem., at 12.

[201] La. Civ. Code, art. 3542; *accord Oliver v. Davis*, 679 So. 2d 462, 465 (La. App. 1st Cir. 1996), *writ denied*, 682 So. 2d 773 (La. 1996).

focused on whether the complaint, on its face, pleads sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[202] Thus, in light of the need for the Court to engage in a fact-intensive analysis to determine the applicable substantive law and the inability to do so at the motion to dismiss stage, the defendants' choice of law argument is premature.[203] Consequently, this Court should not entertain the choice of law arguments advanced by the defendants in a motion to dismiss.

> ### b.   The plaintiffs have alleged class action allegations that require a Rule 23 analysis that is not appropriately performed at this stage.

The plaintiffs have pleaded class action allegations for which they seek damages under Federal Rule of Civil Procedure 23(b)(3) and allege state law claims in multiple states.[204] Therefore, there exist absent class members of the putative class. To protect these absent class members, Rule 23 requires a finding of commonality, typicality, predominance, and superioriity at the class certification stage.[205] Consequently, a choice of law analysis would require (1) a determination of which state laws apply to ascertainable class members, including absent class members and (2) an analysis on whether the identified applicable state laws are materially different.[206] Such an analysis is more appropriate at the class certification stage, or at least at a

---

[202] *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570.

[203] *Blanchard & Co. v. Contursi*, No. 99-cv-1758, 2000 WL 574590, at *4 (E.D. La. May 11, 2000) ("The choice of law issue, which is inherently fact-based, is not appropriately determined on a motion to dismiss."); *see also Official Stanford Inv'rs Comm. v. Breazeale Sachse & Wilson LLP*, No. 11-cv-0329, 2015 WL 13740747, at *3 (N.D. Tex. Mar. 24, 2015) ("[C]hoice of law determinations require assessments of fact and thus are generally inappropriate for resolution on a motion to dismiss[.]" (citations omitted)).

[204]  Compl. ¶¶ 254-71; Defs.' Mem. at 42.

[205] Fed. R. Civ. P. 23.

[206] *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 741 (5th Cir. 1996) ("[A] district court must consider how variations in state law affect predominance and superiority. . . . In a multi-state class action, variations in state law may swamp any common issues and defeat predominance."); *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613, 628-29 (1997) ("Rule 23 . . . must be interpreted with fidelity to the Rules Enabling Act and applied with the interests of absent class members in close view.").

point at which there has been meaningful discovery—not now.[207] At the appropriate stage, if this Court finds there are no material differences in the state law claims pleaded by the plaintiffs, the Court may certify the class. To be sure, such a result is not unprecedented—courts have and do certify class actions that include multiple state law claims when the state law claims are similar.[208]

Hence, this Court should decline to entertain the defendants' choice of law arguments.

### 2.    Allied sufficiently pleads its claims under the ICFA, including damages and proximate cause.

"The elements of a claim under the [ICFA] are: (1) a deceptive act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deception; (3) the occurrence of the deception in the course of conduct involving trade and commerce; and (4) actual damage to the plaintiff; (5) proximately caused by the deception."[209]

Allied pleads that "[p]atients, physicians, PBMs, third-party administrators, pharmacy and therapeutic committees, and *third-party payors* detrimentally relied on Defendants' misrepresentations of Xarelto's safety."[210] Those "material" misrepresentations, the complaint alleges, induced Allied and class members to "purchase Xarelto," because "they concerned facts that would have been important to a reasonable consumer in making a decision whether to

---

[207] The defendants perform a cursory choice of law analysis without even considering the Rule 23 intersection implicated by the plaintiffs' complaint. Nor do they consider whether based on Louisiana's choice of law rules, the Court may evaluate choice of law as the plaintiffs have done above.

[208] *See, e.g.*, *In re Nexium (Esomeprazole) Antitrust Litig.*, 297 F.R.D. 168, 176 (D. Mass. 2013) (certifying class where twenty-six state laws were at issue); *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 278-84 (D. Mass. 2004) (certifying end-payor class where twelve states' laws were at issue); *see also In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-md-2503, 2017 WL 4621777, at *11-12 (D. Mass. Oct. 16, 2017) (certifying multi-state end-payor plaintiff class action); *In re Lidoderm Antitrust Litig.*, No. 14-md-2521, 2017 WL 679367, at *27 (N.D. Ca. Feb. 21, 2017) (seventeen states).

[209] *Capiccioni v. Brennan Naperville, Inc.*, 791 N.E.2d 553, 558 (2003); *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513-14 (7th Cir. 2006) ("[A] damages claim under the ICFA requires that the plaintiff was deceived in some manner and damaged by the deception.").

[210] Compl. ¶ 167 (emphasis added); *see also id.* ¶ 199 ("Plaintiffs, Plaintiffs' members, their physicians, and/or healthcare providers reasonably relied on Defendants' information that negligently, fraudulently and/or purposefully did not include facts that were concealed and/or omitted by Defendants.").

purchase Xarelto."[211] Allied and others relied on the defendants' fraudulent messages.[212] These allegations suffice to plead that the defendants' misrepresentations proximately caused the payors' injuries.

The defendants' slim challenge to the payors' Illinois-law-related allegations do not alter this fact: the primary case they rely upon, *Oliveira v. Amoco Oil*, stands only for the proposition that an Illinois consumer protection claim plaintiff cannot simply allege that a market-wide fraud raised the price of the product above what the plaintiff would otherwise have paid.[213] But, as explained above, this is not what the payors allege; so the defendants' argument has no bearing on the payors' claims.[214]

Perhaps nothing makes this more evident than the fact that claims like the payors' were permitted to proceed in another case. In *Forth v. Walgreen Co.*,[215] the court denied a motion to dismiss third-party payor ICFA allegations of fraudulently inflated drug prices—and like the payors here—alleged "that because it reimburses or pays for its beneficiaries' purchases of prescription drugs, it was harmed by paying more for PSC-listed generic drugs than it would have if Walgreens had accurately reported its [] prices."[216] The court held the third-party payor's

---

[211] Compl. ¶ 225; *see also id.* ¶ 188 ("The representations by Defendants, and each of them, were made with the intention of inducing reliance and the prescription, purchase, and use of Xarelto. Plaintiffs and members of the Class justifiably relied upon the information provided by Defendants to their economic detriment."), ¶ 227 ("Defendants intended that Plaintiff ASD Fund, Plaintiff's members and their physicians, PBMs and healthcare providers would rely on their materially deceptive practices and that Plaintiffs and members of the Class would purchase or pay for Xarelto as a consequence of the deceptive practices.").

[212] *See, e.g., id.* ¶ 188 ("The representations by Defendants, and each of them, were made with the intention of inducing reliance and the prescription, purchase, and use of Xarelto. Plaintiffs and members of the Class justifiably relied upon the information provided by Defendants to their economic detriment."), ¶ 167 ("Third-party payors detrimentally relied on Defendants' misrepresentations of Xarelto's safety and efficacy in reimbursing and/or paying for prescriptions of Xarelto's for their members and has suffered actual damages."), ¶ 199 ("Plaintiffs, Plaintiffs' members, their physicians, and/or healthcare providers reasonably relied on Defendants' information that negligently, fraudulently and/or purposefully did not include facts that were concealed and/or omitted by Defendants.").

[213] 201 Ill. 2d 134, 155 (2002).

[214] *See supra* III.D.

[215] No. 17-cv-2246, 2018 WL 1235015 (N.D. Ill. Mar. 9, 2018).

[216] *Id.* at * 2.

claims could proceed because "the complaint adequately allege[d] that IBEW suffered injury as a result of the purported practices,"[217] and that a plaintiff could bring such claims so long as it its "'able to allege that the challenged conduct 'involves trade practices addressed to the market generally *or otherwise implicates consumer protection concerns*.'"[218] And, here, a plethora of the plaintiffs' claims allege this type of behavior, as described above. Therefore, this Court should deny the defendants' motion to dismiss the payors' ICFA claim.

### 3.    LABC's (BCBSLA) and HMO Louisiana's claims under LUTPA should stand.

Pursuant to the Louisiana Unfair Trade Practices and Consumer Protection Law ("LUTPA"), "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are . . . unlawful."[219] Private individuals or entities who "suffer[] any ascertainable loss of money . . . as a result of the use of . . . [unfair methods of competition or unfair or deceptive acts or practices], may bring an action individually but not in a representative capacity to recover actual damages."[220] "Under LUTPA, a business action is deemed 'unfair' when it offends established public policy and when it is 'immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.' A business action is

---

[217] *Id.*

[218] *Id.* at * 9 (quoting *ATC Healthcare Servs., Inc. v. RCM Techs.*, Inc., 192 F. Supp. 3d 943, 955 (N.D. Ill. 2016)).

[219] La. Stat. § 51:1405.

[220] La. Stat. § 51:1409; *accord IberiaBank v. Broussard*, 907 F.3d 826, 840 (5th Cir. 2018) ("'LUTPA grants a right of action to any person, natural or juridical, who suffers an ascertainable loss as a result of another person's use of unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.'" (quoting *Cheramie Servs., Inc. v. Shell Deepwater Prod.*, Inc., 35 So. 3d 1053, 1057 (La. 2010); *Zeigler v. Hous. Auth. of New Orleans*, 118 So.3d 442, 453 (La. App. 4 Cir. 2013)).

'deceptive' when it amounts to fraud, deceit, or misrepresentation."[221] To recover, the unfair or deceptive act must proximately cause damage to the plaintiff.[222]

> a. **All of the elements of LUTPA, including proximate cause and damages, under the LUTPA are well-pleaded in the complaint.**

To plead that the defendants proximately caused BCBSLA and HMO Louisiana's damages, those plaintiffs have pleaded that the defendants committed illegal deceptive acts by engaging in a deceptive advertising scheme that caused them monetary damages. The complaint alleges that the defendants expended large amounts of promotion dollars to accomplish aggressive and deceptive marketing of Xarelto,[223] overstated Xarelto's efficacy,[224] and actively concealed the risks associated with the drug[225] in order to induce BCBSLA and HMO Louisiana, Inc. to purchase or reimburse purchases for Xarelto. The LUTPA count of the complaint pleads that the "[d]efendants intended that Plaintiffs BCBSLA and HMO Louisiana, Inc. *rely on their materially deceptive practices* to purchase Xarelto as a consequence of the deceptive practices," including the representations "to consumers, prescribing healthcare providers and third-party payors through deceptive promotion and the misleading drug labels, that Xarelto was safe and effective in treating patients for the purposes described above."[226] The defendants "intended that "Plaintiffs BCBSLA and HMO Louisiana, Inc., Plaintiffs' members and their physicians, PBMs and healthcare providers would *rely on their materially deceptive practices*"[227] The

---

[221] *Andretti Sports Mktg. Louisiana, LLC v. Nola Motorsports Host Comm., Inc.*, 147 F. Supp. 3d 537, 564 (E.D. La. 2015).

[222] *Byes v. Telecheck Recovery Servs., Inc.*, No. 94-cv-3182, 1997 WL 736692, at *5 (E.D. La. Nov. 24, 1997) (requiring plaintiff to show "legal causation of damage").

[223] Compl. ¶¶112-18.

[224] *Id.* ¶¶ 119-29.

[225] *Id.* ¶¶136-141.

[226] *Id*. ¶ 233.

[227] *Id*. ¶ 238.

misrepresentations, the payors allege "were material to BCBSLA and HMO Louisiana," and "deceived" the payors and "induce[d]" them "to purchase, reimburse[,] or pay for Xarelto."[228] Thus, BCBSLA and HMO Louisiana's payments for Xarelto were the "proximate result" of the defendants' "deceptive and unlawful marketing practices."[229]

These allegations suffice to state a claim that BCBSLA and HMO Louisiana's purchases of Xarelto were deceptively caused by the defendants' misrepresentations and that they incurred damages as a result. The defendants cite *Byes v. Telecheck Recovery Services, Inc.*, in an effort to undermine this conclusion.[230] *Byes* does not stand for the proposition the defendants contend—it stands only for the proposition that, where there is no evidence of reliance at all by the summary judgment phase of the litigation, dismissal is warranted.[231] Here, the payors have alleged that the defendants' misrepresentations concerning the safety of Xarelto were relied upon;[232] they are entitled to test those allegations in discovery.

LUTPA permits BCBSLA and HMO Louisiana to recover as payors in light of their reliance on the defendants' deceptive marketing practices. By corollary, *Rezulin Products Liability Litigation*[233] stands for the proposition that if a defendant directs deceptive marketing materials to a third-party payor, the third party may recover under LUTPA if the deceptive materials caused the third-party payor to "use, purchase, or

---

[228] *Id.* ¶¶ 232, 235, 237.

[229] *Id.* ¶¶ 239-40.

[230] Defs.' Mem. at 44.

[231] *Byes*, 1997 WL 736692, at *5.

[232] *See, e.g.*, Compl. ¶ 167 ("Patients, physicians, PBMs, third-party administrators, pharmacy and therapeutic committees, and third-party payors detrimentally relied on Defendants' misrepresentations of Xarelto's safety.").

[233] 392 F. Supp. 2d at 604–05.

lease"[234] a product. In *Rezulin*, the court did not permit BCBSLA's LUTPA claim to proceed because it did not "use, purchase, or lease" the drug from the manufacturer.[235] Plus there—*unlike here*—the defendant did not direct any of its marketing materials to the entity; rather, they expended all their efforts on marketing to PBMs.[236] That is *not* the case here. Here, BCBSLA and HMO Louisiana have pleaded that they purchased Xarelto and the complaint alleges, for example, that the defendants "fervently marketed Xarelto using print advertisements, online marketing on their website, and video advertisements with no regard to the accuracy and repercussions of their misleading advertising in favor of increasing sales[]" and "widely disseminated [advertisements] to the consuming public[.]"[237] And, again, BCBSLA and HMO Louisiana allege that, in disseminating deceptive materials for Xarelto, the defendants intended that BCBSLA and HMO Louisiana, among others, would rely on the materials to cause the payors to purchase Xarelto at higher costs and the payors did in fact overpay for Xarelto. Therefore, this Court should hold that the payors have adequately pleaded their claims under LUTPA and deny the defendants' motion to dismiss.

### b.   BCBSLA and HMO Louisiana bring their LUPTA claims individually.

In accordance with § 51:1409 of the LUTPA, BCBSLA, and HMO Louisiana plead that they "bring this Count individually and *not on behalf of a Class* pursuant to Louisiana Unfair Trade Practices and Consumer Protection Law" in Count IV of the complaint.[238] Furthermore,

---

[234] *Id.* at 616.

[235] *Id.* The also mentioned that, alternatively, it "did not engage in any transaction intended for its own personal, family, or household use." *Id.*

[236] *Id.* at 604-05.

[237] Compl. ¶¶ 120, 128.

[238] *Id*. ¶ 231.

the plaintiffs exclude LUPTA from the states' consumer protection and unfair trade practices statutes they seek to vindicate in Count VII of the complaint.[239] Hence, the Court should find that the defendants' request to dismiss BCBSLA and HMO Louisiana *individual* LUTPA claims,[240] which are well-pleaded in the complaint, on this basis is meritless and allow the claims to go forward.

### 4. Plaintiffs have stated a claim under the NJCFA, which requires the Court to interpret the statute liberally.

Through the liberal lens required under the New Jersey Consumer Fraud Act ("NJCFA"),[241] the plaintiffs are consumers entitled to recovery under the Act because the plaintiffs have alleged that they purchased Xarelto directly.

Pursuant to the NJCFA, the use of "unlawful practice," such as deception and misrepresentation "in connection with the sale or advertisement of any merchandise" is illegal.[242] The statute defines "merchandise" to "include any objects, wares, goods, commodities, services or anything offered, *directly or indirectly to the public for sale*."[243]

The plaintiffs have sufficiently pleaded their claims under the NJCFA as "consumers" within the meaning construed under the statutory scheme sufficiently. The complaint alleges that the plaintiffs purchased Xarelto; it does not only state that the plaintiffs reimbursed Xarelto purchases.[244] In fact, the complaint defines the class as:

---

[239] *Id.* ¶ 264.

[240] Defs.' Mem. at 45.

[241] *All the Way Towing, LLC v. Bucks Cty. Int'l, Inc.*, 236 N.J. 431, 434 (2019) (citing *Furst v. Einstein Moomjy, Inc.*, 860 A.2d 435, 435 (2004) ("[C]ourts liberally enforce the [NJCFA] to fulfill its objective to protect consumers from prohibited unconscionable acts by sellers.").

[242] N.J. Stat. § 56:8-2.

[243] N.J. Stat. § 56:8-1(d).

[244] *See, e.g.*, Compl. ¶ 14 ("At all times relevant, Plaintiffs have paid and/or provided reimbursement for some or the entire purchase price for Xarelto during the Class Period. As a result of Defendants wrongful conduct alleged herein, Plaintiffs have been injured."); *id.* ¶ 161 ("Plaintiffs have paid and/or provided reimbursement for some or

> All persons or entities in the United States and its territories (other than governmental entities*), who purchased, paid, and/or reimbursed*, in whole or in part, for Xarelto during the period from July 1, 2011 through the present (the "Class Period").[245]

Additionally, the plaintiffs participated in consumer-oriented transactions by effectuating purchases by individual consumers, who used and consumed Xarelto, by paying a portion of the price. These allegations plead "consumer-oriented" types of transactions.[246] Furthermore, the complaint alleges that these consumer transactions harmed them by causing them to pay inflated prices. The plaintiffs plead that the defendants deceived them through their deceptive advertising and marketing and that they purchased Xarelto as a result of the deception. Thus, the Court should rule in favor of the plaintiffs and hold that the plaintiffs are consumer persons within the meaning of the NJCFA and have been harmed by the defendants' actions.

The defendants rely on *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*[247] to support their position that the purchasers are not consumers. In that case, the United States District Court for New Jersey barred third parties from recovering under NJCFA.[248] But the validity of that case as precedent is in severe doubt. It relies on a Third Circuit interpretation of New Jersey state law[249]—an interpretation that one New Jersey state court derided as "unduly

---

the entire purchase price for Xarelto over other readily available, safer, and less costly drugs such as Warfarin and other anticoagulants."); *id.* ¶ 244 ("The direct and proximate result of Defendants' misrepresentations, unlawful schemes and courses of conduct was the inducement of Plaintiffs and members of the Class to purchase, reimburse or pay for Xarelto.").

[245] *Id.* ¶ 169 (emphasis added).

[246] *Id.* ¶ 244.

[247] No. 06-cv-5774, 2009 WL 2043604 (D.N.J. July 10, 2009).

[248] *Id.*

[249] *See id.* (citing *J&R Ice Cream Corp. v. Cal. Smoothie Licensing Corp.*, 31 F.3d 1259, 1271 (3d Cir. 1994)).

restrictive."[250] Even the *Shering-Plough* decision itself recognizes that this view of the law is not black-letter.[251]

**5.      The LPLA does not govern the plaintiffs' claims and therefore the exclusivity provisions under the LPLA do not bar the common law claims as pleaded in Counts I, II, III, and V.**

None of the plaintiffs' causes of action is a products liability claim. As a result, the Louisiana Product Liability Act ("LPLA") does not govern the plaintiffs' claims. The LPLA is the "exclusive remedy" only for *certain kinds* of claims, as summarized by this Court: defective design, defective construction, failure to warn, or breach of an express warranty, where a plaintiff alleges:

> (1) that the defendant is a manufacturer of the product;
>
> (2) that the claimant's damage was proximately caused by a characteristic of the product;
>
> (3) that the characteristic made the product unreasonably dangerous in one of the four ways provided in the statute; and
>
> (4) that the claimant's damage arose from a reasonably anticipated use of the product by the claimant or someone else.[252]

The plaintiffs' complaint does not allege this type of personal injury claim. While the plaintiffs have described the safety risks Xarelto poses, the complaint contains no allegations concerning physical harm Xarelto has caused to the plaintiff as a result of the drug's dangers. The damages that the plaintiffs have alleged arise from the defendants' deceptive acts, such as false marketing—not from any defect in the product.[253] Thus, the defendants' argument that the

---

[250] *Kavky v. Herbalife Intern. of America*, 820 A.2d 677, 679 (N.J. Super. A.D. 2003).

[251] 2009 WL 2043604, at * 17 ("[T]he [*Desiano*] Court pointed out that '[a]lthough this court has not to date held that insurance companies are, in all circumstances, the 'purchasers' of the drugs for which they reimburse pharmacies, we, like several other courts, have indicated that in a variety of contexts they are the buyers.'" (citing *Desiano v. Warner-Lambert Co.*, 326 F.3d 339, 351 (2d Cir. 2003))).

[252] *Jefferson v. Lead Indus. Ass'n, Inc.*, 930 F. Supp. 241, 244-45 (E.D. La. 1996).

[253] The plaintiffs allege that the defendants omitted critical information and misrepresented the facts. Compl. ¶¶ 10, 189-90, 200, 206, 213-17.

LPLA's exclusivity provisions bars the plaintiffs' common law claims have no merit.[254]

Consequently, a finding that plaintiffs have sought damages under the appropriate avenue of

redress is appropriate here and the plaintiffs' common law claims for fraudulent

misrepresentation, fraudulent concealment, fraud and deceit, and unjust enrichment claims[255]

should survive the defendants' motion to dismiss.

### 6.      The payors have stated a claim in redhibition.

Under Louisiana law, a "seller warrants the buyer against redhibitory defects, or vices, in

the thing sold."[256] Redhibition claims require the exchange of a good for a price in money.[257]

And here, the plaintiffs have alleged that the defendants have exchanged the dangerous drug

Xarelto for payment in money.

But the defendants argue that the payors have failed to state a claim for redhibition,

imagining a definition of a "buyer" found nowhere in Louisiana's redhibition article.[258] The

defendants argue that to be a "buyer" for purposes of redhibition requires the purchaser to have

paid the "entire price" of the good, a requirement it elevates from dicta in a footnote in *Louisiana*

*v. Merck & Co. (In re Vioxx Prods. Liab. Litigation)*.[259] However, that is not what *Vioxx* held.

In *Vioxx*, this Court addressed claims by the state of Louisiana, which paid for

prescription drugs prescribed to and used by the state's Medicare and Medicaid insureds.[260]

Merck argued that the state could not state a claim in redhibition because it never took

---

[254] Defs.' Mem. at 46.

[255] Compl. Counts I, II, III, and V.

[256] La. Civ. Code, art. 2520.

[257] La. Civ. Code, art. 2439 (defining a "sale" as "a contract whereby a person transfers ownership of a thing to another for a price in money").

[258] Defs.' Mem. at 46-47.

[259] *See generally* 2010 WL 11570867.

[260] *Id.* at *8.

44

possession of the drug, which was provided directly to the patients.[261] This Court rejected that argument,[262] allowing the redhibition claims to proceed, based on "similar claims regarding the sale of prescription drugs under the laws of other states" where courts "considered insurance companies the buyers in some circumstances."[263] *Vioxx* considered the reasoning of *Desiano v. Warner-Lambert Co.*,[264] in which third-party payors sought to recover only the portion of the prescription they paid, excluding the patients' co-pay.[265] The Second Circuit rejected a broad prohibition on such claims:

> Although this court has not to date held that insurance companies are, in all instances, the "purchasers" of the drugs for which they reimburse pharmacies, we, like several other courts, have indicated that in a variety of contexts they are the buyers.[266]

*Vioxx* does not stand for the proposition the defendants claim: it simply reflects the rule that "courts have long recognized the right of [health benefit providers] to recover from drug companies amounts that were overpaid due to illegal or deceptive marketing practices."[267] Any other rule—such as the one the defendants now urge—"would create an untenable situation whereby drug companies would be immune from redhibition suits for Medicaid funded prescription drugs."[268]

Here, the payors have alleged that they paid for "some or the entire purchase price for Xarelto," and "[a]s a result of Defendants' wrongful conduct alleged herein, Plaintiffs have been

---

[261] *Id.*

[262] *Id.* at *9.

[263] *Id.*

[264] 326 F.3d 339 (2d Cir. 2003).

[265] *Id.* at 345.

[266] *Id.* at 350-51.

[267] *Id.*

[268] *Vioxx*, 2010 WL 11570867, at *9.

injured."[269] As a preliminary matter, the defendants' redhibition arguments do not touch—at all—those Xarelto purchases for which the payors have paid the entire purchase price.[270] In any event, given a proper reading of *Vioxx* and *Desiano*, the result is the same where the payors paid *part* of the price. The payors are the buyers without whom the transaction would never take place. It does not matter that patients who paid co-pays may *also* state a claim in redhibition for their overpayments.[271] Given *Vioxx*'s "recognition that insurance companies, who only pay a portion of the drug price, are buyers under certain circumstances, granting dismissal of Plaintiff's redhibition claim at this stage would be inappropriate."[272]

> 7. **The plaintiffs have stated unjust enrichment claims under the laws of Illinois, Louisiana, and New Jersey.**

The defendants' arguments for the dismissal of the payors' unjust enrichment claims are all derivative of their arguments for the dismissal of the payors' RICO and state-law causes of action. Since the defendants' arguments for dismissal of the RICO and state-law claims fail, as explained above, so too must their arguments regarding unjust enrichment. But even if the defendants' arguments for the dismissal of the RICO and state-law claims are valid (and they are not), the defendants' arguments concerning unjust enrichment under Illinois, Louisiana, and New Jersey law are fatally flawed.

---

[269] Compl. ¶ 14 (emphasis added).

[270] Accordingly, even if this Court adopts the rule the defendants urge, some of the payors' redhibition claims will survive to discovery.

[271] *Contra* Defs.' Mem. at 47.

[272] *Vioxx*, 2010 WL 11570867, at *9.

a.      **Illinois Law**

Both the Illinois Supreme Court and the Seventh Circuit have found that an unjust enrichment claim can stand on its own,[273] even if factually related statutory or common law claims are dismissed.[274] The reason for this is simple. Unjust enrichment claims are premised on "a contract implied in law,"[275] so the law "imposes an obligation upon the defendant to repay a benefit that it obtained at the plaintiff's expense, even in situations where the defendant does not owe a contractual duty to repay and has not committed an independent tort directed at the plaintiff."[276]

The defendants mis-use *Cleary v. Phillip Morris Inc.* to suggest that claims premised on the same factual predicate as other contract, tort, or statutory claims *must* fail if those other claims are dismissed. *Cleary* actually says the opposite: "it appears that the Illinois Supreme Court recognizes unjust enrichment as an independent cause of action."[277] An issue in *Cleary* was distinct from the issue presented here.[278] Nothing in *Cleary*, or any of the other cases the defendants cite, compels the dismissal of the payors' claims here, *even if* the Court were to somehow dismiss the RICO or other state-law claims.

---

[273] *See Cleary v. Phillip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011) ("The Illinois Supreme Court appears to recognize unjust enrichment as an independent cause of action."); *Raintree Homes, Inc. v. Vill. of Long Grove*, 209 Ill. 2d 239, 445 (Ill. 2004) (involving a standalone unjust enrichment claim); *see also Carlson v. Champion Mortg. Co.*, No. 20-cv-2323, 2020 WL 7123067, at *2 (N.D. Ill. Dec. 4, 2020).

[274] *See PECO Pallet, Inc. v. Northwest Pallet Supply Co.*, No. 15-cv-6811, 2018 WL 10601988, at *1 (N.D. Ill. Oct. 29, 2018).

[275] *Stevens v. Interactive Fin. Adv'rs., Inc.*, No. 11-cv-2223, 2015 WL 791384, at *16 (N.D. Ill. Feb. 24, 2015).

[276] *Am. Inter-Fid. Corp. v. M.L. Sullivan Ins. Agency, Inc.*, No. 15-cv-4545, 2017 WL 2506393, at *3 (N.D. Ill. June 9, 2017).

[277] 656 F.3d, 511, 516 (7th Cir. 2011).

[278] *Id.* (examining whether a plaintiff *must* plead other causes of action in addition to unjust enrichment claim).

b.      **Louisiana Law**

Under Louisiana law, an unjust enrichment remedy is available only to "fill a gap in the law where no express remedy is provided."[279] The defendants seek in one breath the dismissal of all of the plaintiffs' causes of action, and seek in the next dismissal of the unjust enrichment claims, alleging other causes of action are available.[280] The defendants cannot have it both ways: either the plaintiffs' other claims should be dismissed, or the unjust enrichment claim should.

The availability of an unjust enrichment claim under Louisiana law (which the plaintiffs have here pleaded in the alternative to their other claims[281]) cannot be determined before a determination that the payors have "no other remedy available."[282] For the reasons articulated above, the payors' RICO and other state-law causes of action should not be dismissed, but rather should be tested on the merits after discovery; so a dismissal of the payors' unjust enrichment claim "at this stage of the litigation would be premature and inappropriate."[283]

The defendants' only other basis for dismissing the Louisiana unjust enrichment claims rests on a forty-year old, distinguishable case: in *Our Lady of the Lake Medical Center v. Cropper*, Cropper was injured while working at Our Lady of the Lake, and his employer paid the bills.[284] Our Lady of the Lake sought reimbursement from Cropper's insurer, the insurer sent the reimbursement check to Cropper, but Cropper did not reimburse his employer.[285] The appellate court held that Our Lady of the Lake did not have an unjust enrichment claim against Cropper,

---

[279] *Oil Mop. LLC v. Chem. S. Transp., Inc.*, No. 20-cv-1073, 2020 WL 7234644, at *3 (W.D. La. Nov. 23, 2020) (citing *Baker v. Maclay Prop. Co.*, 648 So. 2d 888, 897 (La. 1995)).

[280] *Compare* Defs.' Mem. at 11-14 (seeking dismissal the plaintiffs' subrogation claims) *with id.* at 49 (claiming unjust enrichment claims should be dismissed because of the availability of the subrogation claims).

[281] *Cf.* Fed. R. Civ. P. 8(d) (permitting pleading in the alternative).

[282] *Oil Mop*, 2020 WL 7234644, at *3.

[283] *Id.*

[284] 401 So. 2d 403, 404 (La. App. 1st Cir. 1981).

[285] *Id.*

because, as his employer, it was legally obligated to pay for his workplace injuries.[286] Here, by contrast, the payors may be obliged to provide the benefits they offer to their members, but they have no legal obligation to pay the defendants for excess prescriptions written, or prices inflated, as a result of the defendants' fraud. *Our Lady of the Lake* does not stand for the proposition the defendants assert, and in no way compels dismissal of the payors' claims.

### c.    New Jersey Law

Finally, the defendants' arguments for dismissing the New Jersey unjust enrichment claims are nothing more than a reincarnation of their first-person-reliance proximate cause arguments disposed of above.[287] Because the relationship between the defendants' misrepresentations and the payors' injury is sufficiently direct, this argument likewise fails.[288]

## IV.    CONCLUSION

For the foregoing reasons, the defendants' motion to dismiss should be denied.[289]

Dated: January 12, 2021                    Respectfully Submitted,

                                            _____/s/ James R. Dugan, II_____
                                            James R. Dugan, II. (LSBA No. 24785)
                                            David S. Scalia (LSBA No. 21369)
                                            TerriAnne Benedetto  (admitted pro hac vice)
                                            One Canal Place
                                            365 Canal Street, Suite 1000

---

[286] *Id.* at 405.

[287] *See* Defs.' Mem. at 50.

[288] *See supra* III.B.1-3.

[289] By notice filed contemporaneously with this opposition, the payors have voluntarily dismissed their subrogation claims without prejudice. Accordingly, the defendants' arguments for the dismissal of those claims are moot. *See Carter v. United States*, 547 F.2d 258, 259 (5th Cir. 1977) (plaintiff has absolute right to dismiss his complaint under Rule 41(a) prior to the filing of an answer or motion for summary judgment); *Ragsdale v. Classroom Teachers of Dallas, et. al.*, No. 06-cv-863, 2006 WL 3392192 (N.D. Tex. Nov. 15, 2006); *In re Amerijet Int'l, Inc.*, 785 F.3d 967, 973 (5th Cir. 2015) ("Rule 41(a)(1)(A)(i) 'means precisely what it says' by stating that only the filing of an answer or motion for summary judgment terminates the plaintiff's unilateral right to dismiss the action by notice."); 9 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure §2363 (3d ed.) ("A motion to dismiss is neither an answer nor . . . a motion for summary judgment; thus, unless formally converted into a motion for summary judgment under Rule 56 . . . a motion to dismiss under Rule 12 does not terminate the right of dismissal by notice.").

In the event the Court grants any portion of the defendants' motion, the purchasers respectfully request, in the alternative, leave to amend their complaint to meet the Court's concerns.

New Orleans, Louisiana  70130
Telephone:  (504) 648-0180
Facsimile:  (504) 648-0181
E-mail: *jdugan@dugan-lawfirm.com*
        *dscalia@dugan-lawfirm.com*
        *tbenedetto@dugan-lawfirm.com*

Thomas M. Sobol
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA  02142
Telephone: (617) 475-1950
Facsimile: (617) 482-3003
tom@hbsslaw.com

*Attorneys for all plaintiffs and the proposed class*

Richard A. Sherburne, Jr. (LA Bar No. 02106)
Jessica W. Chapman (LA Bar No. 31097)
5525 Reitz Avenue (70809)
Post Office Box 98029
Baton Rouge, Louisiana 70898-9029
Telephone:      (225) 298-1444
Facsimile:      (225) 297-2760
Richard.Sherburne@bcbsla.com
Jessica.Chapman@bcbsla.com

*Attorney for plaintiffs Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana and HMO Louisiana, Inc.*

Art Sadin (TXSBA # 17508)
SADIN LAW FIRM, P.C.
121 E. Magnolia Street, Suite 102
Friendswood, TX  77546
Telephone: (281) 648-7711
Facsimile (281) 648-7799
asadin@sadinlawfirm.com

*Attorney for plaintiff Allied Services Division Welfare Fund*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on January 12, 2021, the foregoing pleading was filed electronically with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to counsel of record by operation of the court's electronic filing system and served on the following counsel for the defendants by electronic transmission:

Susan M. Sharko
Faegre Drinker Biddle & Reath LLP
600 Campus Drive
Florham Park, NJ  07932-1047
Telephone: (973) 549-7000
susan.sharko@faegredrinker.com

Rodney M. Hudson
Faegre Drinker Biddle & Reath LLP
Four Embarcadero Center, 27th Floor
San Francisco, CA 94111-4180
Telephone: (415) 591-7500
rodney.hudson@faegredrinker.com

Chanda A. Miller
Faegre Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Telephone: (215) 988-2700
chanda.miller@faegrerdrinker.com

Kim E. Moore
Irwin Fritchie Urquhart & Moore LLC
400 Poydras Sreet, Suite 2700
New Orleans, LA 70130
Telephone (504) 310-2100
kmoore@irwinllc.com

Irwin Fritchie Urquhart & Moore LLC
400 Poydras Sreet, Suite 2700
New Orleans, LA 70130
Telephone (504) 310-2100
kmoore@irwinllc.com

Andrew K. Solow
Steven Glickstein
Robert M. Glass
Arnold & Porter Kaye Shoeller LLP
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8485
andrew.solow@arnoldporter.com
steven.glockstein@arnoldporter.com
robert.glass@arnoldporter.com

William Hoffman
Arnold & Porter Kaye Shoeller LLP
601 Massachusetts Ave, NW
Washington, DC 20001
Telephone: (202) 942-5000
william.hoffman@azrnoldporter.com

Lindsey C. Boney IV
Bradley Arant Boult Cummings LLP
One Federal Place, 1819 Fifth Avenue North
Birmingham AL 35203-2119
Telephone: (205) 521-8914
lboney@bradley.com

John. F. Olinde
Chaffe McCall LLP
1100 Pydras Street, Suite 2300
New Orleans, LA 70163
Telephone: (504) 585-7241
olinde@chaffe.com


Dated: January 12, 2021                      _____*/s/ James R. Dugan, II*_____

52

1