UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  XARELTO (RIVOROXIBAN)      *      Docket No. 14-MDL-2592
PRODUCTS LIABILITY LITIGATION      *
                                   *
                                   *
* * * * * * * * * * * * * * * * * * * * * * *
                                   *      February 3, 2021
THIS DOCUMENT RELATES TO:          *
                                   *
Louisiana Health Services          *
Indemnity Co. d/b/a Blue Cross     *
Blue Shield of Louisiana, et al    *
V Janssen Research & Development,   *
LLC, et al.                        *
                                   *      Section L
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**REPORTER'S OFFICIAL TRANSCRIPT OF THE HEARING ON THE
MOTION TO DISMISS
BEFORE THE HONORABLE ELDON E. FALLON,
UNITED STATES DISTRICT JUDGE.**

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**APPEARING FOR ARGUMENT:**

For the Plaintiffs:              Dugan Law Firm
                                 BY: DAVID SCALIA
                                 365 Canal Street, Ste. 1000
                                 New Orleans, LA  70130


For the Defendants:              Arnold Porter Kaye Scholer
                                 BY: STEVEN GLICKSTEIN
                                 250 West 55th Street
                                 New York, NY  10019




**REPORTED BY:**       Mary V. Thompson, RMR, FCRR
                       500 Poydras Street, Room 275
                       New Orleans, Louisiana  70130
                       (504)589-7783

**OFFICIAL TRANSCRIPT**

1              **P R O C E E D I N G S**

2                                  (Call to order of the court.)

3          THE COURT:  Dean, call the case.

4          THE CASE MANAGER:  MDL 14-2592, *IN RE: Xarelto Products*

5  *Liability Litigation.*

6          THE COURT:  Counsel, make appearances for the record,

7  please.

8          MR. GLICKSTEIN:  Good morning, Your Honor.  Steven

9  Glickstein for the defendants represented there, but arguing on

10  behalf of the Janssen and Bayer defendants.

11          MR. SCALIA:  Good morning.  David Scalia for the

12  third-party payor plaintiffs.

13          MR. HUDSON:  Good morning, Your Honor.  Rodney Hudson

14  for the Janssen defendants.

15          MS. SHARKO:  Good morning.  Susan Sharko for the

16  Janssen defendants.

17          THE COURT:  Susan.  And I see Lenny on the line.

18          MR. DAVIS:  Good morning, Your Honor.  Leonard Davis,

19  plaintiff liaison co-counsel.  It's a pleasure to see everybody.

20          MR. BIRCHFIELD:  Good morning, Your Honor.  Andy

21  Birchfield.  I'm just listening in.

22          THE COURT:  Of course.

23          MS. CHAPMAN:  Good morning, Your Honor.  Jessica

24  Chapman on behalf of Blue Cross Louisiana.

25          MR. OLINDE:  Your Honor, this is John Olinde.  Good to

*00:00:10* (line 10)
*00:00:29* (line 15)
*00:00:45* (line 20)
*00:00:58* (line 25)

**OFFICIAL TRANSCRIPT**

1    see you.  I'm going to be stopping the video for me so we won't

2    have too many people on, but good to see you.

3         THE COURT:  Folks, let me make a couple of comments.

4         The case arises out of an alleged unfair or deceptive

*00:01:13*   5    marketing practice by the defendant pharmaceutical companies that

6    manufacture Xarelto.

7         Three third-party payors, Louisiana Health Service

8    Indemnity Company doing business as Blue Cross and Blue Shield,

9    Allied Services Division Welfare Fund, and HMO Louisiana, brought

*00:01:42*   10   this action on behalf of themselves and particular third-party

11   payors seeking to recover the amounts paid by the plaintiffs to

12   fill Xarelto prescriptions dispensed to their insureds.

13        The plaintiffs allege that they paid for Xarelto

14   prescriptions at higher prices as a result of defendants'

*00:02:11*   15   fraudulent and misleading conduct, and that Xarelto would have

16   been restricted or priced differently if the defendants had put

17   forth what they say is truthful information and complete

18   information to the medical community.

19        The defendants deny the plaintiffs' allegations and

*00:02:33*   20   have filed this motion to dismiss.

21        Let me say that I know that the plaintiffs have made a

22   number of claims, but it seems to me that kind of across all of

23   those claims is a question of proximate cause.  So I don't want

24   to inhibit your arguments, but focus me on proximate cause.  That

*00:03:04*   25   seems to me to be present in each of the theories of the

**OFFICIAL TRANSCRIPT**

1  plaintiffs.

2          I'll hear from the moving party on the defendants'

3  motion to dismiss.  Steve, are you going to make an argument?

4          MR. GLICKSTEIN:  Yes.

5          THE COURT:  Okay.

6          MR. GLICKSTEIN:  Good morning, Your Honor.  It's nice

7  to see you, and I have to say it's different putting on a suit

8  again.

9          Your Honor, before we -- I will be focusing on

10  proximate cause, Judge, but I thought it might be worthwhile,

11  just in a minute or a minute and a half, to kind of summarize

12  where we are in the litigation.

13          The MDL was formed more than six years ago, in

14  December 2014.  We had over 30,000 personal injury cases.  We had

15  six bellwether trials, three before Your Honor and three in

16  Philadelphia, all of which defendants won.  After those defense

17  judgments, at Your Honor's request the parties considered a

18  global resolution.  We did settle globally.

19          I think perhaps relevant to this case is any

20  third-party payor whose insured was a personal injury plaintiff

21  had their liens satisfied.  There are only three personal injury

22  cases that remain.

23          You know, unlike many MDLs, we've had no Department of

24  Justice or state attorney general actions, and so virtually the

25  last thing that remains in the MDL is this third-party payor

00:03:20

00:03:35

00:03:58

00:04:23

00:04:44

**OFFICIAL TRANSCRIPT**

1   case.  And I may lapse into calling them TPPs, these third-party
2   payors; and if I do, Your Honor will know what I mean.
3   This case was filed about five and a half years ago in
4   August of 2015.  They filed an amended complaint in September of
5   2015.  And if I ever cite to a complaint, I'm referring to the
6   amended complaint.
7   THE COURT:  Okay.
8   MR. GLICKSTEIN:  And I think one of the things that we
9   should keep in mind is that, except for the injury alleged --
10  economic versus personal injury -- and for the circuitous
11  derivative nature of the causal chain that's the subject of this
12  motion, you know, the factual allegations of alleged
13  misstatements in the First Amended Complaint are identical to
14  those that were fully litigated in the six bellwethers that the
15  personal injury plaintiffs lost.
16  And I joke that the copyright laws apply when you line
17  up the PSC's master complaint with the third-party payor's master
18  complaint.  The third-party payors would probably owe Lenny Davis
19  and Andy Birchfield some money for certain copyrights, but
20  they're the same claims.
21  And the case -- you know, even though the factual
22  allegations are identical as to the personal injury cases, this
23  case has been dormant for five and a half years.  The third-party
24  payors didn't participate in common discovery, and really nothing
25  had happened until we activated the case by this motion, and that

00:05:08

00:05:26

00:05:55

00:06:16

00:06:37

**OFFICIAL TRANSCRIPT**

1   brings us to the motion to dismiss.

2        There is a theory of indirect injury.  That's their

3   only theory.  Their claimed injury is based on the actions and

4   decisions of physicians and pharmacy benefit managers -- who

5   sometimes I call PBMs -- and it's not a theory of direct

6   causation based on any action or failure to act that the third

7   party -- the named third-party payors took themselves.

8        And I thought it's worth kind of reading their brief to

9   describe their allegations, and this mirrors also Paragraphs 159

10   and 160 of their amended complaint.

11        They say, and I quote:  The defendants misrepresented

12   the safety and efficacy of their drugs to physicians and pharmacy

13   benefit managers inducing physicians -- not them -- inducing

14   physicians to prescribe Xarelto and inducing pharmacy benefit

15   managers -- not them -- to put Xarelto on their formulary, and

16   that these actions by the physicians and the pharmacy benefit

17   managers in turn caused the payors to pay for the prescriptions.

18        So the claimed economic injury is not the direct result

19   of the plaintiffs' own response to defendants' statements --

20   there's nowhere in the complaint where these three named

21   plaintiffs say they received or acted upon those statements --

22   but that their claim is entirely derivative of the actions taken

23   by independent decision-makers, namely, physicians and PBMs.

24        So the question I think that's raised in our motion

25   that Your Honor has to decide is does the law allow such a

**OFFICIAL TRANSCRIPT**

1    derivative theory of proximate causation?

2         And before I answer that question, I would like to take

3    one issue off the table.  It's very relevant to the motion, but

4    in every one of these third-party payor cases that I've been

5    involved in, the plaintiffs cry to the judge, who has to decide

6    the motion, and say, If you don't allow us to survive the motion

7    to dismiss, the defendants have a free pass on a fraud; there is

8    no remedy.  And I would like to emphasize that enforcing the

9    direct relationship proximate cause requirement does not mean

10   that third-party payors have no remedies for fraud.

11        Now, needless to say, we don't agree there was any

12   fraud.  The amended complaint omits that we warned of the risk of

13   fatal bleeding.  We have won six judgments.  The fact is that

14   physicians continue to prescribe Xarelto and PBMs continue to put

15   it on their formularies and third-party payors continue to

16   reimburse for it, which is certainly inconsistent with a fraud

17   that was allegedly discovered five and a half years ago.

18        But even putting all of that to one side, all right,

19   and even accepting the plaintiffs' allegations as true, and

20   hypothesizing that there was a fraud, third-party payors are not

21   without a remedy if a pharmaceutical company commits a fraud.

22   There are two potential remedies.

23        The first is a direct claim.  And, you know, if a

24   third-party payor believes a manufacturer has made a false

25   statement about a medicine, and actually acts upon the

**OFFICIAL TRANSCRIPT**

1  defendant's statement itself, it has a claim for direct injury.

2  But these plaintiffs, as alleged in their direct claim, they

3  don't say they've done anything.  They say other people have

4  taken actions based on those statements and they're indirectly

00:11:22  5  harmed by those actions of the other people.

6        So that's one potential remedy if the facts support it,

7  but the plaintiffs don't allege it, and presumably because, like

8  many third-party payors, they don't make their own formulary

9  decisions.

00:11:45  10        The second -- and this is, I think, important to keep

11  in mind -- is subrogation.  You know, subrogation is the

12  traditional remedy, Your Honor, for insurers that seek to recover

13  money they reimbursed on behalf of their insureds.  And in a

14  subrogation case, as you know, the insurer stands in the shoes of

00:12:10  15  the insured and has to prove, you know, the insured's case.  In

16  this case, the Xarelto user's case.

17        And if a third-party payor believes that physicians

18  prescribed Xarelto based on false information, it can bring a

19  claim in the name of the Xarelto user who was insured in a

00:12:32  20  certain claim.  Of course, they have to show what the insured's

21  physician -- what they would have done differently.  And the

22  defendants could defend by showing the circumstances of that

23  particular patient's case, and why they needed medicine, and why

24  Xarelto was a match for them, and that the physician was fully

00:12:50  25  informed before it was prescribed.

**OFFICIAL TRANSCRIPT**

1    So, you know, the fact is that Allied never asserted a
2  subrogation claim; and the two Louisiana plaintiffs originally
3  asserted a subrogation claim, and, in the face of our motion to
4  dismiss, withdrew the subrogation claim.
5    So there is a claim, they're just not asserting it.
6  And so the problem isn't the absence of a remedy, it's that they
7  don't have a way to prove the remedy.  And the fact they don't
8  plead and prove the remedy doesn't entitle them to sort of a
9  fraud-like remedy where they can avoid having to meet the
10  requirements of proximate cause through the back door via the
11  doctors and PBMs.
12    Now we turn to the particular problems with the
13  plaintiffs' -- I think it's three attempts at a fraud-like claim.
14    First there's proximate cause; direct versus indirect
15  injury.
16    Second, there's Rule 9(b)'s requirement to plead
17  circumstances of fraud with particularity.
18    And third, there's the problem of an aggregate versus
19  individual causation.
20    And all three of these I think are artifices designed
21  to avoid plaintiffs having issues with their insureds, pleading a
22  case and proving a subrogation claim.
23    Regarding proximate cause, here are what I think are
24  some inarguable legal propositions.
25    First, we and the plaintiffs agree that the proximate

**OFFICIAL TRANSCRIPT**

1   cause cast under RICO and proximate cause cast under state law
2   are the same -- that's at Pages 26 and 27 of the brief -- and so
3   we can take off the table whether there's any distinction here
4   between federal and state law.

5            The second, proximate cause is not the same as the
6   "but for" cause.  Reading through the plaintiffs' brief, you get
7   the impression that they say, We can prove "but for" cause;
8   therefore, proximate cause.  The Supreme Court in the *Holmes* case
9   rejected that very proposition, and I think it's important enough
10  that I should read you the two sentences from *Holmes* on that very
11  proposition.

12           At 503 U.S. at 265-267, *Holmes*, the Supreme Court said:
13  RICO can, of course, be read to mean that a plaintiff is injured
14  by reason of a RICO violation, and therefore may recover simply
15  on a showing that the defendant violated the statute.  The
16  plaintiff was injured and the defendant's violation was a
17  "but for" cause of the plaintiff's injury.  This construction is
18  hardly compelled, however, and the very unlikelihood that
19  Congress meant to allow all factually injured plaintiffs to
20  recover persuades us that RICO should not get such an expansive
21  reading.

22           So under *Holmes*, you know, in addition to the "but for"
23  clause, the law imposes this added requirement of proximate
24  cause.  And *Holmes* describes that as the judicial tool used to
25  limit a person's responsibility for an alleged tort, and that

00:15:04
00:15:30
00:15:56
00:16:18
00:16:42

**OFFICIAL TRANSCRIPT**

1   exact quote is at 503 U.S. 268.

2           So what is proximate cause?

3           You know, proximate cause, under Supreme Court

4   authority, requires that there be a -- and I'm quoting again --

5   direct relation between the injury asserted and the injurious

6   conduct alleged.  A direct relation.  And that standard is not

7   only in *Holmes,* but in every Supreme Court case that has

8   addressed the issue since *Holmes,* whether it be *Anza* in 2006,

9   *Bridge* in 2008, or *Hemi Grp* in 2010.

10          And the next general principle -- and then we'll get to

11  the specifics -- is that direct relation does not equal

12  foreseeability.  Foreseeability is a component of proximate

13  cause, but direct relation is independent and an additional

14  requirement of proximate cause.

15          And let me read to Your Honor what the Supreme Court

16  said in *Hemi Grp* about the relationship between -- about the twin

17  concepts of direct relationship and foreseeability.

18          And I'm now reading at 559 U.S. 12.

19          "The concepts of direct relationship and foreseeability

20  are, of course, two of the main shapes proximate cause took in

21  common law.  Our precedents make clear that in the RICO context,

22  the focus is on the directness of the relationship between the

23  conduct and the harm.  Indeed, *Anza* and *Holmes* never even mention

24  the concept of foreseeability."

25          So we take these general principles.  "But for" is not

*00:17:01*
*00:17:28*
*00:17:54*
*00:18:17*
*00:18:38*

**OFFICIAL TRANSCRIPT**

1  enough; it has to be a direct relationship.  It's not the same.

2  It's more than just foreseeability.  And there are a lot of cases

3  that apply those general legal principles in the context of

4  third-party payors to say that either physicians or pharmacy

5  benefit managers took some action which indirectly caused them

6  some harm by causing them to pay for a prescription.

7  Your Honor's decision in *Vioxx* was one of those.  And I

8  would like to discuss *Vioxx* in some detail because it's your

9  decision, and I think it really disposes of this case.

10  There were three series of causations in *Vioxx*.

11  First, the doctors would have prescribed -- that

12  doctors that received false information would have prescribed

13  *Vioxx* last having then to choose.

14  Second, that the third-party payor -- in that case

15  Louisiana Medicaid -- would have implemented a formulary that

16  limited but didn't entirely prohibit *Vioxx,* which in turn would

17  have caused physicians to write fewer prescriptions.

18  And then the third theory was that the third-party

19  payor itself, Louisiana Medicaid, would have taken *Vioxx* off its

20  formulary altogether.

21  You know, as to the first theory of causation, the

22  physicians would have written fewer prescriptions had Merck not

23  concealed the alleged fraud, Your Honor said, and I quote:  There

24  was a tenuous causal relationship -- or a tenuous causal

25  connection, that's the quote -- insufficient to establish

**OFFICIAL TRANSCRIPT**

1   proximate causation.

2          And Your Honor's reasoning was as follows, and I'm

3   quoting.  This is at, I think, Pages -- starts at 6-7 of your

4   decision.

5          "Each decision by each doctor and each patient was

6   different.  The effect any alleged misrepresentation had on each

7   decision is unique.  Many patients would have chosen to use *Vioxx*

8   even if they had been fully informed of the risks associated with

9   it.  Likewise, many doctors may have weighed risks and benefits

10  of the drug, and felt that in the specific case prescribing *Vioxx*

11  was an acceptable risk."

12         Plaintiffs' theory in this case that they were injured

13  because of the defendants' alleged fraud -- you know, alleged

14  statements of how Xarelto induced doctors to write more Xarelto

15  prescriptions -- is no different between what Your Honor found

16  insufficient as a matter of law in *Vioxx*.  The facts are the

17  same, and so that theory of causation should be out.

18         Now, the second theory, as they said, was based on --

19  in *Vioxx* was based on the argument that the third-party payor

20  would have restricted but not prohibited access to *Vioxx* on the

21  formulary.  It's sort of like imposing a prior authorization

22  requirement.

23         Your Honor also found that that theory was insufficient

24  as a matter of law.  Your Honor said -- and again I'm quoting --

25  "Assuming arguendo that LDHH would have chosen to remove *Vioxx*

**OFFICIAL TRANSCRIPT**

1  from its preferred drug list, doctors would have still been able

2  to prescribe *Vioxx*.  They merely would have had to make a phone

3  call prior to doing so."

4       And although said step might very well have discouraged

00:22:46  5  some doctors, it would not have discouraged all.  Again, under

6  this theory, plaintiff would have to show that each individual

7  with doctor would have chosen not to seek prior authorization

8  which would have been granted had it been sought.

9       So in our case, Your Honor, the causal chain is even

00:23:10  10  more remote under this theory than it was in *Vioxx*.  In *Vioxx*

11  there was no PBM so there was only one set of independent

12  decision-makers between the alleged fraud and Louisiana

13  Medicaid's injury, the physician.  And in this case we've got --

14  there is a PBM, and so there are two independent decision-makers

00:23:34  15  between the alleged fraud and the plaintiffs' alleged injuries,

16  physicians and PBMs.

17       So this case, on the second theory of restricting but

18  not eliminating Xarelto from the formulary, should follow

19  *a fortiori Vioxx* and it should be dismissed.

00:24:00  20       The third theory in *Vioxx* was based on allegations that

21  the third-party payor had discretion to refuse all Vioxx

22  prescriptions altogether, and that the third-party payor would

23  have done so had the true potential injury been disclosed, and

24  Your Honor did find in *Vioxx* that those allegations were

00:24:25  25  sufficient to allege proximate causation.

**OFFICIAL TRANSCRIPT**

1    But the chain -- all right, there is an important

2 difference between Xarelto and Vioxx concerning the chain of

3 causation, and that difference makes all the difference in the

4 world in terms of directness or indirectness of the injury.  As

*00:24:49* 5 they said in *Vioxx*, there were no pharmacy benefit managers.  The

6 third-party payor, Louisiana Medicaid, alleged a direct claim

7 that Louisiana Medicaid itself -- not a third party, itself --

8 would have removed Vioxx from the formulary.

9    In this case the three named plaintiffs don't allege

*00:25:12* 10 they made formulary decisions.

11    Let me repeat that because it's key.

12    Louisiana Blue Cross, HMO Louisiana, and Allied, they

13 do not allege that they make their own formulary decisions.

14 Instead, they allege that independent decision-makers, pharmacy

*00:25:31* 15 benefit managers, who plaintiffs concede are outside vendors and

16 whom plaintiffs concede are not their agents and are at arm's

17 length with them -- those PBMs would have to make the decision in

18 their own judgment whether or not to remove Xarelto from the

19 formulary if they had received different information.

*00:25:57* 20    And if we're looking for the contention that these are

21 outside vendors, I refer Your Honor to the amended complaint,

22 Paragraph 160.  And for the contention that the PBMs are not

23 their agents, look at Pages 2 and 25 of their brief.

24    Legally a claim that injury derives from a decision of

*00:26:22* 25 a PBM exercising its own independent judgment is no different

**OFFICIAL TRANSCRIPT**

1   from a claim that Your Honor rejected in *Vioxx* that the injuries

2   derived from a decision of a physician exercising his or her own

3   independent judgment.  Both are equally indirect, both are

4   equally tenuous, to use Your Honor's words, and both are equally

5   flawed.  So I respectfully suggest that *Vioxx* disposes of this

6   case.

7         Now, of course *Vioxx* isn't the only decision on point.

8   It doesn't stand alone.  We cited to Your Honor the decisions in

9   the Second, Seventh, and Eleventh Circuits that go the same way

10   and reject claims by third-party payors asserting derivative

11   injury from the decisions of independent third parties.

12         All of these decisions --

13         THE COURT:  How do you deal with the First and the

14   Ninth -- how do you deal with the First and Ninth Circuit cases,

15   Steve, that go the other way -- or seem to go the other way?

16         MR. GLICKSTEIN:  Obviously, Your Honor, the circuits

17   flip, and the Fifth Circuit hasn't weighed in, but I would

18   respectfully suggest that the First and Ninth Circuit decisions

19   are wrong for a couple of reasons.

20         You know, first is that the First and Ninth Circuits

21   have -- the reasons for their decisions were based on

22   foreseeability; that the result of the defendant making the

23   statement is it's foreseeable that a third-party payor would be

24   paying more.

25         And you can get the quotes from those cases.  The

*00:26:50*
*00:27:15*
*00:27:37*
*00:27:58*
*00:28:24*

**OFFICIAL TRANSCRIPT**

1 lines, though, that we quote are at Pages 26 and 27 of our

2 opening brief.

3     But the Supreme Court in *Hemi Grp* rejected

4 foreseeability as a *sine qua non* of proximate cause. *Hemi Grp* --

00:28:46   5 and I read the quote to Your Honor -- expressly said it rejected

6 the argument that would have RICO's proximate cause requirement

7 turn on foreseeability rather than on the existence of a

8 sufficiently direct relationship between the fraud and the harm.

9 That's at 559 U.S. 12.

00:29:09  10     A second problem I think that they have is that, you

11 know, the cases rely on -- they over-read another Supreme Court

12 case called *Bridge,* and this is a case that the plaintiffs

13 principally relied on.

14     And, you know, to be sure, Your Honor, the

00:29:31  15 Supreme Court in *Bridge* did say there could be a circumstance in

16 which the injured party did not itself review and act upon the --

17 review and rely on the allegedly false statement.  But when you

18 look at the narrow circumstances that existed that led to that

19 ruling in *Bridge*, you can see readily why it doesn't apply here.

00:30:04  20     *Bridge* involved tax liens, and in the event -- a county

21 was auctioning off tax liens, and, in the event of a tie, they

22 would be assigned to bidders on a rotational basis.  And there

23 was a rule against submitting multiple bids so that you couldn't

24 rig the system.  And what happened is the defendant in that case

00:30:32  25 submitted multiple bids under straw bids, and under the law the

**OFFICIAL TRANSCRIPT**

1   county was required, automatically, in a predetermined way

2   without discretion, to assign bids on a rotational basis which

3   meant that if you violated the rule against submitting multiple

4   bids, you automatically, without discretion, got more than your

*00:31:03*   5   fair share and the other bidders were cheated.

6          That has nothing to do with the situation in this case

7   where the people who are alleged to rely and act upon the

8   information are independent physicians and independent PBMs

9   making decisions and relying on their own discretion, and who

*00:31:29*   10  have all sorts of independent professional and business reasons

11  for continuing to -- for continuing to prescribe Xarelto.  It's

12  not if A, automatically B.

13         But Your Honor doesn't have to take my word for the

14  distinction between *Bridge* and third-party payor cases.  I think

*00:31:52*   15  I can refer Your Honor instead to Circuit Judge Frank Easterbrook

16  who authored the Seventh Circuit decision in *Bridge* that was

17  affirmed by the Supreme Court, and he also authored the Seventh

18  Circuit decision in *Sidney Hillman* which was a third-party payor

19  case.

*00:32:11*   20         And his decision in *Bridge* -- which is 477 F3d 928, and

21  his decision in *Sidney Hillman* is 873 F3d 574.  Here is what the

22  same judge who wrote those opinions said, "Disentangling the

23  effects of the improper promotions from the many other influences

24  on physicians' prescribing practices would be difficult -- much

*00:32:48*   25  more difficult than following the one-step causal link in

**OFFICIAL TRANSCRIPT**

1    *Bridge*."

2          And so I would respectfully submit to Your Honor that

3    the First and Ninth Circuit decisions are wrong.  The Second,

4    Seventh, and Eleventh are right.  And Your Honor's decision in

5    *Vioxx* is right.  It's more consistent with the totality of

6    Supreme Court precedent.  And the fact is, as a matter of common

7    sense, we know that physicians and PBMs make these decisions

8    based on their own professional and business reasons, and that

9    the plaintiffs' claim here of fewer prescriptions is entirely

10   dependent on those physicians.

11         THE COURT:  Let me ask you one question.

12         The plaintiffs take the position that this is a

13   12(b)(6) motion that you're filing, and therefore I have to

14   assume -- or take into consideration everything that they say in

15   their pleading as true and correct.  And they say that they have

16   been misled -- or that the prescribers have been misled, and, as

17   a result, they sustained damages.  Do I just assume that that's

18   right or take that as a given?

19         MR. GLICKSTEIN:  Well, you can assume the facts are

20   true, but you can't assume that the legal conclusions are true.

21         So they do not allege that they -- they do not allege

22   as a fact that they themselves relied -- received, relied, or

23   took action on any of the statements by defendants.  The fact

24   that they allege that Your Honor has to assume as true is that

25   physicians and PBMs relied and acted upon the defendants'

**OFFICIAL TRANSCRIPT**

1   statements.  And those facts as stated do not support the legal

2   conclusion that there is a direct relation between the party and

3   the statement and the alleged harm.  So, no, you don't assume the

4   legal conclusions.

5          And I will say that in *Vioxx* Your Honor rejected the

6   theory of causation.  It was not dependent on any case-specific

7   facts developed in the record.

8          The Seventh Circuit in *Sidney Hillman* was a 12(b)(6)

9   decision.  The Eleventh Circuit was a 12(b)(6) decision.  So I

10  think you can decide this on a motion to dismiss, and should,

11  because they haven't alleged a direct injury.

12         THE COURT:  Okay.  Let me hear from the plaintiffs at

13  this time.

14         MR. SCALIA:  Morning, Your Honor.  David Scalia.  I'm

15  sorry, my mic was off.  I just turned it back on.

16         THE COURT:  Okay.

17         MR. SCALIA:  Let me first talk a little bit about the

18  prescription drug industry in this country and how it works.  I

19  think it's instructive and will be helpful in rendering a

20  decision in this case.

21         Pharmaceuticals in this country are not paid for by

22  patients by and large.  About 85 percent of the prescription

23  drugs that are paid for in the United States are paid for by two

24  sources:  The third-party payors, such as our clients here, and

25  government payors.  And the government payors are administered by

*00:35:06*

*00:35:27*

*00:35:44*

*00:36:04*

*00:36:28*

**OFFICIAL TRANSCRIPT**

1   third-party payors.  What remains is a very small percentage of

2   all of the pharmaceuticals that are paid for by anybody other

3   than our clients.

4          In order for those drugs to be paid for by our clients,

00:36:54   5   they have to be listed on a formulary.  And as Your Honor may or

6   may not know, formularies are created by PBMs.  They are a

7   product of the PBM through their national P&T committees' and

8   value committees' review of manufacturers' clinical studies,

9   marketing, and sales pitches that come through representatives

00:37:37   10   who visit PBMs.  All of these things are considered, and the

11   value and the cost of the drug is considered, and the drug makes

12   it to a formulary.

13          And this is very important to the defendants, because

14   if the drug doesn't get on the formulary, it doesn't matter how

00:37:55   15   many prescriptions a doctor may want to write, nobody is going to

16   pay for it.  If it's not on the formulary, the third-party payor

17   is not paying the bill.  And certainly the patient is not going

18   to pay for it when you're talking about drugs that cost $350,

19   $400, and sometimes $1,000.  You know, lots of money.

00:38:23   20          And the way it works now is that that patient will pay

21   $15 or $10, and the third-party payor picks up the balance.  And

22   that's workable.  But if it's -- if the drug is not on the

23   formulary and the doctor writes a prescription, so what?  Nobody

24   pays for it.

00:38:42   25          So in the context of this case, and in the context of

**OFFICIAL TRANSCRIPT**

1    any RICO case, it is the third-party payor who is the victim.

2    They're the only ones that pay the money, and so of course

3    they -- you know, they're paying for drugs that are on

4    formularies.  And they rely on PBMs to make those decisions to

5    put them on the formulary.  And then of course third-party payors

6    have their own P&T committees that review drugs -- new drugs and

7    clinical studies and so forth, and they can contribute with their

8    PBMs and their contracting.  But by and large, I think, you know,

9    it's probably a correct statement to say that the decision to put

10   it on a formulary belongs with the PBM.

11          But this gets us -- you know, this is a little bit of

12   the background and a little bit of understanding of how the

13   market works, and so now we can get on to proximate cause.

14          You know, the defendants -- if we look at *Hemi Grp*, the

15   case tells us that proximate cause requires wholly a causal

16   connection that is not too remote, that is not purely contingent,

17   and is not indirect.

18          Well, I think, Your Honor, it is not too remote to

19   suggest that the injury in this case works the only way it can

20   work.  The plaintiffs suffered the harm because they're paying

21   for the drug.  The only way they can pay for the drug is if it

22   gets onto the formulary, and the entire intent of all the

23   defendants' actions is to get the drug onto the formulary.  You

24   know, you follow the money in the causal chain here to figure out

25   who is injured and why they were injured.

**OFFICIAL TRANSCRIPT**

1       You know, these types of cases have damages.  This is a

2 RICO case, basically.  And it's no secret that we have alleged

3 other causes of action, but the main thrust of this case is that

4 it's a RICO case.

5       And there are plenty of RICO cases where, in these

6 exact same circumstances, circuits across the country have

7 approved of it.  One for example is the *Avandia* case out of the

8 Third Circuit.  On a motion to dismiss, basically the same

9 arguments that the defendants are making here were made, and the

10 Third Circuit disagreed.

11       I recall in that argument it was brought up -- you

12 know, the *Bridge* case, which of course we rely on.  It talks

13 about the proximate cause protecting the primary victim of the

14 wrongful conduct to obtain compensation.  The victim in these

15 cases is the third-party payors.  They're the only ones buying

16 the drug.  They are not the primary victim; they are the only

17 victim.  So, you know, if we follow that line of reasoning that

18 was in the *Neurontin* case and that follows the *Bridge* line of

19 reasoning, the third-party payors here are the primary victims

20 and the only victims.

21       Also, Your Honor, I point out that *Bridge* looked at --

22 in determining the RICO cause of action, they looked at the

23 language and they made an analysis comparing the RICO to the

24 anti-trust cause of action.  I don't believe that if we were here

25 today on an anti-trust case for these third-party payors, that

00:41:28

00:41:53

00:42:24

00:42:45

00:43:15

**OFFICIAL TRANSCRIPT**

1  there would be any argument but that the plaintiffs in this

2  case -- the third-party payors in this case do in fact have a

3  cause action, but we're here on a RICO cause of action.

4  When the comparison was made in the Supreme Court, they

00:43:45

5  said, What can we draw, basically, from the anti-trust cause of

6  action to understand the cause of action in the RICO context?

7  And, you know, the Court's analysis was predicated on a

8  comparison between those two lines of authority.

9  And if you -- they have the same statutory language and

00:44:07

10  they have the same statutory intent, which is to enable the

11  private enforcement of the law.  Well, that's again the

12  third-party payors being the ones -- being the party that's

13  injured.  They are the ones that you would look to, to enforce

14  this private -- to act as private attorneys general to pursue

00:44:33

15  this RICO case.

16  I also think, Your Honor, that the *Vioxx* case cited by

17  the defendants and decided by Your Honor ten years ago was in

18  fact a case decided on a motion for summary judgment, which is

19  way past where we are right now.  Obviously the case had already

00:45:05

20  bypassed the hurdle of the 12(b)(6) motion, which is where we are

21  here, and made it to the motion for summary judgment stage.

22  It also, I believe, was decided based upon the state

23  law -- Louisiana state law regarding the establishment of a

24  formulary.  You know, whether or not the Department of Health and

00:45:35

25  Hospitals could restrict their formulary so as to not include the

**OFFICIAL TRANSCRIPT**

1  drug, the Vioxx, in question.

2          I think those were issues that were important to the

3  Court's decision in that case.  And, of course, again it was

4  decided, as I said, on a motion for summary judgment and predated

*00:45:59*  5  some of the other cases.  It's a 2015 or 2016 decision, and

6  *Avandia* was decided well after that.

7          In any event, as I said, I believe that it's too early

8  in the game to be making that decision.

9          THE COURT:  With regard to too early in the game, you

*00:46:33*  10  know, I've had this case now since 2015.  I've participated in

11  six bellwether trials -- I've participated in most of them.  I've

12  handled all of the discovery in this case.  I relied on

13  magistrates in that aspect of the case for exigency purposes.  So

14  a lot has gone past this.  We're six years into the case now.  It

*00:47:06*  15  seems to me we ought to be further.

16          MR. SCALIA:  Well, I understand it's six years into the

17  case, but by and large, Your Honor -- and you know this -- the

18  case -- from its inception up until just recently when the

19  defendants filed their motion to dismiss, the case dealt

*00:47:21*  20  primarily with the personal injury aspect.  In fact, entirely

21  with the personal injury aspect.

22          And so the third-party payor plaintiff case was filed,

23  but -- and I don't know if this is a -- you know, if there were

24  any talks of a stay of the litigation or if there were

*00:47:48*  25  discussions between counsel for third-party payors at the time

**OFFICIAL TRANSCRIPT**

1  when the case was filed and counsel on the plaintiffs'

2  committee -- lead counsel on the plaintiffs' committee and

3  defendants to say let's set this case aside while we deal with

4  the personal injury aspects of this case, which is by far the

00:48:13  5  largest portion, and then pick this up.

6         You know, I know there's been discovery -- tons of

7  discovery, as I've heard about it, but there's been no

8  third-party-payor-specific discovery conducted.  There are no

9  expert reports done on behalf of third-party payors regarding

00:48:41  10  some of what I just talked about, about how drugs end up on

11  formularies and how we would calculate damages at the end of the

12  day.  You know, whether PBMs, as a general rule across the

13  country, rely on the type of information that we believe has been

14  mischaracterized by the defendants.

00:49:08  15         These are all sorts of things that, you know, we

16  anticipated would come through the discovery process after the PI

17  portion of the case was resolved, so I think that's why not a lot

18  has gone on.

19         And going back --

00:49:27  20         And not anything, really, has gone on, on the

21  third-party payor case.

22         Going back, I want to mention the subrogation argument

23  that was advanced by counsel, you know, saying that the

24  plaintiffs have -- the third-party payor plaintiffs have a remedy

00:49:50  25  in subrogation.  That remedy only -- that's only subrogation for

**OFFICIAL TRANSCRIPT**

1 the amounts of money that we expended for those plaintiffs --

2 those personal injury plaintiffs who suffered an injury.  Our

3 allegations -- our allegations in this case are far more

4 extensive than the drug was bad and it caused people injury and

5 we're entitled.

6        What we're suggesting here, Your Honor, is that this

7 drug never would have been on the formulary, or it wouldn't have

8 been on the formulary at the preferred level that it is, and we

9 wouldn't have -- and so we wouldn't have paid for the drug at --

10 the price would have been the same, but our payment would have

11 been less because --

12        THE COURT:  How do you know that?  It's still on the

13 market and you're still paying.  I assume you know everything

14 that you're saying now, but you're still paying the same amount.

15        MR. SCALIA:  Well -- but there's been new information

16 come out and new -- you know, I think there's some antidotes now

17 to the bleeding that we were not aware of before.

18        And, you know, we're still paying for it.  I don't

19 really know at what level because we haven't delved into the

20 product transactions.

21        But we're -- I think we know it because PBMs would not

22 have placed them at a preferred spot on the formulary.  It may

23 have been on the formulary at some other level.  And it may be

24 now on the formulary at some other level.  And it may be being

25 purchased and sold as a rate much, much lower than it was in

00:50:22

00:50:45

00:51:01

00:51:26

00:51:56

**OFFICIAL TRANSCRIPT**

1  previous years before information was more widely known.

2       It goes to -- I think if that's what has happened now,

3  then we can safely say that would have happened in the first

4  place.  It may have even been that it wouldn't have made the

5  formulary at all early on.

6       And I think we determine this through expert reports.

7  You know, we would have experts who say how formularies work and

8  how PBMs decide how they're going to put things on their

9  formulary and so forth.  And, again, we're not there in this

10  litigation yet.

11       THE COURT:  Okay.  Anything further from the plaintiff?

12       MR. SCALIA:  I think if we look back at *Bridge* and what

13  *Bridge* suggests should be the -- suggests -- I'm sorry, not

14  *Bridge*.

15       Yeah.

16       THE COURT:  You're talking about *Holmes* or *Bridge?*

17       MR. SCALIA:  I'm sorry, I'm talking about the --

18       THE COURT:  Yeah, the problem with both *Holmes* and

19  *Bridge* is that they're securities fraud cases, and these are so

20  specific in their area that it's hard to apply what they say in

21  those cases, whether it's for the plaintiff or for the defendant,

22  to facts of this case.  It's difficult.  They're sort of in their

23  own world, so to speak, the security cases -- I find anyway.

24       But go ahead.  I didn't mean to interrupt you.

25       MR. SCALIA:  No, that's fine.

**OFFICIAL TRANSCRIPT**

1      But they do talk about the issue of first-party
2   reliance.  And the Supreme Court rejected the argument regarding
3   first-party reliance.  I think the Court said nothing in the
4   relevant statutory provision imposes such a requirement.

*00:54:31*
5      The causal chain is defendants manufacture this drug,
6   market it, promote it, and talk about how great it is, and talk
7   about how it's going to replace the other drug that you're only
8   paying $5 for that people have been using since the '50s.  They
9   get it on formularies and doctors prescribe it and we pay for it.

*00:55:03*
10      We're the only ones in this whole causal chain that are
11   paying any money.  And without a requirement of first-party
12   reliance, I don't see how we lose on the issue -- at least at the
13   motion to dismiss stage, you know, with *Holmes* and *Hemi Grp*.

14      And that's really all I have.

*00:55:35*
15      I think the subrogation claims -- as I said before, we
16   move to dismiss those without prejudice because they are --
17   defendants are correct that we can pursue those separately, and
18   they are being resolved by the Private Lien Resolution Program.

19      But to suggest that the subrogation claim is our claim
*00:56:03*
20   that we're not pursuing, for all of what -- everything else that
21   we're seeking here, which I think we're entitled to, I think is a
22   misstatement.

23      THE COURT:  Anything further?

24      MR. SCALIA:  I have nothing.

*00:56:20*
25      THE COURT:  Okay.  How about rebuttal, anything?

**OFFICIAL TRANSCRIPT**

1    MR. GLICKSTEIN:  Your Honor, I have no more than two
2 minutes.
3    Your Honor, Mr. Scalia I think said all he needed to
4 say when he said the decision to put Xarelto on the formulary
5 belongs to the PBM.  That pretty much -- I'm not a court
6 reporter, but that's pretty much a quote of what he said.  That
7 disposes of the case.  He said it's not the third-party payors'
8 decision, it's the PBMs' decision.
9    As he indicated, they have national P&T committees that
10 evaluate information from the manufacturer.  They look at the
11 value and the cost of the drug -- that's what he said -- and they
12 make their own decision.  Based on that, that is why his injuries
13 are purely contingent -- not his but his clients' injuries are
14 purely contingent upon the decisions of third parties.  That is
15 why it's indirect.
16    Your Honor, he mentioned the *Avandia* decision.  I'll
17 just refer Your Honor to Page 30 and note that we discussed
18 the *Avandia* decision at length.  In *Avandia* you had a case where
19 the third-party payor itself took action, not the PBMs.
20    I don't understand Mr. Scalia's point on subrogation.
21 Third-party payors are alleging torts committed against the
22 people taking the drugs saying they were prescribed something
23 that wasn't effective or was unsafe.  Under the law they have a
24 right to bring -- stand in the shoes of their insureds and bring
25 a claim for the tort that the insureds could bring.  One party

**OFFICIAL TRANSCRIPT**

1   didn't bring it.  Two parties dropped it.  But that is -- you

2   know, to the extent they claim they are a victim, they should

3   bring the right claim.  You don't get to bring an indirect claim.

4           And I would like to also just conclude by talking about

*00:58:48*   5   Mr. Scalia's musings about what these third-party payors might be

6   doing now with the drug.  None of what he said is in the

7   complaint.  They don't allege that they have done -- actually

8   taken any action with respect to Xarelto as they claim maybe they

9   would have taken action.

*00:59:08*   10          I've got here, Your Honor, the 2021 formulary for

11  Louisiana Blue Cross and HMO Louisiana.  It's on their website.

12  On Page 14, Xarelto is there with preferred status.  You can go

13  to their website and find it.

14          Allied doesn't have a -- doesn't put their formulary on

*00:59:37*   15  the website so I can't speak to them.

16          But what we do know is that there is no allegation in

17  this complaint that these third-party payors have, in fact, taken

18  any action, either when they brought the claims or during the

19  five and a half years later.  The case to me is -- should never

*01:00:01*   20  have been brought.  I don't know if it really satisfied -- the

21  statements that Mr. Scalia made rise to the level of Rule 11.

22          But the bottom line is their claim is indirect.

23  They're not saying they did anything that caused their injury.

24  They're saying the physicians exercised independent judgment and

*01:00:27*   25  they're saying PBMs exercised independent judgment, and that

**OFFICIAL TRANSCRIPT**

1    those independent judgments indirectly caused them harm.  That's

2    not what Your Honor's *Vioxx* decision said, and that's not what

3    the majority of the circuits say.

4         THE COURT:  Okay.  Thank you both very much.  I

5    appreciate the briefs.  You were very thorough in them.  They

6    were very helpful to me.

7         Thank you very much.  I'll take the matter under

8    consideration.  I appreciate it.

9         Everybody have a good day and stay well.

10        Court will stand in recess.

11                                  (Proceedings adjourned.)

12

13                        *  *  *  *

14                        **CERTIFICATE**

15

16       **I hereby certify this 5th day of February, 2021, that the**

17    **foregoing is, to the best of my ability and understanding, a true**

18    **and correct transcript of the proceedings in the above-entitled**

19    **matter.**

20

21                        */s/ Mary V. Thompson*

22    _____

                                **Official Court Reporter**

23

24

25

01:00:45

01:00:59

**OFFICIAL TRANSCRIPT**