## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **IN RE: XARELTO (RIVAROXABAN)** | : | |
| **PRODUCTS LIABILITY LITIGATION** | : | **MDL No. 2592** |
| | : | |
| | : | **SECTION L** |
| **THIS DOCUMENT RELATES TO:** | : | |
| | : | |
| *Nicole Nails Stone, Individually, and as the* | : | **JUDGE ELDON E. FALLON** |
| *Executrix of the Estate of Raymond Fulton Nails* | : | **MAGISTRATE JUDGE NORTH** |
| **Civil Action No. 2:17-cv-05372** | : | |

## THE JANSSEN AND BAYER DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Plaintiff Nicole Stone, individually and as executrix of the estate of Raymond Nails, cannot prevail on her claims under Louisiana law for either of the two injuries claimed in her lawsuit, i.e., Mr. Nails' asymptomatic gastrointestinal bleed and separately, more than a week after his last use of Xarelto, his death during surgery. All of Plaintiff's claims fail for the following reasons.

***First***, Plaintiff cannot prevail on any of her failure to warn claims that an inadequate Xarelto label caused either Mr. Nails' gastrointestinal bleed or his death during surgery. There is no evidence that an alleged inadequate warning caused either of these alleged injuries because Mr. Nails' prescribing physician, Dr. Samuel Stagg, testified without contradiction that (1) he knew of the risk of bleeding from Xarelto use; (2) Xarelto's label adequately warned him of the relevant risks, (3) even today he still believes that Xarelto was the appropriate anticoagulant to reduce Mr. Nails' much greater risk of stroke, (4) he had sufficient information about the safe use of Xarelto to make informed decisions to both prescribe Xarelto and instruct Mr. Nails to discontinue Xarelto use a week prior to his surgery; and (5) he took the bleeding risks into account

in deciding to both prescribe and discontinue Xarelto use for Mr. Nails.  Nor is there any evidence that any different warning would have changed Dr. Stagg's decisions to prescribe Xarelto or approve that Mr. Nails discontinue Xarelto before his surgery.  Because Plaintiff lacks evidence that an inadequate Xarelto label caused Mr. Nails' gastrointestinal bleed or subsequent surgical bleed and death, all of Plaintiff's failure to warn claims should be dismissed.

*Second*, all of Plaintiff's causes of action arising from Mr. Nails' surgical bleed and death also fail as a matter of law because there is no proof that Mr. Nails used Xarelto at or around the time of his fatal June 14, 2016 surgery, and therefore Plaintiff lacks evidence that Xarelto was the medical cause of these alleged injuries.  The evidence demonstrates that Mr. Nails discontinued Xarelto use well in advance of the surgery during which the fatal bleed occurred.  The contemporaneous medical records and uncontroverted deposition testimony confirm as a matter of undisputed fact that (1) Dr. Stagg approved that Mr. Nails hold Xarelto a week before his surgery, (2) Mr. Nails' healthcare providers instructed him to discontinue Xarelto use, and (3) Nurse Practitioner Annette Windham, who cleared Mr. Nails for surgery the day before the fatal bleed, confirmed with Mr. Nails that he last used Xarelto eight days before his planned surgery.  Both Dr. Stagg and Ms. Windham testified that Xarelto would not have remained in Mr. Nails' system, and therefore could not have caused Mr. Nails' surgical injuries and death.  Accordingly, all of Plaintiff's claims related to Mr. Nails' surgery and death fail.

*Third*, there is no evidence to support Plaintiff's manufacturing defect or design defect claims.

*Finally*, Plaintiff cannot prevail on any of her other theories—negligence, breach of express and implied warranties, misrepresentation, fraud and violation of consumer protection statutes—because the LPLA provides the exclusive remedy for her claims.

**STATEMENT OF FACTS**

**I.      Plaintiff's Claims and Mr. Nails' Xarelto Use**

Raymond Nails was first prescribed 15 milligrams of Xarelto by his cardiologist Dr. Samuel Stagg on May 17, 2016 at the age of 81, to reduce the risk of stroke and systemic embolism as a result of his recently diagnosed atrial fibrillation.  Ex. A, Dr. Samuel Stagg, III Dep. 34:20-36:16, Jan. 7, 2021.  Mr. Nails' risk of stroke and embolism was very high due to his many underlying health conditions, including atrial fibrillation.  *Id.* at 37:2-38:6 ("he was a high risk patient with atrial fibrillation"); *id.* at 23:20-25.

Xarelto is in a class of medications known as novel oral anticoagulants ("NOACs").  Xarelto was initially approved by the United States Food and Drug Administration ("FDA") in July 2011.  *See* Pl.'s Compl. ¶ 47, Doc. 1, No. 2:17-cv-05372.  All anticoagulant medications carry an increased risk of bleeding, *see* Ex. A, Stagg Dep. 38:10-39:4, and Xarelto's labeling, in particular, clearly and repeatedly warns of that risk, mentioning the terms "bleed" or "bleeding" more than 100 times.  *See, e.g.*, Ex. B, May 2016 USPI Highlights of Prescribing Information: Warnings and Precautions (warning of "serious or fatal bleeding"); *id.* § 5.2 (Warnings and Precautions) (same); Medication Guide (warning that "Xarelto can cause bleeding which can be serious, and rarely may lead to death").

Plaintiff Stone filed this action individually and on behalf of the estate of Mr. Nails, alleging that Mr. Nails developed an asymptomatic gastrointestinal bleed from Xarelto use and later died from a hemorrhage during surgery to remove a cancerous lesion.  Ex. C, 2d Am. Patient Profile and Consent Form at 12; *see also* Compl., Doc. 1, No. 2:17-cv-05372.

II.    **Dr. Stagg Knew Xarelto Presented a Risk of Bleeding, and Given Mr. Nails'**
**Condition, Still Believes that Xarelto Was the Appropriate Medicine**

Dr. Stagg knew when he prescribed Xarelto to Mr. Nails that serious and potentially fatal

bleeding was an inherent risk of all anticoagulant medications.  *See* Stagg Dep. 38:10-39:4.  Dr.

Stagg testified:

> [T]he good part is you're going to prevent strokes significantly.  The bad part is
> any blood thinner increases their risk of bleeding.  That's the main side effect of
> blood thinners.  That's what they do.  All of them do that, not just Xarelto.

*Id.* at 38:10-39:4.  Prior to prescribing Xarelto, Dr. Stagg read Xarelto's label explaining the

bleeding risks.  Ex. A, Stagg Dep. 70:1-20 ("Did you read the warning label?  A. I -- I read the –

yes . . . . .In the case of a blood thinner, you want to know whether or not there's significant

bleeding associated.  Because all blood -- you would expect there would be bleeding because that

is a known risk factor, but you want to know about it.").  The label in effect when Dr. Stagg

prescribed Xarelto to Mr. Nails repeatedly warned of an increased risk of bleeding, including

potentially serious and deadly bleeding.  *See, e.g.*, Ex. B, § 5.2 (Warnings and Precautions).

In deciding to initially prescribe Xarelto for Mr. Nails, Dr. Stagg followed the label's

direction to prescribers to weigh the risk of bleeding against the risk of thrombotic events as

reflected in the "CHADS-VASc" score, which helps physicians evaluate stroke risks.  Ex. A, Stagg

Dep. 37:2-38:6.  According to Dr. Stagg, Mr. Nails' CHADS-VASc score was very high at five—

and he "had every factor that you can have for vascular disease, and he was on all the treatments

that -- that [Dr. Stagg] thought appropriate at that point."  *Id.*; *see also id.* at 26:12-15; *id.* at 27:2-

5 ("the chances of him living to this stage were somewhat limited or -- or decreased because of all

this terrible vascular disease he had"); *id.* at 30:20-22 ("Now in January 2016, according to your

records, he was on some 18 medications?  A. Yeah. Yes, ma'am.").  Dr. Stagg testified that for Mr.

Nails, "atrial fibrillation . . . increases the risk in general terms of having a stroke by 500 percent

or five times" and with atrial fibrillation "the strokes are more likely to be severe, fatal, or recurrent.  So it's a severe problem."  *Id.* at 37:2-38:6.

Dr. Stagg confirmed that he had all of the important information necessary to make an informed prescribing decision:

> Q.    Dr. Stagg, in May 2016, you prescribed Xarelto for Mr. Nails.  Did you have all the essential information you needed to make a proper risk-benefit decision?
>
> A.    Yes.
>
> Q.    Is it fair to say that you knew before you prescribed Xarelto to Mr. Nails that serious and potentially fatal bleeding was an inherent risk of any anticoagulation medicine, including Xarelto?
>
> A.    Yes.
>
> Q.    Despite this unavoidable risk of bleeding, did you conclude in May 2016 that the benefit of avoiding a life-ending or life-altering stroke outweighed the risk of bleeding from taking an anticoagulant like Xarelto for Mr. Nails?
>
> A.    Yes.

*Id.* at 45:19-46:9; *see also id.* at 46:21-47:4 ("Q. Now you could not have eliminated the risk of bleeding for Mr. Nails by prescribing a different anticoagulant, could you have?  A. That's correct.  Q. It would be complete speculation, wouldn't it, to say that Mr. Nails would have avoided his bleed if you had prescribed a different anticoagulant to him?  A. That's – that's correct.").

During his treatment of Mr. Nails, Dr. Stagg also discussed the risks of bleeding and stroke directly with Mr. Nails:

> A. . . . So the use of any anticoagulant -- the -- the first question is the use of an anticoagulant.  And when your -- your risk is at least 500 times increase risk or high -- 500 percent increase risk of having a stroke -- and I always discuss it with patients.  I say, This is the deal, We're going to put you on a blood thinner or give you the option to take a blood thinner, If you take the blood thinner, your risk of stroke goes down to very low, almost none, but it increases your risk of bleeding . . . .

*Id.* at 42:21-43:25; *see also id.* at 47:5-20 ("Q. Now you talked about a discussion you would have with a patient before prescribing an anticoagulation medicine like Xarelto.  Based on your habit and custom, do you believe that you had that discussion about risks and benefits with Mr. Nails before you gave him the Xarelto?  A. Yes. I did. I -- I -- I believe I do that with every single patient that I see with atrial fibrillation, new onset or – I'm going to put them on an anticoagulant.  I discuss the risk of bleeding, which is the main risk, and the risk of the inherent disease, which is atrial fibrillation and having a stroke.  And I -- I talk to those -- every patient about it, and I -- I believe strongly in that.").[1]

Dr. Stagg believed that Xarelto was the appropriate medicine for Mr. Nails because he was "very familiar with" Xarelto, and he "thought at that point it was the preferred medication for [Mr. Nails].  I -- I still would feel that way.  So I – that's the reason I used it."  *Id.* at 39:19-22.  Dr. Stagg testified that Xarelto continues to be an important medicine and that he still prescribes Xarelto to his patients today.  *Id.* at 117:4-7 ("So I still -- I still prescribe Xarelto.  And -- and unless something changes, I will continue to prescribe it.  I -- I think it's a good medication. It's effective.").

## III. Mr. Nails' Healthcare Providers Approved and Instructed Him to Discontinue Xarelto Use More Than a Week Before His June 14, 2016 Surgery

On June 2, 2016, Mr. Nails presented to Dr. Stagg with long-standing gastrointestinal symptoms and unresolved diarrhea.  Ex. D, Cardiovascular Institute of the South Records. Dr. Stagg referred him to a gastroenterologist, *id.*, while advising Mr. Nails "[o]kay to hold Effient, cilostazol, and Xarelto for up to 1 week pre-endoscopy if needed and resume ASAP after."  Ex. E,

---

[1] Dr. Stagg's practice also was to provide patients like Mr. Nails with handouts for medications. Ex. A, Stagg Dep. 34:4-15.  The Medication Guide provided to patients when they fill Xarelto prescriptions also warned that "XARELTO may cause bleeding, and rarely may lead to death." Ex. B (Medication Guide).  In addition, Plaintiff Stone testified that, before Mr. Nails' surgery, she researched Xarelto's side effects, forwarded a screen shot of risks to Mr. Nails, including the risk of bleeding, and explained that "I did see the bleeding reference as a side effect, but I just kind of ignored that."  Ex. K, Nicole Nails Stone Deposition 72:7-23, Sept. 27, 2020.

Cardiovascular Institute of the South Records; *see also* Ex. A, Stagg Dep. 53:7-13 ("I put okay to hold Effient, cilostazol, and Xarelto for up to one week pre-endoscopy if needed and resume as soon as possible post-intervention and with plans -- after his GI evaluation, we will treat his peripheral vascular disease and claudication with possible angioplasty.").  Dr. Stagg testified:

> Q.    And the instructions on the third page of the document for him are what, under patient instructions?
>
> A.    "Make appointment with Dr. Pellegrin," "Okay to hold Effient, cilostazol, and Xarelto for up to 1 week pre-endoscopy if needed and resume" as soon as possible "after," "Follow-up post GI evaluation."
>
> Q.    Okay.  And that was your last visit with Mr. Nails; correct?
>
> A.    Correct.

Ex. A, Stagg Dep. 57:13-23.  In approving Mr. Nails' discontinuation of Xarelto prior to his planned colonoscopy, Dr. Stagg explained:

> Q.    Now you knew at -- you knew based on your knowledge, training, and experience that if a -- that if a patient is undergoing an invasive procedure, it's important for the patient to stop anticoagulation medicine -- correct --
>
> A.    Well --
>
> Q.    -- before the procedure?
>
> A.    Yeah. Well, you have to -- you always base it on the risk of bleeding versus the risk of them having an untoward event from stopping the medicine. In this case, if he needed to have colonoscopy and a biopsy, which is what I thought was going to need to be done, then he would not be able to have that if he was on anticoagulation. Or if he was on an antiplatelet agent or even if he was on cilostazol, they may or may not do it but would probably stop that as well.

*Id.* at 53:17-58:8.  As Dr. Stagg further explained:

> A.    With Xarelto, usually you can hold it for one or two or three days and the medication is gone. But because he had some issue with his kidney function and was on other medicines, I put that it was all right to hold all of them for up to a week.  And -- and also -- Dr. Pellegrin also likes for them to be off of anticoagulation or off of antiplatelet agents for several days, five to seven days, before they have any procedure.

Q.      And did you tell Mr. Nails that it was important for him to stop these three medications 1 a week before his GI procedures?

A.      I told him it was -- that he could stop the medicine up to a week before the medicine depending on what Dr. Pellegrin said and need -- and what needed -- what the recommendations from gastroenterology were. I -- I didn't -- I wanted him to -- because this was a potential colon cancer, I wanted to move ahead with this whole process as quickly as possible; so I preempted any kind of follow-up call so the -- when I send him to the gastroenterologist, so he would already know that the patient was ready to go with colonoscopy and he could hold the -- all of these medicines for as long as the -- as long as he needed before -- before the surgical procedure, before the colonoscopy.

*Id.* at 54:15-55:16. Dr. Stagg understood that for "Xarelto, the half-life as I understand in somebody [Mr. Nails'] age is up to 14 hours or 16 hours or so. So after a week off of it, there should be basically none left or a minuscule amount, not enough to anticoagulate or cause a problem." *Id.* at 75:2-17.

## IV.     Mr. Nails Confirmed that He Discontinued Xarelto Use More than a Week Before His Fatal Surgery

Mr. Nails had a colonoscopy without incident on June 13, 2016, which revealed a 5 cm cancerous tumor in his colon, polyps, and diverticulitis. Ex. F, Terrebonne General Medical Center Records. He went from the endoscopy suite that morning to being admitted as an in-patient for surgery the following day, June 14, to remove the diseased part of his colon. Ex. G, Terrebonne General Medical Center Discharge Summary.

Consistent with Dr. Stagg's earlier decision to approve discontinuation of Xarelto, on June 13, 2016, upon Mr. Nails' admission to the hospital, Nurse Practitioner Annette Windham conducted a pre-surgery screening with Mr. Nails to confirm that he had in fact discontinued Xarelto and his antiplatelet medications a week earlier. Ex. H, Annette Windham Dep. 21:17-22, Jan. 27, 2021. Nurse Practitioner Windham noted the following in the medical records:

PLAN: Consult Dr. Schwab for surgical evaluation. The patient is scheduled to undergo right hemicolectomy June 14, 2016, transfuse 2 units of packed red blood

cells today, **antiplatelet and anticoagulants on hold for a week thus far**, monitor
telemetry, and **cleared for surgery**.

Ex. I, Terrebonne General Medical Center Consult Report (emphasis added). Both Dr. Stagg and

Nurse Practitioner Windham testified that Mr. Nails' report that he discontinued Xarelto for a week

before surgery was consistent with Dr. Stagg's instruction that Mr. Nails do so.

> Q.      Okay. Is the history given of "antiplatelet and anticoagulants on hold for a
>         week thus far" consistent with your instructions to Mr. Nails?
>
> A.      Yes. Yes. It is. That's what I – what I recommended.

Ex. A, Stagg Dep. 60:15-61:10; *id.* at 64:7-14 ("Q. Oh, okay. As with the last document we looked

at, Dr. Stagg, does this handwritten consult note dated June 13, 2016 also indicate that the patient,

Mr. Nails, gave a history of antiplatelets and anticoagulants on hold for a week? A. That's – that's

correct. That's what it says."); Ex. H, Windham Dep. 21:17-22.

> Nurse Practitioner Windham testified that she confirmed in discussions with Mr. Nails (or

his representative) that he discontinued Xarelto use a week earlier:

> Q.      You had mentioned that one of the things you did was to verify that he was
>         off certain medications. So did you ask him questions about whether he was
>         taking any medications at or near the time of his hospitalization in June of
>         2016?
>
> A.      I did. I -- my routine with a consultation is that I verify the list of
>         medications that may be available in the medical record versus asking if he
>         has a list or if he recalls all the medications that he's currently taking. I
>         compile that list, and it's either verified by the patient or someone speaking
>         on behalf of the patient . . . .

Ex. H, Windham Dep. 18:19-19:6.[2] Nurse Practitioner Windham was trained to take medical

histories from patients and to accurately record what patients told her about their last use of

medicines like Xarelto. *Id.* at 21:1-16.

---

[2] Nurse Practitioner Windham confirmed that Mr. Nails was alert and oriented when she examined
him and that there is no indication in her notes that she received Mr. Nails' medical history from
anyone other than him. *See* Ex. H, Windham Dep. 23:1-24:4 (confirming that, while Ms. Windham

In confirming that Mr. Nails had in fact discontinued Xarelto use, Nurse Practitioner

Windham testified:

> Q.    So does this note reflect what Mr. Nails told you, that he had held his antiplatelet and anticoagulant medications for one week prior to the time you talked to him on June 13?
>
> A.    That was confirmed with the patient or someone in his room who was speaking on his behalf.

*Id.* at 21:17-22.  She further testified:

> Q.    If we look back at, again, Exhibit 2 here, going down to the second page, again, under Plan, did you further dictate the information that Mr. Nails or his representative had provided to you about when he had last used any antiplatelet or any anticoagulant medication?
>
> A.    Yes.
>
> Q.    And what did you record here, please?
>
> A.    Antiplatelet and anticoagulants on hold for a week thus far.  As of the day I -- that means as of the day I did my consultation, these medications were on hold.

*Id.* at 21:23-22:9.

Because Xarelto was an anticoagulant, Nurse Practitioner Windham knew and understood

that it was particularly important to confirm that patients like Mr. Nails had already discontinued

anticoagulants prior to surgical procedures because of "[a]ny time you do any type of invasive

procedure or surgical procedure with a patient that is currently on any antiplatelet or anticoagulant

medication, that increases the risk of bleeding."  *Id.* at 24:5-25:4.  Nurse Practitioner Windham

knew that Xarelto's label warned of bleeding risks.  *Id.* at 44:13-25.

Nurse Practitioner Windham relied upon Mr. Nails' answer to clear him for his surgery.

*Id.* at 22:20-25 ("Q. And did you rely on what Mr. Nails or what Mr. Nails' representative told you

---

did not recall Mr. Nails independently, there was nothing in her note to suggest that anyone other
than Mr. Nails provided the answers to her questions about his medical history).

about him stopping his antiplatelet and anticoagulant medications a week before in deciding to clear him for surgery? A. Yes.").  In particular, she confirmed that Mr. Nails' last Xarelto use was "eight days" before his surgery.

> Q.     So at that point, Mr. Nails would have last used Xarelto and his antiplatelet medications eight days before that procedure; is that a correct interpretation of your notes and what you were told?
>
> A.     Correct.

*Id.*; *see also id.* at 38:14-39:8.

Nurse Practitioner Windham determined that Mr. Nails could be cleared for surgery because sufficient time had passed since his last dose and his surgery the next day.  *Id.* at 24:22-25:4; *see also id.* at 42:24-43:11 ("the standard of care is to hold these type of medications for seven days prior to an invasive procedure and/or surgery").  This was more than ample time for Xarelto to clear his system.  *Id.* at 47:13-18 ("Q. Sure. Just knowing what you know from your training and experience, would you basically expect the Xarelto that he had last used a week before you spoke with him on June 13 to have been essentially eliminated from his body by that point? A. Correct.").

On June 13, the day before his surgery, Mr. Nails' surgeon, Dr. Schwab, also noted in the medical records that the risks and benefits of the surgeries, including bleeding, were discussed with Mr. Nails and that Mr. Nails had already discontinued Xarelto use.  Ex. J, Terrebonne General Medical Center Consultation Report.  Mr. Nails' daughter, Plaintiff Stone, also testified that "the doctor probably had him, you know, come off of it before a procedure."  Ex. K, Stone Dep. 90:10-21.  She further acknowledged that she has no personal knowledge as to when he took his last pill of Xarelto.  *Id.* at 80:23 to 81:1.  And, she confirmed that her father "faithfully" followed his doctors' instructions on medication "to the letter."  *Id.* at 31:8-10.  Mr. Nails died during the surgery on June 14, 2016.  His death was attributed to hemorrhagic shock with the underlying

cause of death being colon cancer and cardiovascular disease.  Ex. G, Terrebonne Medical Center

Discharge Summary; Ex. L, Death Certificate.

## ARGUMENT

**I.      Standard for Summary Judgment**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgement as a matter of law." Fed. R. Civ.

P. 56(a).  "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to

make a showing sufficient to establish the existence of an element essential to that party's case,

and on which the party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986) (citing Fed. R. Civ. P. 56(c)); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th

Cir. 1994).  The moving party need not negate the elements of the opposing party's case; it is

enough to show that the opposing party cannot satisfy an element of his or her claim.  *Bayle*

*v. Allstate Ins. Co.*, 615 F.3d 350,355 (5th Cir. 2010).  A fact is material only if its resolution would

affect the outcome of the action. *Wiley v. State Farm Fire & Cas. Co.*, 585 F.3d 206, 210 (5th Cir.

2009).    Alleged "[f]actual disputes that are irrelevant or unnecessary will not be counted."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A party opposing summary judgment

must come forward with reliable evidence to prove his or her claim and cannot rely on speculation

or assumptions not supported by the record.  *Hayes v. Asbestos*, Case No. No. 2:13–2392., 2015

WL 3463491, at *2 (W.D. La. May 28, 2015).  Summary judgment is required if the nonmovant

fails to make a showing sufficient to establish the existence of an element essential to his or her

case on which he or she bears the burden of proof at trial.  *Celotex Corp.*, 477 U.S. at 322.

II.     **There Is No Evidence Any Alleged Inadequacy in Xarelto's Label Caused Either Mr. Nails' Asymptomatic Gastrointestinal Bleed or Death During Surgery**

All of Plaintiff's claims for failure to warn are subsumed under the LPLA and fail as a matter of law under the learned intermediary doctrine as applied by Louisiana courts. *See* La. Stat. Ann. § 9:2800.52 ("This Chapter establishes the exclusive theories of liability for manufacturers for damage caused by their products. A claimant may not recover from a manufacturer for damage caused by a product on the basis of any theory of liability that is not set forth in this Chapter."); *Grenier v. Med. Engr. Corp.*, 99 F. Supp. 2d 759, 763 (W.D. La. 2000), *aff'd*, 243 F.3d 200 (5th Cir. 2001) (dismissing common law claims that are covered by the LPLA).

In Louisiana, a manufacturer of a prescription medicine has no duty to warn a patient directly regarding the potential risks associated with the use of the medicine. *See Stahl v. Novartis Pharma. Corp*., 283 F.3d 254, 265 (5th Cir. 2002); *Mikell v. Hoffman-LaRoche, Inc.*, 649 So. 2d 75, 80 (La. Ct. App. 1994). Rather, Louisiana courts apply the learned-intermediary doctrine, which provides that a pharmaceutical company discharges its duty to consumers by reasonably informing prescribing physicians of a medicine's risks. *Id.* "The doctor acts as an informed intermediary. The decision to use the drug in a particular circumstance rests with the doctor and the patient, not with the manufacturer." *Calhoun v. Hoffman LaRoche Inc.*, 768 So. 2d 57, 61 (La. App. 1st Cir. 2000) (citing *Cobb v. Syntex Labs., Inc.,* 444 So. 2d 203, 205 (La. App. 1st Cir. 1983)).

To prove a failure-to-warn claim under the LPLA, *see* La. Rev. Stat. § 9:280057.57, in a case involving a prescription medicine, a plaintiff must prove: (1) that the defendant failed to warn the physician of a risk associated with the use of the product that was not otherwise known to the physician and (2) that the failure to warn the physician was both a cause-in-fact and the proximate cause of the plaintiff's injury. *See Stahl*, 283 F.3d at 265–66; *Zachary v. Dow Corning Corp.*, 884

F. Supp. 1061, 1065 (M.D. La. 1995); *Willet v. Baxter Int'l, Inc.*, 929 F.2d 1094, 1098 (5th Cir. 1991).  If the plaintiff fails to carry his or her burden to sustain either of these elements, summary judgment is appropriate.  *Id.*; *see also Ferguson v. Proctor & Gamble Pharm.*, 353 F. Supp. 2d 674, 679 (E.D. La. 2004).

To prove "warnings causation," a Louisiana plaintiff alleging an inadequate prescription medicine warning must also show that the allegedly defective warning itself proximately caused his injury.  *Stahl*, 283 F.3d at 260–61 (citing La. Rev. Stat. § 9:2800.54).  In particular, the plaintiff must "show that a proper warning would have changed the decision of the treating physician; but for the inadequate warning, the treating physician would not have used or prescribed the product." *Zachary*, 884 F. Supp. at 1065; *see also Wheat v. Pfizer, Inc.*, 31 F.3d 340, 343 (5th Cir. 1994); *Willett*, 929 F.2d at 1098.  If the plaintiff fails to sustain this burden, then, as a matter of law, she fails to meet the burden of proving causation.  *Willett*, 929 F.2d at 1099.  For the reasons set forth below, Plaintiff cannot prevail on any of her failure-to-warn claims for either the asymptomatic gastrointestinal bleed or Mr. Nails' later alleged injuries and death during surgery.

Defendants are entitled to summary judgment on all of Plaintiff's failure to warn claims related to both Mr. Nails' asymptomatic gastrointestinal bleed and alleged injuries during surgery, including death, because Dr. Stagg unequivocally testified that (1) he was aware of Xarelto's bleeding risks, (2) Xarelto's label adequately warned him of the relevant risks; (3) even today he believes that Xarelto was the appropriate medicine to reduce Mr. Nails' risk of stroke, (4) he had sufficient information about the safe use of Xarelto to make informed decisions to both prescribe Xarelto and instruct Mr. Nails to discontinue Xarelto use prior to his surgery, and (5) he took the bleeding risks into account in deciding to both prescribe and discontinue Xarelto use for Mr. Nails.

Nor is there any evidence that a different warning would have changed Dr. Stagg's decisions to prescribe Xarelto or discontinue Xarelto use in advance of surgery.

      **A.**      **Dr. Stagg's testimony that he was aware of the risks and had sufficient information to safely prescribe Xarelto forecloses any claim that Xarelto's label caused Mr. Nails' asymptomatic gastrointestinal bleed and his death**

Under Louisiana law, if the physician is aware of the risk and testified that he had sufficient information to safely prescribe a medicine, summary judgment in defendant's favor is proper. As explained in *Stahl*,

> The premise underlying a failure-to-warn claim in the learned intermediary context is that the patient is claiming that the manufacturer failed to adequately warn the *treating physician*. The treating physician's knowledge is thus the focus of the inquiry. Accordingly, when a particular adverse effect is clearly and unambiguously mentioned in a warning label and the prescribing physician unequivocally states that he or she was adequately informed of that risk by the warning, the manufacturer has satisfied its duty to warn under the learned intermediary doctrine.

*Stahl*, 283 F.3d at 268.

Here, Dr. Stagg's testimony unequivocally demonstrates that at all relevant times he was aware of Xarelto's bleeding risks, Ex. A, Stagg Dep. 38:10-39:4; 70:1-20, and Xarelto's label provided him with the information necessary to make an informed prescribing decision both at the time of prescription and prior to Mr. Nails' surgery. Dr. Stagg testified:

> Q.      Dr. Stagg, in May 2016, you prescribed Xarelto for Mr. Nails. Did you have all the essential information you needed to make a proper risk-benefit decision?
>
> A.      Yes.

*Id.* at 45:19-46:9. Indeed, Xarelto's label clearly, prominently, and repeatedly warned of the very risk that Plaintiff alleges from his asymptomatic gastrointestinal bleed, stating that "XARELTO increases the risk of bleeding can cause serious or fatal bleeding," and mentions the terms "bleed" or "bleeding" more than 100 times. *See supra* at 3-5; *see also, e.g.*, Ex. B, May 2016 USPI

Highlights of Prescribing Information: Warnings and Precautions (warning of "serious or fatal bleeding"); *id.* § 5.2 (Warnings and Precautions) (same); Medication Guide (warning that "Xarelto can cause bleeding which can be serious, and rarely may lead to death"). Dr. Stagg's testimony that the labeling clearly informed him of the "specific ailment suffered by the plaintiff" is sufficient to render Xarelto's label "adequate as a matter of law." *Id.* at 267; *see also Jackson v. Johnson & Johnson*, No. 10-cv-1113, 2012 WL 2428262, at *3–4 (W.D. La. June 25, 2012); *In re Taxotere (Docetaxel) Prods. Liab. Litig.* (MDL 2740), 462 F.Supp.3d 650, 653 (E.D. La. May 27, 2020) (holding that the label "clearly and consistently explained that the drug carried a risk of permanent hair loss," "the precise injury Plaintiffs suffered").

Under Fifth Circuit precedent, when, as here, "a particular adverse effect is clearly and unambiguously mentioned in a warning label and the prescribing physician unequivocally states that he or she was adequately informed of that risk by the warning, the manufacturer has satisfied its duty to warn under the learned intermediary doctrine." *Stahl*, 283 F.3d at 268.

Not only did Xarelto's label adequately disclose the bleeding risks, Dr. Stagg testified because he had the relevant information to safety prescribe Xarelto, he approved that Mr. Nails "hold" Xarelto for up to a week before his planned surgery due to the inherent bleeding risks associated with surgery. Ex. A, Stagg Dep. 53:7-13. Both Dr. Stagg and Nurse Practitioner Windham confirmed that discontinuing Xarelto for a week for the upcoming surgery, due to Mr. Nails' underlying health conditions, would both eliminate Xarelto from his system and any potential bleeding risks from Xarelto use. *Id.* at 54:15-55:16; Ex. H, Windham Dep. at 24:22-25:4, 38:14-39:8, 42:24-43:11, 47:13-18.[3] Nurse Practitioner Windham confirmed the day before his

---

[3] La.Rev.Stat.Ann §9:2800.57(B); *see Stahl*, 283 F.3d at 265-66 ("the plaintiff must show that the defendant failed to warn (or inadequately warned) the physician of a risk associated with the product that was not otherwise known to the physician"); *Willett*, 929 F.2d 1098, n.16.

surgery that Mr. Nails had in fact stopped Xarelto use a week earlier.  Ex. I, Terrebonne General Medical Center Consultation Report; Ex. H, Windham Dep. 24:22-25:4, 38:14-39:8, 42:24-43:11, 47:13-18.

The clear and unequivocal testimony demonstrates that Dr. Stagg had the relevant information to both safely prescribe and discontinue Xarelto as appropriate.  Accordingly, Plaintiff cannot prove that an inadequate label caused either of Mr. Nails' alleged injuries, and Defendants are entitled to summary judgment on all of Plaintiffs' failure-to-warn claims.

> **B.    There is no evidence that a different warning would have avoided Mr. Nails' alleged injuries**

Plaintiff cannot prevail on her failure to warn claims for the additional reason that she cannot establish that an inadequate label was the proximate cause of Mr. Nails' asymptomatic gastrointestinal bleed or his bleeding during surgery when he was off Xarelto.  Under Louisiana law, "the plaintiff must show that a proper warning would have changed the decision of the treating physician, i.e., that but for the inadequate  warning,  the  treating physician would not have  used or prescribed the  product." *Ferguson*, 353 F. Supp. 2d at 678 (citing *Willett*, 929 F.2d at 1099); *Grenier*, 99 F. Supp. 2d at 767 (granting summary judgment where plaintiffs "submitted  no  proof  to  show  how  [the  prescribing  physician]  would  have  reacted  given  a warning  of  the  possibility  or  frequency  [of the undisclosed risk]"); *Oliver v. Pharmacia & Upjohn Co., LLC*, CIV.A. 06-5737, 2008 WL 4691626, at *7 (E.D. La. Oct. 22, 2008) (maintaining an order granting summary judgment in part because the prescribing  physicians continued to prescribe  the medication even after a stronger warning was put in place).

This Court's decision in *Allgood* v. *GlaxoSmithKline PLC*, No. 06-3506, 2008 WL 483574, at *4 (E.D. La. Feb. 20, 2008), is instructive.  There this Court explained that, "[f]or better or for worse, cases governed by the learned-intermediary doctrine often turn on the testimony of the

prescribing physician, and on his or her speculation as to what may have been done differently in various hypothetical situations." *Allgood,* 2008 WL 483574, at *6 n.6 (E.D. La. Feb. 20, 2008) (Fallon, J.).  In granting summary judgment in defendant's favor, the court held that because the prescribing physician's testimony "clearly reveal[ed] that stronger warnings concerning the risk of suicide would not have changed his decision to prescribe Paxil in this case" dismissal was warranted. *Id.*  Here, just as in *Allgood*, and this Court's similar decision in *Whitener v. PLIVA, Inc.*, No. 10-cv-1552, 2014 WL 1276489 (E.D. La. Mar. 27, 2014) (Fallon, J.), *aff'd*, 606 F. App'x 762 (5th Cir. 2015), holding that "even knowing everything he knows today, [the prescribing physician] would have still prescribe[d] [the medication] to [plaintiff]," Dr. Stagg's testimony unequivocally demonstrates that a different warning would *not* have changed his decision to prescribe Xarelto or to approve that Mr. Nails' discontinue Xarelto use.  Dr. Stagg knew that Xarelto, like all anticoagulants, carried an increased risk of serious bleeding, Ex. A, Stagg Dep. 38:10-39:4; 70:1-20, and testified that he had all of the relevant information to make informed decisions to prescribe Xarelto for Mr. Nails, *id.* at 45:19-46:9.  He further confirmed that he stands behind his decision to prescribe Xarelto in this case and continues to this day to prescribe Xarelto to his patients.  *See id.* at 37:2-38:6; *id.* at 39:19-22 (Dr. Stagg testifying that he believed Xarelto was the appropriate medicine for Mr. Nails because he was "very familiar with" Xarelto, and he "thought at that point it was the preferred medication for [Mr. Nails]. I -- I still would feel that way. So I – that's the reason I used it."); *id.* at 117:4-7 ("So I still -- I still prescribe Xarelto. And -- and unless something changes, I will continue to prescribe it.  I -- I think it's a good medication.  It's effective.").  Dr. Stagg further testified that he had adequate information to both safely prescribe Xarelto and discontinue Xarelto use in light of Mr. Nails' upcoming surgical procedure that carried its own inherent bleeding risks.  *E.g.*, Ex. A, Stagg Dep.

45:19-46:9; *see also id.* at 53:7-13.  Accordingly, there is no evidence that a different warning could have avoided Mr. Nails' alleged injuries.

Nor does Plaintiff's counsel's questioning of Dr. Stagg create any disputed material fact about either Dr. Stagg's decision to prescribe Xarelto in the first instance or to approve that Xarelto be held a week before the surgery.  When asked if he was aware of any test that could have been performed to determine the presence of Xarelto in a patient's system, Dr. Stagg confirmed Mr. Nails' discontinuation of Xarelto for a week would have eliminated Xarelto from his system based on its half-life for patients like Mr. Nails, and he also explained there are no reliable tests that he or anyone else could have ordered that would have changed the decision to discontinue Xarelto a week in advance.  *Id.* at 77:15-78:16 ("Checking an INR is not a reliable test . . . there's not a routine test we do. . . . You could do a Factor X assay or a Factor Xa assay or a fibrinogen assay, prothrombin assay, but those aren't really practical in -- in routine medical practice and we don't do those for -- for any of these new agents."); *id.* at 75:2-17.  Dr. Stagg and Nurse Practitioner Windham confirmed that after a week there would be no Xarelto remaining in Mr. Nails' system that could have contributed to his death.  *Id.* at 54:15-55:16; Ex. H, Windham Dep. 24:22-25:4, 38:14-39:8, 42:24-43:11, 47:13-18.

Thus, just as in *Allgood* and *Whitener*, it is absolutely clear from Dr. Stagg's testimony that a different warning would not have changed his prescribing decisions.  Thus, there is no causal connection between the alleged failure to warn and Mr. Nails' asymptomatic gastrointestinal bleed or his bleed during surgery when he was off Xarelto.  Accordingly, Defendants are entitled to summary judgment on all of Plaintiff's failure to warn claims.

### III.   Plaintiff Cannot Prove Xarelto Discontinued a Week Before His June 14, 2016 Surgery Was the Medical Cause of Mr. Nails' Alleged Injuries During the Surgery Including Death

Plaintiff cannot prove that Xarelto caused Mr. Nails' surgical bleed and death, and all of his claims arising from these alleged injuries fail as a matter of law.   Under the LPLA, a plaintiff bears the burden of proving all of the elements of her claim, including that the product caused the plaintiff's injuries, which in this case includes a wrongful death claim.   La. Rev. Stat. § 9:2800.52(D).   Among other requirements, "[b]efore liability may be imposed, under the LPLA, a plaintiff must show proximate causation – a link between the actions of a manufacturer and the injury-causing product." *Jefferson v. Lead Industries Ass'n*, 106 F.3d 1245 (5th Cir. 1997) ("[t]he claimant's damage was proximately caused by a characteristic of the product."); *see also Hayes v. Asbestos*, No. 2:13–2392., 2015 WL 3463491, at *2 (W.D. La. May 28, 2015).

The LPLA requires affirmative proof of product use at the relevant time to establish the essential element of medical causation.   *Jefferson,* 106 F.3d at 1245.   This threshold evidentiary showing cannot be "based on speculation and assumption."   *Hayes*, 2015 WL 3463491, at *3. Rather, Louisiana law requires proof of actual use or exposure, proximately causing the alleged injuries.   *Id.*   Where direct and reliable evidence of product use is lacking, Louisiana state and federal courts have granted summary judgment in favor of the defendant for lack of proof.   *Id.* Proffered evidence of causation "based on speculation and assumption" and not direct, specific proof of actual exposure at the relevant time, warrants summary judgment in favor of the defendant.   *See Maldanado v. State Through Dep't of Transp*., 618 So.2d 537 (1993); *see also id.* at 538 (*citing Burrell v. Baton Rouge Securities Co.,* 169 So.2d 668 (La. App. 1st Cir. 1964) ("The very purpose of a motion for summary judgment is to pierce behind the allegations in the petition which may set up a cause of action but upon which the plaintiff cannot produce any proof whatever in support of same."); *Estate of Billy E. Wilson v. The Growing Group, In*c., Case No. 94-307,

1996 WL 137499, at 2 (E.D. La. March 21, 1996) (granting summary judgment in the defendant's favor because the plaintiff failed to proffer specific evidence of product use and causation).

Consistent with decisions applying the LPLA's product use and causation requirements, Plaintiff Stone has the burden of proof to come forward with affirmative evidence that Mr. Nails used Xarelto in sufficient, close proximity to his June 14, 2016 surgery that could have and did cause his alleged injuries including death. Plaintiff has not produced any evidence and cannot do so here to satisfy her burden of proof under Louisiana law.

By contrast, the undisputed evidence shows that Mr. Nails discontinued the use of Xarelto some eight days before his fatal surgery. The record clearly demonstrates that Mr. Nails' healthcare providers confirmed in a contemporaneous medical record that Xarelto use was discontinued and Mr. Nails was then "cleared for surgery" and that Xarelto would not have remained in his body, and thus could not have caused his surgical bleed and death. Ex. M, Cardiovascular Institute of the South Records ("okay to hold . . . Xarelto for up to 1 week pre-endoscopy . . ."); Ex. I ("antiplatelet and anticoagulants on hold for a week thus far").[4]

The record facts demonstrate that two weeks before Mr. Nails' planned colonoscopy, Dr. Stagg approved Mr. Nails to hold Xarelto for "up to a week" in advance. Ex. M; *see also* Ex. A, Stagg Dep. 53:7-13. Dr. Stagg believed that discontinuing Xarelto for a week, due to Mr. Nails' underlying health conditions, including some kidney impairment, would eliminate Xarelto from his system and any bleeding risk from his earlier Xarelto use. Ex. A, Stagg Dep. 54:15-55:16. When Ms. Windham pre-screened Mr. Nails on June 13 in advance of his surgery the next day,

---

[4] Dr. Stagg confirmed that Mr. Nails complied with instructions regarding medication use. Ex. A, Stagg 32:12-17 ("Q. As far as you could tell, he followed your instructions in terms of taking his medications and reporting back or regular follow-up. Would that be fair to say?  A. I would -- I would say so. I would say he was a compliant patient as a rule.").

she understood that Mr. Nails was instructed to discontinue Xarelto use a week earlier.  Ex. H, Windham Dep. 24:22-25:4, 38:14-39:8, 42:24-43:11, 47:13-18.  After Mr. Nails confirmed that he last used Xarelto eight days prior to his June 14 surgery, Ms. Windham cleared him for surgery. *Id.* at 42:24-43:11.  When asked about Mr. Nails' Xarelto use, Plaintiff Stone also confirmed that Mr. Nails' physicians had him hold medications in advance of the surgery and that she overheard one of his physicians state that the surgery could go forward since Mr. Nails had discontinued medicines that may increase bleeding risks.  Ex. K, Stone Dep. 90:23-91:7; *id.* at 112:14-25.

Both Dr. Nails and Ms. Windham confirmed that Xarelto could not have caused Mr. Nails' injuries during surgery because Xarelto would not have been in his system a week after he discontinued use.  Ex. A, Stagg Dep. 54:15-55:16; Ex. H, Windham Dep. 24:22-25:4, 38:14-39:8, 42:24-43:11, 47:13-18.  As a result, Plaintiff Stone cannot satisfy her threshold requirement to prove that Xarelto use was the medical cause of Mr. Nails' injuries during surgery including death, and Defendants are entitled to summary judgment on all of Plaintiff's claims arising from the surgery.

## IV.     Plaintiff Had Not Identified any Manufacturing Defect Under the LPLA

Plaintiff's manufacturing defect claim also fails.  To state a manufacturing defect claim, Plaintiff must prove that the process used to manufacture Mr. Nails' Xarelto pills deviated from the process used to manufacture Xarelto and that this deviation resulted in a defect that caused the alleged injuries. La. Ann. Stat. §9:2800.55 ("A product is unreasonably dangerous in construction or composition if, at the time the product left its manufacturer's control, the product deviated in a material way from the manufacturer's specifications or performance standards for the product or from otherwise identical products manufactured by the same manufacturer."). Without evidence "that the particular pills [plaintiff] received deviated in any way from the manufacturer's production standards or from the manufacturer's otherwise identical products" summary judgment

is proper.  *Stahl*, 283 F.3d at 263.  Here, there is no evidence that the Xarelto used by Mr. Nails deviated from the manufacturing process, and Plaintiff's manufacturing defect claims fail as a matter of law.

**V.      Plaintiff Cannot Prevail on Her Design Defect Claims under the LPLA**

Plaintiff also cannot prevail on her alleged design defect claims.  Plaintiff has not offered any evidence to prove the essential elements of a design defect claim including that "[t]here existed an alternative design for the product that was capable of preventing the claimant's damage" and that defendants should have adopted an "alternative design" because "the product's design" was outweighed by the damage and gravity of damage from the existing design.  *Id.* § 9:2800.56; *see Roman v. W. Mfg., Inc.*, 691 F.3d 686, 700-701 (5th Cir. 2012); *see also* Ex. A, Stagg Dep. 38:10-39:4, 46:21-47:4 ("Q. Now you could not have eliminated the risk of bleeding for Mr. Nails by prescribing a different anticoagulant, could you have?  A. That's correct.  Q. It would be complete speculation, wouldn't it, to say that Mr. Nails would have avoided his bleed if you had prescribed a different anticoagulant to him?  A. That's – that's correct.").  Absent evidence of these essential elements, summary judgment dismissing a design-defect claim is proper.  *See, e.g.*, *Wiley v. Gen. Motors Corp.*, 100 F.3d 953, 953 (5th Cir. 1996); *Ashley v. Gen. Motors Corp.*, 666 So. 2d 1320, 1322 (La. Ct. App. 1996).

**VI.      Plaintiff Cannot Prevail on Her Other Claims**

Plaintiff's separately alleged claims for negligence, breach of express and implied warranties, design and manufacturing defect, misrepresentation, fraud, violation of consumer protection statutes, wrongful death, survival action, and loss of consortium fail as a matter of law for additional reasons.

### A.     The LPLA's exclusivity provision bars her non-LPLA claims

By its terms, the LPLA "establishes the *exclusive* theories of liability for manufacturers for damage caused by their products."   La. Rev. Stat. Ann. § 9:2800.52 (emphasis added). Accordingly, there is no separate claim for negligence, strict liability and other types of alleged wrongful acts under Louisiana law outside the scope of the LPLA.  *See, e.g.*, *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 261-62 (5th Cir. 2002) (holding that the LPLA precludes intentional tort, negligence, and strict liability claims); *In re Vioxx Prods. Liab. Litig.*, MDL No. 1367, 2010 WL 11570867, at *12 (E.D. La. Mar. 31, 2010); *Grenier v. Med. Eng'g Corp.*, 99 F. Supp. 2d 759, 763 (W.D. La. 2000) ("Given the exclusivity of the LPLA, all causes of action inconsistent with it must be dismissed."), *aff'd,* 243 F.3d 200 (5th Cir. 2001).

Because the LPLA provides the exclusive remedies for product liability claims, Plaintiff's separately alleged claims for strict liability, negligence, misrepresentation, implied warranty, fraud and violation of consumer protection statutes fail as a matter of law.

### B.     Plaintiff's derivative claims for wrongful death and loss of consortium should be dismissed

The Court should grant summary judgment on Plaintiff's wrongful death claim, survival action and loss of consortium claims because those claims derive from Plaintiff's LPLA claim, which she cannot prove.  La. R.S.9;2800.53(5) ("'Damage' means all damage caused by a product, including survival and wrongful death damages, for which Civil Code Articles 2315, 2315.1 and 2315.2 allow recovery."); *see In re Xarelto (Rivaroxaban) Prods. Liab. Litig.*, NO. 2:19-CV-13139, 2021 WL 66453, at *3 (E.D. La. Jan. 7, 2021) (applying Colorado law) (granting summary judgment on wrongful death claim where "Plaintiff cannot sufficiently establish that Ms. Barnes' death was linked to Xarelto use"); *Fuller v. Wal-Mart Stores, L.L.C.*, No. 12-251-RLB, 2013 WL 4094319, at *7 (M.D. La.  Aug. 13, 2013) ("because his claim is derivative of his wife's, the

Court's dismissal of Mrs. Fuller's negligence claim renders moot Mr. Fuller's claim for loss of consortium").

## CONCLUSION

For the foregoing reasons, Defendants' motion should be granted.

FAEGRE DRINKER BIDDLE & REATH LLP

By: */s/Susan M. Sharko*
Susan M. Sharko
600 Campus Drive
Florham Park, NJ 07932-1047
Telephone: (973) 549-7000
susan.sharko@faegredrinker.com

Rodney M. Hudson
Four Embarcadero Center, 27th Floor
San Francisco, CA 94111-4180
Telephone: (415) 591-7500
rodney.hudson@faegredrinker.com

Chanda A. Miller
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Telephone: (215) 988-2700
chanda.miller@faegredrinker.com

IRWIN FRITCHIE URQUHART & MOORE LLC

By: */s/Kim E. Moore*
Kim E. Moore
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: (504) 310-2100
kmoore@irwinllc.com

*Attorneys for Janssen Research*
*& Development, LLC f/k/a Johnson &*
*Johnson Pharmaceutical Research &*
*Development, LLC, Janssen Ortho LLC,*
*Janssen Pharmaceuticals, Inc. f/k/a/ Janssen*
*Pharmaceutica Inc. f/k/a Ortho-McNeil-*
*Janssen Pharmaceuticals, Inc., and Johnson*
*& Johnson*

ARNOLD & PORTER KAYE SCHOLER LLP

By: */s/Andrew K. Solow*
Andrew K. Solow
Steven Glickstein
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8485
andrew.solow@arnoldporter.com
steven.glickstein@arnoldporter.com

William Hoffman
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5000
william.hoffman@arnoldporter.com

BRADLEY ARANT BOULT CUMMINGS LLP
Lindsey C. Boney IV
One Federal Place, 1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8914
lboney@bradley.com

CHAFFE MCCALL L.L.P.

By: */s/John F. Olinde*
John F. Olinde
1100 Poydras Street, Suite 2300
New Orleans, LA 70163
Telephone: (504) 585-7241
olinde@chaffe.com

*Attorneys for Bayer Healthcare*
*Pharmaceuticals, Inc. and Bayer Pharma AG*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on March 12, 2020, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to Liaison Counsel for Plaintiffs and Defendants by operation of the court's electronic filing system and served on all other Plaintiff's counsel via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre-Trial Order No. 17.  A copy of this filing will also be sent by electronic mail to Plaintiff's counsel at the following address:

> Damon J. Baldone
> Thomas E. Dunn
> Damon J. Baldone & Associates
> 162 New Orleans Blvd.
> Houma, LA 70364
> Email: damon@baldonelaw.com
> Email: thomas@baldonelaw.com

> */s/ Kim E. Moore*
> **Kim E. Moore**