IN RE: XARELTO (RIVAROXABAN)
PRODUCTS LIABILITY LITIGATION

MDL NO. 2592

SECTION L

JUDGE ELDON E. FALLON

MAGISTRATE JUDGE NORTH

**THIS DOCUMENT RELATES TO:**
*Louisiana Health Service and Indemnity Co.*
*d/b/a Blue Cross and Blue Shield of Louisiana, et al.*
No. 15-CV-03913

## ORDER AND REASONS

Before the Court is Defendants' Motion to Dismiss the First Amended Class Action Complaint of three health care third-party payors. R. Doc. 17888. Plaintiffs oppose the motion, R. Doc. 17925, and Defendants replied. R. Doc. 17932. Having considered the parties' briefs and the applicable law, and having heard oral argument, the Court now rules as follows.

### I. BACKGROUND

This case arises out of the multi-district litigation ("MDL") involving the prescription anticoagulant medication known as Xarelto. To put this matter in perspective, a brief review of the litigation is helpful. Beginning in 2014, lawsuits were filed in federal courts throughout the nation against Defendants Bayer Corporation, Bayer HealthCare LLC, Bayer HealthCare Pharmaceuticals Inc., Bayer HealthCare AG, Bayer Pharma AG, Bayer AG, Janssen Pharmaceuticals, Inc., Janssen Research & Development, LLC, Janssen Ortho LLC, and Johnson & Johnson (collectively, "Defendants"). In their suits, plaintiffs assert that they or their family

1

members suffered severe bleeding and other injuries due to Xarelto's allegedly inadequate warning label, as well as other theories.

The Judicial Panel on Multidistrict Litigation ("JPML") determined that the plaintiffs' claims involved common questions of fact, and that centralization under 28 U.S.C. § 1407 would serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation. Accordingly, on December 12, 2014, the JPML consolidated the plaintiffs' Xarelto claims into a single multidistrict proceeding ("MDL 2592"). MDL 2592 was assigned to Judge Eldon E. Fallon of the United States District Court for the Eastern District of Louisiana to coordinate discovery and other pretrial matters in the pending cases. Subsequent Xarelto cases filed in federal court have been transferred to this district court to become part of MDL 2592 as "tag along" cases. In addition, a number of cases were filed directly in this Court and became part of this MDL proceeding. At its peak, the Court had over 30,000 individual cases in this MDL.

After years of discovery and six bellwether trials, the Plaintiffs' Steering Committee ("PSC") and the Defendants entered into settlement discussions and reached a settlement in early 2019. On March 25, 2019, the PSC and Defendants announced the Master Settlement Agreement, which resolves the claims of eligible Xarelto patients who suffered bleeding events, strokes, or cerebrovascular accident, venous thromboembolism, blood clots, and other various injuries that they associated with their use of Xarelto. R. Doc. 17623-1 at 6–7. This is an opt-in settlement program and thus far, over ninety-nine percent of the plaintiffs in this litigation have chosen to opt into the settlement. In addition, all personal injury claims by plaintiffs outside of the settlement program have now been resolved.

The current matter involves Defendants' alleged unfair and deceptive marketing practices related to Xarelto. Three third-party payors ("TPPs")— Louisiana Health Service and Indemnity

Company d/ba/ Blue Cross and Blue Shield ("LABC"), Allied Services Division Welfare Fund ("Allied"), and HMO Louisiana, Inc. ("HMO Louisiana")—brought this action on behalf of themselves and a putative class of TTPs seeking to recover the amounts paid by Plaintiffs to fill Xarelto prescriptions dispensed to their insureds from July 1, 2011 through the present.

The FDA approved Xarelto in July 2011 for the prevention of deep vein thrombosis and pulmonary embolism following hip or knee replacement surgeries, in November 2011 to reduce the risk of stroke and embolism in patients with non-valvular atrial fibrillation, and in November 2012 to treat deep vein thrombosis or pulmonary embolism and their recurrence. Although Plaintiffs admit that Defendants submitted relevant information to the FDA and warned in an FDA-approved label that "Xarelto can cause serious and fatal bleeding," Plaintiff maintain that Defendants did not adequately inform the prescribing medical community about the risks of uncontrollable bleeds associated with Xarelto or advise on how to stabilize a patient should a bleed occur. R. Doc. 1337 ¶ 136. Plaintiffs further allege Defendants fraudulently marketed Xarelto as a "one size fits all," once-daily medication that did not require blood monitoring, minimizing the risks associated with that usage. *Id.* ¶ 150.

As part of their business model, Plaintiffs contract with an outside vendor to provide pharmacy benefit management services for the drug component of their healthcare plans. These pharmacy benefit managers ("PBMs"), after reviewing clinical evidence, prepare a formulary, which is a list of drugs that are approved for coverage by the TTPs.[1] *Id.* ¶ 162. In order for a drug to be listed on the formulary, it must be assessed by the PBM for clinical safety, efficacy, and cost

---

[1] According to the American Society of Health-System Pharmacists, a formulary is "a continually updated list of available medications and related information, representing the clinical judgment, resulting from a review of the clinical evidence, of physicians, pharmacists, and other clinicians in the diagnosis, prophylaxis, or treatment of disease and promotion of health." Christy Ciccarello et al., *ASHP Guidelines on Pharmacy and Therapeutics Comm. and Formulary Sys.*, 78 A. J. HEALTH-SYS. PHARM. 907, 907 (2021).

effectiveness. *Id* In accordance with this procedure, Xarelto was included on Plaintiffs' formularies. Plaintiffs provided reimbursement, in whole or in part, for Xarelto prescriptions prescribed by doctors for covered patients in several states.

Plaintiffs now allege that Defendants mispresented Xarelto's safety and efficacy to the FDA, prescribing physicians, PBMs, and the medical community as a whole. In particular, Plaintiffs argue if the FDA, PBMs, and/or prescribes had truthful and complete information about Xarelto: (1) the Plaintiffs would not have paid for Xarelto at all because PBMs would not have put it on the formularies; or (2) the PBMs would have placed Xarelto in a disfavored tier on their formularies, decreasing the cost to the payors of the drug and deterring physicians from prescribing it. *Id.* ¶¶ 160-165. In either circumstance, the payors allege, they would have paid for the more affordable, less dangerous drug, warfarin. *Id.* ¶ 161.

Based on these allegations, Plaintiffs assert claims for: 1) common law fraudulent misrepresentation; fraudulent concealment; and fraud and deceit; 2) violation of the Illinois Consumer Protection Act; 3) violation of the Louisiana Unfair Trade Practices Act ("LUTPA"); 4) violation of the New Jersey Consumer Fraud Act ("NJCFA"); 5) violations of other state consumer protection statutes; 6) violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"); 7) redhibition; and 8) unjust enrichment.[2] R. Doc. 1337. Plaintiffs seek class certification and monetary damages with pre-judgment and post-judgment interest, treble damages, fees and costs. Regarding the unjust enrichment claims, Plaintiffs seek disgorgement, restitution, and the creation of a constructive trust. *Id.* at 75.

---

[2] Plaintiffs LABC and HMO Louisiana also brought subrogation claims, which have been voluntarily dismissed pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i). R. Doc. 17924.

These claims have been dormant since Plaintiffs filed the First Amended Complaint on September 29, 2015. In the meantime, six bellwether trials were held—three in the MDL[3] and three in the Pennsylvania state court[4]—each of which resulted in judgment in favor of Defendants. Except for the nature of the injuries at issue, the TPPs' factual allegations underlying their claims are identical to those put forth by the personal injury plaintiffs in the MDL.

## II.    PRESENT MOTION

### a.    Defendants' Motion to Dismiss

Defendants now seek to dismiss the Complaint in its entirety under Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. R. Doc. 17888. In particular, Defendants contend that each of Plaintiffs' claims fail to plead facts that would establish proximate causation. First, Defendants argue that Plaintiffs fail to demonstrate a "direct relation" between the injury asserted and alleged injurious conduct, in violation of the proximate cause requirement set forth by the United States Supreme Court in *Holmes* and its progeny. Second, Defendants assert that Plaintiffs impermissibly rely on a fraud-on-the-market theory to establish proximate causation. In Defendants' view, the claim that the medical community as a whole, rather than individual physicians, acted in a particular way in response to the alleged misrepresentations is insufficient to establish liability. Third, Defendants argue that Plaintiff's fraud-based claims fail to satisfy Federal Rule of Civil Procedure 9(b) because Plaintiffs do not identify any particular physician or pharmacy benefit manager that received any alleged misrepresentation, the timing of content of the misrepresentation, or how it caused Plaintiff to act or refrain from acting.

---

[3] *See Boudreaux, Jr., et al. v. Janssen et al.*, (Case No. 2:14-cv-02720); *Orr, Jr., et al. v. Janssen et al.*, (Case No. 2:15-cv-03708); *Mingo v. Janssen Research & Development, LLC, et al.*, (Case No. 2:15-cv-03367)

[4] *See Hartman v. Janssen Pharmaceuticals, Inc., et al.* (Case No. 160503416); *Russell et al. v. Janssen Pharmaceuticals, Inc., et al.* (Case No. 150500362); and *Cooney et al. v. Janssen Pharmaceuticals, Inc., et al.* (Case No. 160602012).

Defendants also provide a number of arguments in support of dismissing Plaintiffs' state law claims, including that Plaintiffs' failed to demonstrate sufficient causation under the various state consumer protection and unfair trade practice statutes.

### b. Plaintiffs' Opposition

Plaintiffs oppose the motion, arguing that they have adequately allegedly a direct causal link between the Defendants' fraudulent marketing of Xarelto and the TPPs' injuries. R. Doc. 17925. Next, Plaintiffs counter that their allegations of fraud are sufficient to support their fraud claims under FRCP 9(b). **Finally,** Plaintiffs further argue that their claims under the state consumer protection and unfair trade practices statutes withstand the alternative grounds for dismissal advanced by Defendants.

### III.    LAW & ANALYSIS

### a. Standard of Review

The Federal Rules of Civil Procedure permit a defendant to seek a dismissal of a complaint based on the "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). "To survive a Rule 12(6) motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The district court must construe facts in the light most favorable to the nonmoving party and must accept as true all factual allegations contained in the complaint. *Id*. However, a

court need not accept "conclusory allegations, unwarranted factual inferences, or legal conclusions" as true. *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005).

### b. Plaintiffs' RICO Claims (Counts IX and X)

#### i. Supreme Court Precedent

To recover for a civil Racketeer Influenced and Corrupt Organizations Act (RICO) violation, a plaintiff must prove that the defendant engaged in (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. 18 U.S.C. § 1962. In addition, "a plaintiff must show injury to business or property and a causal connection between the violation and the injury." *Ironworkers Local Union No. 68 v. AstraZeneca Pharm. LP*, 585 F. Supp. 2d 1339, 1343 (M.D. Fla. 2008). This casual connection encompasses both but-for and proximate cause. *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992) (interpreting the phrase "by reason of" in 18 U.S.C. § 1962(c)). The requirement of proximate cause "demand[s] ... some **direct relation** between the injury asserted and the injurious conduct alleged." *Id.* (emphases added). Put differently, "a link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient." *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 9 (2010) (quoting *Holmes*, 503 U.S. at 271, 274). Proximate cause, broadly speaking, "reflects 'ideas of what justice demands, or of what is administratively possible and convenient.'" *Holmes*, 503 U.S. at 268 (citing W. Keeton et. al., Prosser and Keeton on Law of Torts § 41, p. 264 (5th ed. 1984)).

The *Holmes* Court offered three policy reasons justifying the proximate cause requirement:

> First, the directness of the injury: indirect injuries make it difficult 'to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent factors.' Second, the risk of multiple recoveries: indirect injuries may present such a risk and courts would have to adopt complicated rules apportioning damages to guard against this risk. Third, the likelihood of vindication by others: the need to grapple with the problems presented by indirect claims may be unjustified 'since directly injured victims can generally be counted on to vindicate the law as private attorneys general.'

*In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*, 804 F.3d 633, 642 (3d Cir. 2015) (quoting *Holmes*, 503 U.S. at 269–70). While first-party reliance is not necessary to ensure a sufficiently direct relationship, the Supreme Court has found proximate cause only where the theory of causation is "straightforward" and "there are no independent factors that account for respondents' injury, there is no risk of duplicative recoveries by plaintiffs removed at different levels of injury from the violation, and no more immediate victim is better situated to sue." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658, 128 S. Ct. 2131, 2144, 170 L. Ed. 2d 1012 (2008).

### ii. Circuit Court Precedent

Supreme Court precedent makes clear that the direct relation requirement and *Holmes* factors control the RICO proximate cause analysis. *See Hemi Grp. LLC v. City of New York*, 559 U.S. 1 (2010); *Anza v. Ideal Steel Supply Co*., 547 U.S. 451 (2006). Still, the Circuits are divided on whether TTPs' allegations that pharmaceutical manufacturers deceived physicians and pharmacy benefit managers are can satisfy RICO's proximate cause requirement. The Fifth Circuit has not answered this question directly. The Second, Seventh, and Eleventh Circuits have held that the proximate cause requirement bars derivative claims by TTPs based on allegations that physicians, pharmacy benefit managers, and healthcare providers were deceived by pharmaceutical manufactures.[5] Conversely, the First and Ninth Circuits have allowed TTPs to pursue RICO claims based on allegations that pharmaceutical manufacturers deceived third

---

[5] *See Sidney Hillman Health Center of Rochester v. Abbott Laboratories*, 873 F.3d 574 (7th Cir. 2017); *Sergeants Benevolent Association Health & Welfare Fund v. Sanofi-Aventis U.S. LLP,* 806 F.3d 71 (2d Cir. 2015); *Southeast Laborers Health & Welfare Fund v. Bayer Corp*., 44 F. App'x 401 (11th Cir. 2011)

parties, specifically prescribing physicians or pharmacy benefit managers.[6] The Court now delves into the reasoning of these cases for guidance.

In *Sidney Hillman*, the Seventh Circuit affirmed the dismissal of TTPs' RICO claims based on allegations that a drug manufacturer's marketing of seizure medication to physicians for off-label uses caused TPPs to pay for medically unnecessary prescriptions. *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs*., 873 F.3d 574 (7th Cir. 2017). The Circuit found that misrepresentations made to physicians did not support a RICO claim by insurers "several levels removed in the causal sequence." *Id.* at 578. While "[p]ayors part with money, to be sure," the Circuit concluded that the payors were not the "initially injured parties, let alone the sole injured parties." *Id.* at 576. The Circuit further reasoned that "disentangling the effects of the improper promotions from the many other influences on physicians' prescribing practices would be difficult—much more difficult than following the one-step causal link in *Bridge*." *Id.* at 577.

Likewise, in *Southeast Laborers Health & Welfare Fund v. Byaer Corp*., the Eleventh Circuit upheld the district court's ruling that the TTP failed to satisfy the proximate cause requirement under RICO because the TTP did not show it would have independently determined the drug was not medically necessary if the manufacturer had disclosed the allegedly suppressed information. 444 F. App'x 401 (11th Cir. 2011). The district court had emphasized that doctors are presumed to go beyond advertising to use their independent knowledge in making medical decisions. *Se. Laborers Health & Welfare Fund v. Bayer Corp*., 655 F. Supp. 2d 1270, 1281 (S.D. Fla. 2009). Moreover, loss calculations in that case would require analysis of whether particular physician ever received or relied on company's alleged fraudulent statements, and whether physician, knowing risks and benefits of drugs, would still have used it. *Id.* Similarly, in *Sergeants*

---

[6] *See Painters & Allied Trades District Council 82 Health Care Fund v. Takeda Pharmaceuticals Co. Ltd*., 943 F.3d 1243 (9th Cir. 2019); *In re Neurontin Marketing and Sales Practices Litigation*, 712 F.3d 21 (1st Cir. 2013).

*Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, the Second Circuit found that a health benefit plan could not prove causation by offering evidence of a correlation between disclosure of information regarding drug's safety risks and a decline in sales of drug, without any aggregate statistical proof of causation or without showing individual reliance on misrepresentations by prescribing doctors. 806 F.3d 71, 97 (2d Cir. 2015).

District courts have also dismissed third-party payors RICO claims against manufacturers for lack of proximate causation. *See In re Schering–Plough Corp. Intron/Temodar Consumer Class Action*, 2009 WL 2043604, at 26 (D. N.J., Jul. 10, 2009) (dismissing third party payors' RICO claims alleging where the "court or jury would have to determine whether each prescribing physician received fraudulent marketing information from the Defendants and whether each physician was influenced to prescribe the Subject Drugs on account of Defendants' conduct"); *In re Actimmune Marketing Litigation*., 614 F.Supp.2d 1037 (N.D. Cal. Apr. 28, 2009) (recognizing that doctors prescribe drugs based on "personalized conditions," while rejecting the plaintiffs' claims on causation grounds); *District 1199P Health and Welfare Plan v. Janssen, L.P.,* 2008 WL 5413105, at *9 (D. N.J. Dec. 23, 2008) (questioning whether third party payors "could ever properly plead proximate causation, as required by [*Holmes*] or if the independent and individualized decision-making of physicians prescribing [the subject drug] breaks any chain of causation between Defendants' alleged misconduct and Plaintiffs' payment for the medication"). *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prod. Liab. Litig*., No. 09-20071, 2010 WL 3119499, at *8 (S.D. Ill. Aug. 5, 2010) (holding that "the remoteness of the injury and the speculative nature of any potential damages analysis prevent [third party payors] from meeting the direct causal relationship requirement and proximate cause is therefore lacking.")

By contrast, *In re Neurontin Marketing,* the First Circuit affirmed a RICO verdict in favor of a third-party payer where the district court had found that the TPP relied on Pfizer's fraudulent marketing campaign in deciding to include Neurontin in its formulary. 712 F.3d 28-29 (1st Cir. 2013). Similarly, *in re Avandia*, the Third Circuit, applying the direct relation test, held that "[t]he conduct that allegedly caused [the] plaintiffs' injuries is the same conduct forming the basis of the RICO scheme alleged in the complaint—the misrepresentation of the heart-related risks of taking Avandia that caused TPPs…to place Avandia in the formulary." *In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.,.* 804 F.3d 633, 644 (3d Cir. 2015)*.*

The Ninth Circuit also applied similar reasoning to allegations that the defendants concealed a diabetes medication's risk of bladder cancer, and as a result, Plaintiffs purchased prescriptions for which they would not have paid. *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co. Ltd*., 943 F.3d 1243, 1246 (9th Cir. 2019). There, the Court emphasized that "the failure to warn of the bladder cancer risk in this case makes Plaintiffs' damages more clearly 'attributable to [Defendants'] violation" because it was likely that the risk of causing such a serious disease as bladder cancer would materially influence prescribing physician's decisions. *Id.* at 1258 (citing *Holmes*, 503 U.S. at 269). The Court also considered the allegations offered to confirm Plaintiffs' theory, including the fact that drug sales decreased approximately 80% once the FDA issued its official warning that the diabetes medication may be linked to bladder cancer after prolonged use. *Id.*

### iii.  Proximate Cause Analysis

Upon careful review of the case law, the Court concludes that a line must be drawn to "distinguish the direct consequences in a close causal chain from more attenuated effects influenced by too many intervening causes.'" *Emp'r Teamsters–Local Health & Welfare Trust*

*Fund v. Bristol Myers Squibb Co.*, 969 F.Supp.2d 463, 475 (S.D.W.Va. 2013)). The distinguishing factor appears to be "whether the drug manufacturer directly made misrepresentations to the TPP because otherwise intervening factors—such as a physician's independent medical judgment or a patient's decisionmaking—interrupt the chain of causation." *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs. & Abbvie Inc.*, 192 F. Supp. 3d 963, 970 (N.D. Ill. 2016), *aff'd sub nom. Sidney Hillman Health Ctr. of Rochester v. Abbott Labs.*, 873 F.3d 574 (7th Cir. 2017) *see also In re Testosterone Replacement Therapy Prod. Liab. Litig. Coordinated Pretrial Proceedings*, 159 F. Supp. 3d 898, 919 (N.D. Ill. 2016) (noting that "RICO claims generally survive where TPPs allege that defendants made direct misrepresentations to them and fail where they do not.").

Although the TPPs characterize the casual chain as "direct," the allegations in the Complaint suggest otherwise. The TPPs offer two distinct casual theories to connect Defendants' alleged fraud regarding the safety and efficacy of Xarelto to Plaintiffs' injuries. In their first theory, the TPPs allege that Defendants' misrepresentations to physicians caused them to reimburse prescriptions at greater quantities. R. Doc. 1337 ¶¶ 148-151. As discussed above, the Second, Seventh, and Eleventh Circuits have applied *Holmes* to reject TPP's claims under this type of theory. This Court agrees with the reasoning of the Seventh Circuit in *Sidney Hillman Health*, which found that "[i]mproper representations made to physicians do not support a RICO claim by Payors, several levels removed in the causal sequence." 873 F.3d. at 578. As the Circuit further explained, TPPs are only derivatively injured when physicians and patients are deceived: "Payors part with money, to be sure, but it is not at all clear that they are the initially injured parties, let alone the sole injured parties." *Id.* at 576; *see also Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 2, 130 S. Ct. 983, 985, 175 L. Ed. 2d 943 (2010) ("The general tendency of the law, in

regard to damages at least, is not to go beyond the first step.") This theory requires the Court to move well beyond the first step to account for the intervention of physicians decisionmaking.

The TPP's second theory is that Defendants' false statements, made directly to PBMs, induced the PBMs to place Xarelto on their formularies. R. Doc. 1337 ¶¶ 165-66. Plaintiffs claim that because higher-preference drugs have lower beneficiary co-pays, this in turn caused TPPs to pay for more Xarelto prescriptions at higher prices than they would have otherwise. R. Doc. 1337. ¶ 168. Plaintiffs have not pleaded any facts that, even if true, would establish that they have a legally cognizable claim for alleged deception of PBMs. The TPPs disclaim any allegation that *they* made formulary decisions regarding Xarelto based on Defendants' alleged misrepresentations. Nor have Plaintiffs alleged that their PBM(s) acted as their agents in creating formularies. To the contrary, Plaintiffs admit that the unidentified PBMs are "outside vendor[s]." *Id*. ¶ 160. Moreover, even if Plaintiffs had alleged that their PBMs made decisions regarding Xarelto solely based on Defendants' alleged misrepresentations,[7] Plaintiffs have not alleged how that caused the TPPs themselves, rather than the PBMs, to do or refrain from doing anything that resulted in their paying more for Xarelto prescriptions.

Turning to the *Holmes* factors, the TPPs' attenuated claims squarely illustrate the reasons why "directness of relationship" between a plaintiff's asserted injury and the defendant's allegedly tortious conduct "has been one of [the] central elements" of proximate causation. *Holmes*, 503 U.S. at 269. One reason is that "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors." *Id.* With respect to the TPP's claims, "[i]t is simply impossible, or close to it, to determine the individual thought process of each of the thousands of doctors and patients involved," which is necessary to determine

---

[7] Plaintiffs concede that pharmacy benefit managers assess whether to list a drug on the formulary based on its clinical safety, efficacy, and cost effectiveness. R. Doc. 17925 at 20.

"whether doctors and patients relied upon [defendant's] misrepresentations or whether their decisions were based on other factors." *In re Vioxx Prod. Liab. Litig.*, No. MDL 1657, 2010 WL 11570867, at *7 (E.D. La. Mar. 31, 2010); *see also Sidney Hillman*, 873 F.3d. at 577 ("Disentangling the effects of the improper [pharmaceutical manufacturer] promotions from the many other influences on physicians' prescribing practices would be difficult—much more difficult than following the one-step causal link in *Bridge*.")

Another reason for the direct relation requirement is "the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely." *Holmes*, 503 U.S. at 269–70. Here, thousands of plaintiffs who allege to have been injured from Xarelto have already brought and settled their claims. As in *Sidney Hillman*, "[t]he patients' health and financial costs come first in line temporally; that pharmacies then send bills to Payors, which cover the remainder of the expense, does not make those Payors the initial losers from the [manufacturer's] promotional scheme." 873 F.3d at 576. TPPs could (if they chose) pursue alleged economic injury through subrogation on a patient-by-patient basis, where they would stand in the shoes of their insureds. These policy factors weigh heavily against a finding of proximate causation.

Plaintiffs' other argument—that they are the foreseeable, intended victim of Defendants' conduct—is equally unavailing. At oral argument, Plaintiffs focused on the overall mechanics of the pharmaceutical industry in the United States, asserting that because patients and doctors do not pay for prescriptions themselves, the Defendants could reasonably foresee that their alleged fraudulent conduct would affect third-party payors, who ultimately are responsible for paying for the prescriptions. The Supreme Court, however, has made clear that the proximate cause inquiry does not turn on whether harm to plaintiffs was "foreseeable," "intended" or "desired." *Hemi Grp.,*

*LLC v. City of New York, N.Y.*, 559 U.S. 1, 12 (2010). In fact, prior cases *Anza* and *Holmes* "never even mention the concept of foreseeability." *Id.* at 12. Instead, "in the RICO context, the focus is on the directness of the relationship between the conduct and the harm." *Id.*; *see also In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prod. Liab. Litig.*, No. 09-20071, 2010 WL 3119499, at *8 (S.D. Ill. Aug. 5, 2010) ("[w]hen a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries)." Therefore, Plaintiffs improperly rely on foreseeability as the touchstone of proximate cause rather than the directness of the relationship.

In sum, accepting as true the allegation that Defendants "induce[d] physicians to prescribe Xarelto and pharmacy benefit managers to put Xarelto on their formularies," the alleged injuries necessarily flow from multifaceted and individualized decisions made by thousands of physicians and multiple PBMs who exercise their own independent judgment about whether to prescribe Xarelto to a particular plaintiff or place it on a formulary. Intervening factors, such as the physician or PBM's independent professional judgment and the patient's physical condition, medical history, and personal decisionmaking, interrupt the chain of causation and extinguish proximate causation. And these intervening events are not so "readily predictable" that they could be considered the expected consequence of Defendants' alleged misconduct. *See Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 20 F. Supp. 3d 305, 323 (E.D.N.Y. 2014), *aff'd*, 806 F.3d 71 (2d Cir. 2015). Ultimately, between Defendants' alleged misleading marketing and Plaintiffs' prescription reimbursements "lies a vast array of intervening events" including the independent judgment of both PBMs and physicians. *Emp. Teamsters-Loc. Nos. 175/505 Health & Welfare Tr. Fund v. Bristol Myers Squibb Co.*, 969 F. Supp. 2d 463, 475 (S.D.W. Va. 2013).

The Court therefore concludes that Plaintiffs' RICO claims do not meet the "direct relation" test found in *Holmes* and are insufficient as a matter of law to establish proximate causation.

Because the Court dismisses the TPP's RICO claims for failure to adequately plead proximate cause, any RICO conspiracy claims under § 1962(d) must fail as well. *See United Food & Commercial Workers Unions & Emp'rs Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 856–57 (7th Cir. 2013) ("Having failed to plead facts that would establish a violation of Section 1962(c), [Plaintiff] cannot state a claim for conspiracy under Section 1962(d) based on those same facts.") ; *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs. & Abbvie Inc.*, 192 F. Supp. 3d 963, 972 (N.D. Ill. 2016), *aff'd sub nom. Sidney Hillman Health Ctr. of Rochester v. Abbott Labs.*, 873 F.3d 574 (7th Cir. 2017) (same). For this reason, the Court also need not address Defendants' alternative argument that the TPPs failed to properly alleged racketeering activity on behalf of an enterprise. *In re Oil Spill by Oil Rig Deepwater Horizon,* 802 F. Supp. 2d 725, 731 (E.D. La. 2011) ("Because the Court finds that Plaintiffs have failed to allege proximate causation, it need not address [defendant's] alternative arguments in support of its Motion to Dismiss.")

### c. Plaintiff's State Law Claims

Having addressed the issue of causation in the RICO claims, the Court now turns to an analysis of the TPP's specific claims—each of which Defendants have attacked.

### i. Fraud Claims (Counts I, II and III)

Plaintiffs also brought claims for fraudulent misrepresentation, fraudulent concealment, and fraud and deceit. R. Doc. 1337 ¶¶ 178-217. Plaintiffs do not specify which states' laws should apply to these claims; however, this will not impact the Court's analysis because each state requires

a plaintiff to allege that a defendant made a misrepresentation of material fact and that the plaintiff reasonably relied on it, causing damages.[8]

The threshold issue is whether Plaintiffs have plead their fraud-based claims with sufficient particularity as required by Federal Rule of Civil Procedure 9(b). In alleging fraud or mistake, the Federal Rules of Civil Procedure require a party to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). In this Circuit, pleading fraud with particularity has been defined as stating the "time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby." *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997) (quoting *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994)). In other words, "the who, what, when, and where must be laid out." *Id.* at 178. While Federal Rule of Civil Procedure 9(b) provides that malice, intent, knowledge, and other conditions of a person's mind may be alleged generally, in order to "adequately plead scienter, 'a plaintiff must set forth specific facts that support an inference of fraud.'" *U.S. ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 385 (5th Cir. 2003) (quoting *Tuchman*, 14 F.3d at 1068). "Facts that show a defendant's motive to commit the fraud may sometimes provide a factual background adequate for an inference of fraudulent intent." *Willard*, 336 F.3d at 385.

---

[8] Under Illinois law, common law fraud requires: "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Merix Pharm. Corp. v. Clinical Supplies Mgmt., Inc.*, 59 F. Supp. 3d 865, 878 (N.D. Ill. 2014) (quoting *Connick v. Suzuki Motor Co.*, 174 Ill.2d 482, 497, 221 Ill.Dec. 389, 675 N.E.2d 584, 591 (1996)). Similarly, in New Jersey, the elements of common-law fraud are "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Allstate New Jersey Ins. Co. v. Lajara*, 222 N.J. 129, 147, 117 A.3d 1221, 1231 (2015) (quoting *Banco Popular N. Am. v. Gandi*, 184 N.J. 161, 172–73, 876 A.2d 253 (2005)). Lastly, in Louisiana, delictual fraud involves three elements: (1) a misrepresentation of material fact, (2) made with the intent to deceive, (3) causing justifiable reliance with resultant injury. *Becnel v. Grodner*, 2007-1041 (La. App. 4 Cir. 4/2/08), 982 So. 2d 891, 894 (citing *Newport Ltd. v. Sears Roebuck & Co.,* 6 F.3d 1058, 1068 (5th Cir.1993)).

Defendants argue that Plaintiffs' fraud claims fail under Fed. R. Civ. P. 9(b) because they have not identified specific physicians or PBMs who received misleading information or explained how the alleged fraudulent marketing influenced them to act. In opposition, Plaintiffs respond that they have identified the relevant omitted material information, where it should have appeared, and the way in which it made misrepresentations misleading. Plaintiffs also argue that they have identified specific statements as misleading, such as the claim that Xarelto is safe and effective for once-daily use because Xarelto failed to disclose that "once-daily dosing increased the risk for bleeds which, if they occurred, would be irreversible," and thus have satisfied the 9(b) standard. Plaintiffs take the position that that they are not required to identify "which specific doctors received misrepresentations, which specific misrepresentations were made to the PBMs, and which specific misrepresentations were made to the payors themselves because…'defendants concealed material information from everyone—physicians, other prescribers, pharmacy benefit managers, patients, and payors.'"

This raises a second issue. The Court must consider whether Plaintiffs assert a claim based on generalized proof. "Courts have often rejected the argument that 'generalized allegations and aggregate proof' are sufficient to adequately prove causation." *In re Vioxx Prod. Liab. Litig.*, No. MDL 1657, 2010 WL 11570867, at *7 (E.D. La. Mar. 31, 2010) (citing *In re Schering-Plough Intron/Temodar Consumer Class Action*, No. 06-5774, 2009 WL 2043604, at *25 (D.N.J. July 10, 2009)). As was the case in *Vioxx*, many patients may have chosen to take Xarelto even if they had been fully informed of the risks associated with it. *See* 2010 WL 11570867, at *7. Similarly, in addition to any alleged misrepresentations by Defendants, individual prescribing physicians would have considered, among other things, an individual patient's diagnosis, the patient's medical history, and the physician's past experience with prescribing Xarelto, in addition to any potential

side effects. "Many doctors may have weighed the risks and benefits of the drug and felt that in a specific case, prescribing [Xarelto] was an acceptable risk." *Id.* Moreover, PBMs may have considered clinical data and research and still decided to include it on the formulary.

Some courts have recognized that causation may be proved on a class-wide basis if sufficient circumstantial proof exists to permit the reasonable inference that the third parties in question must have relied on the defendant's misrepresentation.[9] However, such circumstantial evidence is absent here. In fact, Xarelto is still lawfully on the market and is still being prescribed by physicians and included on PBMs' formularies today. The Court cannot presume that a collective group of unnamed physicians and PBMs would have uniformly changed their prescribing decisions and formulary decisions based solely on the marketing information from pharmaceutical manufactures. R. Doc. 17932 at 20. This type of presumption is further weakened by the six defense judgments in Xarelto cases in this MDL and the fact that it is still being prescribed by physicians and still listed on TTP's formularies.

Assuming arguendo that physicians chose to prescribe a different medication or some PBMs changed their formulary decisions based on Defendants' statements, there also is no reason for the Court to assume that warfarin would have been the preferred medication rather than any other (potentially more costly) alternative. For these reasons, a theory that physicians and PBMs would have reacted uniformly to the marketing materials cannot support proximate causation.

---

[9] *See e.g.*, *Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 88 (2d Cir. 2015) (describing instances where class member face "'the same more-or-less one-dimensional decisionmaking process,' such that the alleged misrepresentation would have been 'essentially determinative' for each plaintiff") (quoting Richard A. Nagereda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 120-122 (2009)).

### ii. State Consumer Protection and Unfair Trade Practices Statutes

#### 1. Choice of Law

The Plaintiffs also brought claims under the consumer protection and unfair trade practices statutes of Illinois, New Jersey, and Louisiana. In order to rule on these state-law claims, the Court must make a choice-of-law determination. Unlike the majority of cases in an MDL, which are filed in, or removed to, federal courts across the country and transferred to the MDL court by the Judicial Panel on Multidistrict Litigation,[10] the present case was directly filed into the MDL by two citizens of Louisiana and one citizen of Illinois. For this reason, Louisiana choice-of-law analysis applies to this case. *See In re Vioxx Prod. Liab. Litig.*, 478 F. Supp. 2d 897, 904 (E.D. La. 2007).

Pursuant to Louisiana choice of law principles, consumer protection claims are "governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue." *See* La. Civ. Code, art. 3542 (instructing courts to consider (1) the place of conduct and injury, (2) the domicile, habitual residence, or place of business of the parties; and (3) the state in which the relationship, if any, between the parties was centered)). Stated differently, the ultimate question under Louisiana's choice of law rules is "which state in light of its relationship to the parties and the dispute and its policies rendered pertinent by that relationship, would bear the most serious legal, social, economic, and other consequences if its law were not applied." *Marchesani v. Pellerin-Milnor Corp.*, 269 F.3d 481, 488 (5th Cir. 2001).

This requires the Court to consider the "strength and pertinence" of the relevant policies involved in the present case. *Id.* At first glance, it appears that the policies of (1) upholding the

---

[10] *See* 28 U.S.C. §1407(a). In those cases, "the MDL court must apply the law of the transferor forum, that is, the law of the state in which the action was filed, including the transferor forum's choice-of-law rules. *In re Vioxx Prod. Liab. Litig.*, 478 F. Supp. 2d 897, 903 (E.D. La. 2007) (citing *Ferens v. John Deere Co.,* 494 U.S. 516, 524, 110 S.Ct. 1274, 108 L.Ed.2d 443 (1990)).

justified expectations of parties, (2) minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state, (3) discouraging forum shopping, and (4) favoring interstate uniformity of result, are not significantly implicated. *Id.* Allied is located in— and presumably made payments for Xarelto from and incurred its alleged economic injury in— Illinois. LABC and HMO Louisiana are located in-and presumably made payments for Xarelto from and incurred their alleged economic injuries in—Louisiana. Accordingly, Plaintiffs have no reasons to expect any law other than Louisiana and Illinois should apply to their claims. Second, the Court is much less concerned with subjecting a party to the laws of more than one state when, as is the case here, "the party in question is a manufacturer who, presumably, sells products across the United States (and in fact is arguing for the application of the law of another state)." *Marchesani v. Pellerin-Milnor Corp.*, 269 F.3d 481, 488 (5th Cir. 2001). Third, forum shopping does not appear to come into play given that Plaintiffs filed their claims directly into this MDL. Lastly, considering "the lack of any 'uniform' approach to product liability law throughout the states," the policy of favoring uniform interstate results should not weigh heavily in the analysis. *Id.* at 489.

That being said, the Court concludes that "the policies specifically identified by Louisiana's own choice of law statute with respect to torts—deterring wrongful conduct and repairing the consequences of injurious acts—are the most pertinent to the choice of law analysis in this case." Here, both Illinois and Louisiana have enacted consumer protection or unfair trade practices laws to protect consumers in their respective states. *See Price v. Philip Morris, Inc.*, 219 Ill.2d 182, 233-34, 848 N.E.2d 1, 32 (Ill. 2005) (the ICFA "was enacted…for the purpose of protecting consumers and others against fraud, unfair methods of competition, and unfair or *deceptive acts or practices in the conduct of any form of trade or commerce*"); *Quality Envtl. Processes, Inc. v. LP. Petroleum*

*Co., Inc.*, 144 So.3d 1011, 1025 (La. 2014) ("LUTPA was modeled after the Federal Trade Commission Act ... , and the two acts share the same goals: to protect consumers and to foster competition"). Applying the consumer-protection laws of the state where the resident-consumers are harmed by the wrongful conduct would best serve the policies of deterring wrongful conduct and providing remedies. Accordingly, the Could finds that Louisiana law governs the claims of LABC and HMO, while Illinois law governs the claims of Allied.

## 2. Illinois Consumer Fraud and Deceptive Business Practices Act (Count VI)

The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") "is a regulatory and remedial statute intended to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 934 (7th Cir. 2010) (quoting *Robinson v. Toyota Motor Credit Corp.*, 201 Ill.2d 403, 266 Ill.Dec. 879, 775 N.E.2d 951, 960 (2002)). To recover under the ICFA, a plaintiff must prove: "(1) a deceptive or unfair act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deceptive or unfair practice; and (3) the unfair or deceptive practice occurred during a course of conduct involving trade or commerce." *Id.* In addition to those elements, "to prevail under ICFA, a plaintiff must demonstrate that the defendant's conduct is the proximate cause of the injury." *Id.; see also Oliveira v. Amoco Oil Co.*, 201 Ill.2d 134, 149 (2002) ("Unlike an action brought by the Attorney General under [ICFA], which does not require that 'any person has in fact been misled, deceived or damaged[,]' ... a private cause of action brought under [ICFA] requires proof of 'actual damage.' ... [and] proof that the damage occurred 'as a result of' the deceptive act or practice." (citations omitted)). Illinois courts are clear that "proximate causation is an element of all private causes of action under the

Act" and requires a plaintiff to "prove that he or she was actually deceived by the misrepresentation." *Avery v. State Farm Mut. Auto. Ins. Co.,* 216 Ill.2d 100, 199-200 (2005)

Here, Allied's allegations that Plaintiff, Plaintiff's members, and their physicians, PBMs, and healthcare providers relied on Defendants' marketing is insufficient because even taken as true, such a tenuous casual connection between the alleged injuries and any marketing by Defendants fails the proximate cause requirement of the ICFA. TPPs do not even allege that they received any misrepresentations from Defendants, other than as part of the overall promotion and drug labeling of Xarelto, much less how they acted or refrained from acting to their detriment. *See De Bouse v. Bayer*, 235 Ill. 2d 544, 560, 922 N.E.2d 309, 319 (2009) (finding general deception of "consumers, the medical community, the health care insurance industry, and the public" constituted a market theory which cannot support recovery under the ICFA). The TPP's alleged harm is simply too remote from any alleged deceptive marketing practices by Defendants. For this reason, Plaintiffs' claims under the ICFA must be dismissed for lack of proximate cause.

### 3. Louisiana Unfair Trade Practices Act (Count V)

Plaintiffs BCBSLA and HMO bring this Count individually.[11] R. Doc. 1337 ¶ 231. The Louisiana Unfair Trade Practices and Consumer Protection Act ("LUTPA") contains a private right of action that provides:

> [a]ny person who suffers any ascertainable loss of money or movable property, corporeal or incorporeal, as a result of the use or employment by another person of an unfair or deceptive method, act or practice declared unlawful by R.S. 51:1405, may bring an action individually but not in a representative capacity to recover actual damages.

La. Rev. Stat. § 51:1409. The Fifth Circuit has construed this private right of action narrowly. *In re Vioxx Prod. Liab. Litig.,* No. MDL 1657, 2010 WL 11570867, at *11 (E.D. La. Mar. 31, 2010)

---

[11] The Louisiana Unfair Trade Practices Act prohibits claims brought in a representative capacity.

(citing *Gardes Directional Drilling v. U.S. Turnkey Exploration Co.*, 98 F.3d 860, 867-68 (5th Cir. 1996)). Thus, a plaintiff must be either a business competitor of the defendant or consumer of the defendant's product to avail themselves of the Act. Relevant to the Plaintiffs here, the statute defines a consumer as "any person who uses, purchases, or leases goods or services." La. Rev. Stat. § 51:1402(1). Courts have determined that the definition must also be read in conjunction with the term "consumer transaction," which LUTPA defines as "any transaction involving trade or commerce to a natural person, the subject of which transaction is primarily intended for personal, family, or household use." *Orthopedic & Sports Injury Clinic v. Wang Labs., Inc.,* 922 F.2d 220, 226 (5th Cir. 1991) (citing La. Rev. Stat. § 51:1402(3)).

The availability of remedies under the LUTPA for all consumers was transformed when the Louisiana Legislature enacted the LPLA in 1988. The LPLA "establishes the exclusive theories of liability for manufacturers for damage caused by their products." LA. REV. STAT. ANN. § 9:2800.52. "Damage" is defined as "damage to the product itself and economic loss arising from a deficiency in or loss of use of the product only to the extent that [a redhibition cause of action] does not allow recovery for such damage or economic loss." LA. REV. STAT. ANN. § 9:2800.53(5). A "manufacturer" is defined as a "person or entity who is in the business of manufacturing a product for placement into trade or commerce." LA. REV. STAT. ANN. § 9:2800.53(1). In essence, this exclusive remedy provision "limits a plaintiff's theories of recovery against a manufacturer of an allegedly defective product to those established by the LPLA." *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 261–62 (5th Cir. 2002).

Under the LPLA, a manufacturer is liable for damages caused by an unreasonably dangerous product. A product may be dangerous (1) in construction or composition; (2) in design; (3) because an adequate warning about the product has not been provided; and (4) because it does

not conform to an express warranty of the manufacturer about the product. LA. REV. STAT. ANN. §§ 9:2800.55-58. "The sole exception to the exclusivity provisions under the LPLA is redhibition, which the Act expressly preserved. Thus, the plain language of the LPLA demonstrates the legislature's intent to make the LPLA and Louisiana redhibition law the sole vehicles for a suit against a manufacturer for damages arising from a defective product." *In re Vioxx Prod. Liab. Litig.,* No. MDL 1657, 2010 WL 11570867, at *12 (E.D. La. Mar. 31, 2010).

Plaintiffs argue that their claims are not barred by the exclusivity provisions of the LPLA because "none of the plaintiffs' causes of action is a products liability claim." R. Doc. 17925 at 53. According to Plaintiffs, the damages for which they seek to recover arise from defendants' deceptive acts, rather than any defect in the product. *Id.* This argument is unconvincing. It is not disputed that Defendants are the manufacturer of Xarelto nor that Xarelto is a product as defined by the Act. Additionally, in the Complaint, the Plaintiffs specifically allege that Defendants' drug Xarelto contained a defect. R. Doc. 1337 ¶ 304.

Plaintiffs fail to recognize that the Louisiana legislature, "with full knowledge of the LUTPA, unquestionably enacted the LPLA statutory declaration of exclusive liability in the LPLA and made no exception for the LUTPA." *Bladen v. C.B. Fleet Holding Co*., 487 F. Supp. 2d 759, 767 (W.D. La. 2007). Similar conclusions have been reached by other Louisiana courts examining this issue. *See Cantu v. C.B. Fleet Holding Co., Inc.,* No. 06-2168, 2007 WL 689566 (W.D. La. 2007) ("[I]f this court were to permit the plaintiffs to allege a cause of action for violations of LUTPA, it would be contrary to the fundamental principles of the LPLA."); *Stahl v. Novartis Pharmaceuticals Corp.,* 283 F.3d 254, 261 (5th Cir. 2002) (affirming the district court's dismissal of the plaintiff's intentional tort claim holding that there is no intentional tort exception in the LPLA's exclusive remedy provisions); *Grenier v. Medical Engineering* 243 F.3d 200, 2036-06

(5th Cir. 2001) (affirming the district court's dismissal of a fraud claim and other tort claims not among the exclusive theories of liability in the LPLA).

Plaintiffs cannot circumvent the exclusivity provision of the LPLA by framing their allegations as deceptive trade practice claims. Because the LPLA is the exclusive vehicle of relief for damage caused by the product of a manufacturer, it is unnecessary to address Defendants' other arguments at this time.[12] Accordingly, Plaintiff's LUTPA claim must be dismissed.

### 4. New Jersey Consumer Fraud Act (Count VI)

Plaintiffs have made no effort to justify the application of New Jersey law to their claims; however, should the law apply, the claims under the New Jersey Consumer Fraud Act ("NJCFA") must be dismissed.

The NJCFA prohibits "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise." N.J. Stat. Ann. § 56:8–2. To state a claim under the NJCFA, "a plaintiff must allege each of three elements: (1) unlawful conduct by the defendants; (2) an ascertainable loss on the part of the plaintiff; and (3) a causal relationship between the defendants' unlawful conduct and the plaintiff's ascertainable loss." *Se. Laborers Health & Welfare Fund v. Bayer Corp.*, 444 F. App'x 401, 404–05 (11th Cir. 2011) (citing *N.J. Citizen Action v. Schering–Plough Corp.*, 367 N.J.Super. 8, 842 A.2d 174, 176 (2003)).

---

[12] Defendants alternatively contend that Plaintiffs have failed to state a claim under LUPTA because have not alleged that they saw, heard or read Defendants' alleged misrepresentations and acted on them. R. Doc. 17888-1 at 56. The Court need not reach this issue because the claim is precluded by the LPLA.

While the NJCFA does not require proof of actual reliance, unlike some common law claims, a plaintiff must demonstrate that its ascertainable loss is "attributable to conduct made unlawful by the [NJCFA]." *Thiedemann v. Mercedes–Benz USA, LLC,* 183 N.J. 234, 872 A.2d 783, 791 (2005) (citation omitted). Put simply, "New Jersey courts have interpreted the NJCFA as requiring a causal link between the practice and the harm." *Cannon v. Cherry Hill Toyota, Inc*., 161 F.Supp.2d 362, 374–75 (D.N.J. 2001).

In the present case, as discussed above, Plaintiffs' have not adequately pled a causal connection between any loss they may have suffered and Defendants' alleged misrepresentations or omissions. For this reason, the TPPs' NJCA claims must be dismissed. [13]

### vi.    Redhibition (Count XI)

Plaintiffs have also asserted a claim for redhibition. Defendants contend that Plaintiffs' redhibition claim must fail because Plaintiffs are not "buyers" since they do not gain ownership of the drug within the meaning of the Louisiana Civil Code. R. Doc. 17888-1 at 59.

Under Louisiana law, a "seller warrants the buyer against redhibitory defects, or vices, in the thing sold." La. Civ. Code Ann, art. 2520. There are two ways that a product can have a redhibitory defect. First, if the product is rendered entirely useless so that it is safe to presume that the buyer would not have purchased the product if he had been aware of the defect, then the buyer has a right to obtain recission of the sale. *Id.* Second, if a product has a defect that diminishes its utility to a point where the buyer would still have bought the product, but at a lesser price, if he had been aware of the defect, then the buyer has a right to recover the difference between the

---

[13] Defendants also contend that the Plaintiffs are not "consumers" entitled to sue under the Act. R. Doc. 17888-1 at 45. This Court recognizes that other courts have found in this context that TPPs are not consumers because they do not purchase drugs for their own use or consumption. *See e.g.*, *In re Shceuling-Plough Corp*.,No. 06-5774 2009 WL 2043604, at *31 (D.N.J. July 10, 2009); *In Re Rezulin Prods. Liab. Litig*., 392 F. Supp. 2d 597 (S.D.N.Y. 2005). This Court, however, need not decide this issue because Plaintiffs' allegations are insufficient to support their NJCFA claim. *See Dist. 1199P Health & Welfare Plan v. Janssen, L.P*., 784 F. Supp. 2d 508, 531 (D.N.J. 2011).

excess price and the amount which he would have paid otherwise. *Id.* In order to prevail on a redhibition claim, a plaintiff must prove three elements: (1) the thing sold is absolutely useless for its intended purposes or that he would not have bought it had he known of the defect; (2) that the defect existed at the time he purchased the thing, but was neither known or apparent to him; (3) that the seller was given the opportunity to repair the defect. *Alston v. Fleetwood Motor Homes of Indiana*, 480 F.3d 695, 699 (5th Cir. 2007) (quoting *Dalme v. Blockers Mfd. Homes, Inc.*, 2000-00244 (La. App. 3 Cir. 1/25/01); 779 So. 2d 1014, 1028)).

The Louisiana Civil Code does not contain a definition for the term "buyer." The Civil Code, however, defines a "sale" as "a contract whereby a person transfers ownership of a thing to another for a price in money." LA. CIV. CODE ANN. art. 2439. Defendants, focusing on the "transfer of ownership," claim that HMO and LABC were not buyers of Xarelto because they never took possession of Xarelto, and merely paid some of the cost for patients who purchased Xarelto. R. Doc. 17888-1 at 58-59. On the other hand, Plaintiffs allege that they paid for "some or the entire purchase price for Xarelto," and therefore Plaintiffs "are the buyers without whom the transaction would never take place." R. Doc. 17925 at 45-46. This Court has previously distinguished between Medicaid providers, who pay the entire drug price, and private TTPs like Plaintiffs, who pay only a portion of the price. *In re Vioxx Prod. Liab. Litig.*, No. MDL 1657, 2010 WL 11570867, at *9 (E.D. La. Mar. 31, 2010). And the Court is skeptical that the TPPs qualify as buyers under Louisiana law in the present case.

However, even if the TPPs were considered buyers in this circumstance, causation still presents an insurmountable hurdle for Plaintiffs. Redhibition requires a simple objective test as to whether a thing is so useless "it must be presumed that buyer would not have bought the thing had he known of the defect." La. Civ. Code art. 2520. In this context, that means reasonable doctors or

reasonable patients would not have prescribed or taken Xarelto had they known of its defect. As this Court has previously stated, "what a reasonable person would have done is based on the circumstances of each individual medical case." *In re Vioxx Prod. Liab. Litig.*, 2010 WL 11570867, at *11. Because the scope of the risks inherent in Xarelto require an individual analysis, Plaintiffs cannot show causation based on a theory that fewer doctors would have prescribed and fewer patients would have taken Xarelto but for Defendants' actions. For this reason, Plaintiffs redhibition claims must fail. The appropriate remedy here lies with the patients, who also pay part of the drug price and may assert redhibition claims on their own behalf.

vii. **Violations of other state consumer protection statutes (Count VII) and the Uniform Deceptive Trade Practices Act ("UDTPA") (Count VIII)**

Plaintiffs also purport to bring claims under the consumer protection statutes of the remaining 47 states and on a behalf of a subclass of class members who reside in the 22 states who have enacted the Uniform Deceptive Trade Practices Act ("UDTPA"). As previously discussed above,[14] other state laws are not applicable. Louisiana choice-of-law analysis dictates that the ICFA applies to Plaintiff Allied Services Fund and the LUPTA applies to Plaintiffs LABC and Louisiana HMO. Accordingly, these claims under other state consumer protections laws must be dismissed.

viii. **Unjust Enrichment (Count XIII)**

Plaintiffs additionally argue that they have stated claims for unjust enrichment under Louisiana, Illinois, and New Jersey law.

---

[14] *See* part III(c)(ii)(1).

Louisiana law provides that claims for unjust enrichment "shall not be available if the law provides another remedy for the impoverishment or declares a contrary rule." La. Civ. Code Ann. art. 2298. Courts generally have held that where all of the plaintiff's other tort claims have failed because of the remoteness of a plaintiff's injuries form a defendant's wrongdoing, an unjust enrichment claim must also fail. *See Southeast Laborers Health & Welfare Fund v. Bayer Corp.,* 655 F. Supp. 2d 1270, 1289 (S.D. Fla. 2009) (collecting cases). Notably, "it is not the success or failure of other causes of action, but rather the existence of other causes of action, that determine whether unjust enrichment can be applied." *In re Vioxx Prod. Liab. Litig.*, No. MDL 1657, 2010 WL 11570867, at *14 (E.D. La. Mar. 31, 2010) (citing *Garber v. Badon & Ranier* No. 07-1497, p. 10; 981 So. 2d 92, 99-100 (La. App. 3 Cir. 4/2/08)). Here, Plaintiffs' claims are precluded because another legal remedy is available in the form of subrogation claim on behalf of their insureds. Therefore, LABC's and HMO Louisiana's unjust enrichment claims fail as a matter of law and must be dismissed.

Under Illinois law, "unjust enrichment is not a separate cause of action," but rather, it is a "condition brought about by fraud or other unlawful conduct." *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 739–40 (7th Cir. 2019) (quoting *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 447 (7th Cir. 2011)). Accordingly, Allied's unjust enrichment claim must fail along with the related fraud claims. *Cleary v. Philip Mlateorris Inc.*, 656 F.3d 511, 518 (7th Cir. 2011); *see, e.g., Ass'n Benefit Servs. v. Caremark Rx, Inc.,* 493 F.3d 841, 855 (7th Cir.2007) ("[W]here the plaintiff's claim of unjust enrichment is predicated on the same allegations of fraudulent conduct that support an independent claim of fraud, resolution of the fraud claim against the plaintiff is dispositive of the unjust enrichment claim as well.").

Lastly, as stated above, Plaintiffs have made no justifications for the application of New Jersey law. Under New Jersey law, "in the tort setting, an unjust enrichment claim is essentially another way of stating a traditional tort claim." *Id.* (citing *Steamfitters Local Union No. 420 Welfare Fund v. Phillip Morris, Inc.,* 171 F.3d 912 (3d Cir. 1999)). Where, as here, "the injury or loss is simply too remote and attenuated to establish the causation element required to sustain Plaintiffs' claims[,] [t]he remoteness of the alleged injury to Defendants' actions also dooms Plaintiffs' unjust enrichment claim." *Id.*

## IV.    CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that Defendants' Motion to Dismiss, R. Doc. 17888, is **GRANTED**. The Plaintiffs' First Amended Complaint is **DISMISSED** with prejudice.

New Orleans, Louisiana, this 8th day of July, 2021.

UNITED STATES DISTRICT JUDGE