UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION** | **MDL NO. 2592**<br><br>**SECTION L**<br><br>**JUDGE ELDON E. FALLON**<br><br>**MAGISTRATE JUDGE NORTH** |
| **THIS DOCUMENT RELATES TO:**<br>*Stone vs. Janssen Research & Development LLC, et al*<br>No. 17-5372 | |

## ORDER AND REASONS

Before the Court are (1) Defendants' Motion for Summary Judgment, R. Doc. 17940, and (2) Plaintiff's motion for leave to file an affidavit of another medical expert. R. Doc. 17998. Both motions are opposed. R. Docs. 17952; 17999. Having considered the parties' arguments and the applicable law, and having heard oral argument, the Court now rules as follows.

### I. BACKGROUND

This matter arises from damages Plaintiff Nicole Nails Stone claims to have suffered, individually and on behalf of the estate of Raymond Nails, from the manufacture, sale, distribution, and/or use of the medication known as Xarelto, an anti-coagulant used for a variety of blood-thinning medical purposes. R. Doc. 4 at ¶¶ 1-2.[1]

The decedent Mr. Raymond Nails was first prescribed Xarelto on May 17, 2016 at the age of 81 by his cardiologist Dr. Samuel Stagg to reduce the risk of stroke and systemic embolism as

---
[1] Complaint filed in case no. 17-cv-5372.

1

a result of his recently diagnosed atrial fibrillation and other underlying health conditions.[2] On June 2, 2016, Mr. Nails presented to his healthcare providers with unresolved gastrointestinal issues, and he was scheduled for a colonoscopy. Dr. Stagg approved that Mr. Nails could take Xarelto for up to a week before the procedure and any related surgery that might be necessary following the findings of the colonoscopy.[3] On June 13, 2016, more than seven days after he ceased taking Xarelto, Mr. Nails had a colonoscopy, which revealed a cancerous tumor in his colon requiring surgery.[4] Mr. Nails was cleared for surgery the following day by a nurse practitioner because sufficient time had passed since his last dose of Xarelto.[5] During surgery the next day, Plaintiff suffered a severe and uncontrollable hemorrhage and died shortly after.[6]

Based on the foregoing, Plaintiff alleges that Mr. Nails suffered an asymptomatic gastrointestinal bleed from Xarelto use which caused his death during surgery. Plaintiff's claims sound in negligence, strict liability, breach of express and implied warranties, misrepresentation, fraud, and violation of consumer protection statutes. Plaintiff seeks to recover compensatory and economic damages, punitive damages, prejudgment and post judgment interest, attorney's fees, and costs.

Similar plaintiffs have filed suits in federal courts throughout the nation against Defendants Bayer Corporation, Bayer HealthCare LLC, Bayer HealthCare Pharmaceuticals Inc., Bayer HealthCare AG, Bayer Pharma AG, and Bayer AG, Janssen Pharmaceuticals, Inc., Janssen Research & Development, LLC, Janssen Ortho LLC, and Johnson & Johnson. The Judicial Panel

---

[2] Mr. Nails had a history of peripheral vascular disease, diabetes, hypertension, and hyperlipidemia. R. Doc. 17940-4, Stagg Dep. 23:20-25; 26:1-15.
[3] *See* R. Docs. 17940-7, Cardiovascular Institute of the South Records; 17940-4, Stagg Dep. 53:7-13, 61:5-10.
[4] R. Doc. 17940-9, Terrebonne General Medical Center Records.
[5] R. Docs. 17940-11, Windham Dep. 24:22-25:4, 42:24-43:11, 47:13-18; 17940-12, Terrebonne General Medical Center Consultation Report.
[6] R. Doc. 17940-10.

on Multidistrict Litigation determined that the plaintiffs' claims involved common questions of fact, and that centralization under 28 U.S.C. § 1407 would serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation. Therefore, on December 12, 2014, the Judicial Panel on Multidistrict Litigation consolidated the Plaintiffs' Xarelto claims into a single multidistrict proceeding ("MDL 2592"). MDL 2592 was assigned to Judge Eldon E. Fallon of the United States District Court for the Eastern District of Louisiana to coordinate discovery and other pretrial matters in the pending cases. At its peak, the Court had over 30,000 individual cases in this MDL.

After years of discovery and six bellwether trials, the Plaintiffs' Steering Committee ("PSC") and the Defendants entered into settlement discussions and reached a settlement in early 2019. On March 25, 2019, the PSC and Defendants announced the Master Settlement Agreement, which resolves the claims of eligible Xarelto patients who suffered bleeding events, strokes, or cerebrovascular accident, venous thromboembolism, blood clots, and other various injuries that they associated with their use of Xarelto.[7] This is an opt-in settlement program and thus far, over ninety-nine percent of the plaintiffs in this litigation have chosen to opt into the settlement.

Unlike the majority of cases in an MDL, which are filed in, or removed to, federal courts across the country and transferred to the MDL court by the Judicial Panel on Multidistrict Litigation, the present case was directly filed in this District and became part of MDL No. 2592. Plaintiff did not opt-in to the settlement program; however, the case remains governed by the relevant case management orders issued in the MDL.[8]

---

[7] R. Doc. 17623-1 at 6–7.
[8] *See* R. Doc. 17595-3. On December 12, 2019, Plaintiff completed a Notice of Intent to Proceed, which indicates that she intends to litigate her claims against Defendants and is obligated to comply with all the requirements of Case Management Order ("CMO") 11. *See* R. Doc. 17595-3. On June 1, 2021, the Court ordered provision 10(2)(3) of CMO 11 does not apply to this case. This simply required Defendants to answer Plaintiff's Complaint individually. *See* R. Doc. 17971.

## II.     PRESENT MOTION

### 1. Defendants' Motion for Summary Judgment (R. Doc. 17940)

Defendants now move for summary judgment arguing that Plaintiff cannot prevail on any of her claims under Louisiana law for Mr. Nails' asymptomatic gastrointestinal bleed or his death during surgery. First, Defendants argue that Plaintiff lacks evidence that an inadequate warning label caused Mr. Nails' injuries based on the prescribing physician's testimony. Second, Defendants argue there is no proof that Mr. Nails used Xarelto at or around the time of his fatal surgery; thus, Plaintiff cannot show Xarelto was the medical cause of the alleged injuries. Third, Defendants argue that Plaintiff's manufacturing defect claim fails because there is no evidence that the Xarelto used by Mr. Nails deviated from the manufacturing process. Similarly, Plaintiff's design defect claim must also fail because she cannot show there was an alternative design available capable of preventing the alleged damage. Finally, Defendants argue that all of Plaintiff's common law claims fail because under Louisiana law, the LPLA provides the exclusive remedy for her claims for negligence, breach of express and implied warranties, misrepresentation, fraud, and violation of consumer protection statutes.

In opposition, Plaintiff argues there is a dispute of fact as to the cause of death that precludes summary judgment.[9] Plaintiff provided an affidavit from Dr. Donald Schwab, the surgeon performing the operation when the decedent began the uncontrollable bleeding. Dr. Schwab contends "it is more probable than not, to a medical certainty, that the excessive and unstoppable bleeding which led to Mr. Nails' death during his surgery, was caused by his use of Xarelto."[10] Plaintiff also argues that the relevant warning for the purposes of this case is not the

---

[9] R. Doc. 17952.
[10] R. Doc. 17952-2 at 2.

4

risk of bleeding, but rather the risk of bleeding even after the use of Xarelto is discontinued for 48 hours.[11] Dr. Schwab stated that had the warning label warned him of the risk of bleeding after a patient had been off of Xarelto for 48 hours, "he would have changed his decision on Mr. Nails' surgery."[12]

Defendants replied, arguing that the Dr. Schwab's affidavit is not competent summary judgment evidence because Dr. Schwab repudiated the affidavit at his deposition and stated that the affidavit was prepared by the attorney and he did not carefully read it before signing it.[13] In his deposition, Dr. Schwab testified he never read the Xarelto label before Mr. Nail's surgery.[14] In fact, he first read the label at the time of his deposition.[15] As a result, Defendants contend no matter what warning was included on the label, Dr. Schwab would not have seen it and thus the contents of the label cannot serve as a causal link between the alleged inadequate warning and Mr. Nails' death. Moreover, Defendants also note that Dr. Schwab was unwilling to opine on whether Xarelto could have caused Mr. Nails' death and testified he does not know if there was any Xarelto actually in Mr. Nails' system during surgery. Defendants further argue that summary judgment is appropriate here because Plaintiff fails to prove medical causation, which is fatal to every claim.

**2. Plaintiff's Motion for Leave to File Affidavit of Medical Expert (R. Doc. 17998)**

Plaintiff has apparently decided not to call Dr. Schwab as a witness and now seeks to call a new expert (which is the third one) and moves for leave to file an affidavit from this new expert. On August 17, 2021, the day before oral argument was set in this matter, Plaintiff filed a motion for leave to file an affidavit by Dr. Laber.[16] In the affidavit, Dr. Laber states that it is more probable

---

[11] *Id.*
[12] *Id.*
[13] R. Doc. 17992.
[14] R. Doc. 17992-1, Schwab Dep. 42:1-18, 68:23-70:5.
[15] *Id.*
[16] R. Doc. 17998

than not that the bleeding during Mr. Nails' surgery which led to his death was caused by Xarelto, Cilostazol, and Effient.[17] Additionally, Dr. Label asserts the Xarelto warning label was "inadequate because it did not warn Mr. Nails of the increased risk or uncontrollable bleeding if stopped longer than 24 hours prior to surgery.[18] Dr. Laber further states that the warning label was inadequate because it does not address the half-life of Xarelto "in unhealthy and elderly subjects" like Mr. Nails and fails to warn of the risk of uncontrollable bleeding and death with Xarelto if used with Cilostazol and Effient.[19]

In response, Defendants argue that Plaintiff's motion to substitute Dr. Laber for Plaintiff's pervious two failed expert is both untimely and insufficient to overcome summary judgment even if considered.[20]

## III. LAW & ANALYSIS

### A. Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Id.* A party moving for summary judgment bears the initial burden of demonstrating the basis for summary judgment and

---

[17] R. Doc. 17998-4, Laber Affidavit, ¶ 6
[18] *Id.* ¶ 8.
[19] *Id.* ¶¶ 9, 10.
[20] R. Doc. 17999.

identifying those portions of the record, discovery, and any affidavits supporting the conclusion that there is no genuine issue of material fact. *Id.* at 323. If the moving party meets that burden, then the nonmoving party must use evidence cognizable under Rule 56 to demonstrate the existence of a genuine issue of material fact. *Id.* at 324.

A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1996). "[U]nsubstantiated assertions," "conclusory allegations," and merely colorable factual bases are insufficient to defeat a motion for summary judgment. *See Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994); *see also Anderson*, 477 U.S. at 249-50. In ruling on a summary judgment motion, a court may not resolve credibility issues or weigh evidence. *See Int'l Shortstop, Inc. v. Rally's Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991). Furthermore, a court must assess the evidence, review the facts and draw any appropriate inferences based on the evidence in the light most favorable to the party opposing summary judgment. *See Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 502 (5th Cir. 2001); *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986).

B. **Louisiana Product Liability Act Claims**

The Louisiana Products Liability Act ("LPLA") establishes "the exclusive theories of liability for manufacturers for damage caused by their products." La. Rev. Stat. § 9:2800.52. Accordingly, "[a] claimant may not recover from a manufacturer for damage caused by a product on the basis of any theory of liability that is not set forth in [it]." *Id.* Under the LPLA, "a plaintiff must establish four elements: (1) that the defendant is a manufacturer of the product; (2) that the claimant's damage was proximately caused by a characteristic of the product; (3) that this characteristic made the product 'unreasonably dangerous'; and (4) that the claimant's damage arose from a reasonably anticipated use of the product by the claimant or someone else." *Stahl v.*

7

*Novartis Pharm. Corp.*, 283 F.3d 254, 260–61 (5th Cir. 2002) (citing La. R.S. § 9:2800.54). The four kinds of unreasonably dangerous product are: (1) in construction or composition; (2) in design; (3) because an adequate warning about the product has not been provided; and (4) because it does not conform to an express warranty of the manufacturer about the product *In re Vioxx Prod. Liab. Litig.*, No. MDL 1657, 2010 WL 11570867, at *12 (E.D. La. Mar. 31, 2010) (citing La. R.S. § 9:2800.55-58). Consequently, the LPLA provides four recovery theories: construction or composition defect (also known as manufacturing defect), design defect, inadequate warning, and breach of express warranty. Plaintiff pursues all four of these liability theories.

### i. Failure to Warn and the Learned Intermediary Doctrine

The Court first turns to Plaintiff's inadequate warning claim. To maintain a failure-to-warn claim, a plaintiff must demonstrate that the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product. La. R.S. § 9:2800.57. Any inquiry into an inadequate warning claim must be "viewed through the lens of the "learned intermediary doctrine," which Louisiana law applies to [LPLA] claims involving prescription drugs dispensed by a physician. *Grenier v. Med. Eng'g Corp.*, 99 F. Supp. 2d 759, 765 (W.D. La. 2000), *aff'd*, 243 F.3d 200 (5th Cir. 2001). Under this doctrine, a drug manufacturer discharges its duty to consumers by reasonably informing prescribing physicians of the dangers of harm from a drug. *Anderson v. McNeilab, Inc.*, 831 F.2d 92, 93 (5th Cir. 1987)

To prevail on an inadequate warning claim when the learned intermediary doctrine is applicable, a plaintiff must demonstrate the following: first, "that the defendant failed to warn (or inadequately warned) the physician of a risk associated with the product that was not otherwise

known to the physician," and second, "that this failure to warn the physician was both a cause in fact and the proximate cause of the plaintiff's injury." *Stahl v. Novartis Pharm. Corp.,* 283 F.3d 265, 266 (5th Cir. 2002). Stated differently, the plaintiff must show that "a proper warning would have changed the decision of the treating physician; but for the inadequate warning, the treating physician would not have used or prescribed the product." *Whitener v. PLIVA, Inc.,* No. 10-1552, 2014 WL 1276489, at *5 (E.D. La. Mar. 27, 2014), *aff'd*, 606 F. App'x 762 (5th Cir. 2015).

In this case, Plaintiff fails to raise a genuine issue of material fact as to the adequacy of Xarelto's warnings to the treating physician. Xarelto's labeling clearly and repeatedly warns of serious or fatal bleeding, the specific ailment suffered by Mr. Nails.[21] Additionally, Mr. Nails' prescribing physician Dr. Stagg unequivocally testified that the Xarelto label's warning adequately warned him the risk of bleeding associated with Xarelto use.[22] Dr. Stagg testified that he prescribed Xarelto to Mr. Nails in May 2016, after weighing the risk of bleeding against the risk of thrombotic events, as reflected in Mr. Nail's "CHADS-VASc" score and his atrial fibrillation diagnosis. According to Dr. Stagg, Mr. Nails' CHADS-VASc score was very high, and he "had every factor that you can have for vascular disease, and he was on all the treatments that [Dr. Stagg] thought appropriate at that point."[23] Dr. Stagg further testified that "atrial fibrillation . . . increases the risk in general terms of having a stroke by 500 percent or five times" and with atrial fibrillation "the strokes are more likely to be severe, fatal, or recurrent. So it's a severe problem."[24] Dr. Stagg testified that Xarelto's label provided him with the information necessary to make an informed prescribing decision both at the time of prescription and prior to Mr. Nails' surgery:

---

[21] *See e.g.*, R. Doc 17940-5, USPI Highlights of Prescribing Information, ("XARELTO increases the risk of bleeding and can cause serious or fatal bleeding").
[22] *See* R. Doc. 17940-2, Stagg Dep. 38:10-39:4; 70:1-20.
[23] *Id.* at 26:12-15; 37:2-38:6; *id.* at 27:2- 5 ("the chances of him living to this stage were somewhat limited or--or decreased because of all this terrible vascular disease he had").
[24] *Id.* at 37:2-38:6.

9

Q. Dr. Stagg, in May 2016, you prescribed Xarelto for Mr. Nails. Did you have all the essential information you needed to make a proper risk-benefit decision?

A. Yes.[25]

Dr. Stagg emphasized that he "thought at that point [Xarelto] was the preferred medication for [Mr. Nails]. I -- I still would feel that way. So I – that's the reason I used it."[26]

Therefore, the clear and unequivocal testimony demonstrates that Dr. Stagg had the relevant information to both safely prescribe and discontinue Xarelto as appropriate. Under established Fifth Circuit precedent, when a particular side effect is clearly stated in a warning label and the prescribing physician states that he or she was adequately informed of that risk by the warning, the manufacturer has satisfied its duty to warn under the learned intermediary doctrine. *Stahl v. Novartis Pharm. Corp.,* 283 F.3d 254, 268 (5th Cir. 2002). Accordingly, based on the undisputed facts and Dr. Stagg's testimony, the Court finds that Defendants have satisfied their duty to warn under the learned intermediary doctrine as a matter of law.

### (1) Medical Causation

Furthermore, Plaintiff's failure to warn claim cannot survive judgment because there is no dispute of fact as to medical causation. To establish the element of medical causation, the LPLA requires affirmative proof of product use at the relevant time, which in this case is close proximity to the June 14, 2016 surgery. Plaintiff has the burden of proof that a manufacturer's product proximately caused her injury. *Jefferson v. Lead Indus. Ass'n, Inc.*, 106 F.3d 1245, 1252 (5th Cir. 1997). Plaintiff does not provide any evidence to dispute that Mr. Nails discontinued his use of

---

[25] *Id.* at 45:19-46:9.
[26] *Id*. at 39:19-22; 45:19-46:9; 116:15-117:3.

Xarelto a week before surgery; thus, Xarelto no longer was present in his system at the time surgery.

To start, Dr. Stagg testified that he ordered Mr. Nails to discontinue using Xarelto for a week prior to his colonoscopy:

> With Xarelto, usually you can hold it for one or two or three days and the medication is gone. But because he had some issue with his kidney function and was on other medicines, I put that it was all right to hold all of them for up to a week.[27]

Dr. Stagg understood that for "Xarelto, the half-life as I understand in somebody [Mr. Nails'] age is up to 14 hours or 16 hours or so. So after a week off of it, there should be basically none left or a minuscule amount, not enough to anticoagulate or cause a problem."[28] Upon Mr. Nails' admission to the hospital for surgery, Nurse Practitioner Windham conducted a pre-surgery screening with Mr. Nails and confirmed that he had in fact discontinued Xarelto and his antiplatelet medications a week earlier.[29] Nurse Windham stated that the "standard of care is to hold these types of medications for seven days prior to an invasive procedure or surgery" so that the Xarelto is eliminated from the body.[30] Windham's contemporaneous notes and testimony also indicate that Mr. Nails withheld Xarelto for seven days prior to his surgery:

> Q. So at that point, Mr. Nails would have last used Xarelto and his antiplatelet medications eight days before that procedure; is that a correct interpretation of your notes and what you were told?
>
> A. Correct.[31]

Nurse Windham further testified:

---

[27] R. Doc. 17940-2, Stagg Dep. 54:15-55:16; 57:13-23; R. Doc. 17940-7, Progress Notes at 5.
[28] *Id.* at 75:2-17.
[29] R. Doc. 17940-9, Windham Dep. 21:17-22.
[30] *Id.* 42:24-43:11; 47:13-18.
[31] *Id.*

11

> Q. If we look back at, again, Exhibit 2 here, going down to the second page, again, under Plan, did you further dictate the information that Mr. Nails or his representative had provided to you about when he had last used any antiplatelet or any anticoagulant medication?
> A. Yes.
>
> Q. And what did you record here, please?
>
> A. Antiplatelet and anticoagulants on hold for a week thus far. As of the day I -- that means as of the day I did my consultation, these medications were on hold.[32]

Nurse Windham is trained to take medical histories from patients and to document their medications, and while she did not recall Mr. Nails independently, there was nothing in her note to suggest that anyone other than Mr. Nails provided the answers to her questions about his medical history.[33] Lastly, Mr. Nails' daughter, Plaintiff Stone, also testified that "the doctor probably had him, you know, come off of it before a procedure."[34] She further acknowledged that she has no personal knowledge as to when he took his last pill of Xarelto.[35]. And, she confirmed that her father "faithfully" followed his doctors' instructions on medication "to the letter."[36]

Thus, there is no evidence that Mr. Nails used Xarelto in sufficiently close proximity to his June 14, 2016 surgery to support medical causation, *i.e.* whether Xarelto could have and did cause his alleged injuries. Both Dr. Stagg and Ms. Windham confirmed that Xarelto would not be in Mr. Nails' system a week after discontinued use.[37]. For this reason, the Court must grant summary judgment in favor of Defendants on all of Plaintiff's claims arising out of surgery.[38]

### (2) Dr. Schwab's Affidavit

---

[32] *Id.* at 21:23-22:9.
[33] *See id.* at 18:19-19:6.
[34] R. Doc. 17940-14, Stone Dep. 90:10-21
[35] *Id.* at 80:23 to 81:1
[36] *Id.* at 31:8-10.
[37] Stagg Dep. 54:15-55:16; Windham Dep. 38:14-39:8, 47:13-18
[38] This includes Plaintiff's breach of express warranty claim under La. R.S. § 9:2800.58.

Plaintiff argues that Xarelto warning label was misleading because it did not warn of the risk of bleeding even if Xarelto was stopped more than 48 hours before a surgical procedure.[39] In support of this, Plaintiff first offered an affidavit from Mr. Nails' operating surgeon, Dr. Schwab.[40] Defendants argue that the Court should not consider the affidavit because Dr. Schwab repudiated it at his June 30, 2021 deposition.

Having reviewed Dr. Schwab's affidavit and deposition transcript, the Court finds that the affidavit is not competent summary judgment evidence. *See Belliveau v. Barco, Inc.*, 987 F.3d 122, 134 (5th Cir. 2021) (sworn statements in declaration could not defeat summary judgment where the declarant's "subsequent deposition testimony directly contradicts his assertions"). The sham affidavit doctrine "prevents a party who has been deposed from introducing an affidavit that contradicts that person's deposition testimony without explanation." *Free v. Wal-Mart Louisiana, L.L.C.*, 815 F. App'x 765, 766 (5th Cir. 2020). Inconsistencies abound between Dr. Schwab's affidavit and his deposition testimony just three months later.[41] Dr. Schwab testified that Plaintiff's counsel drafted the affidavit without input from him and he executed it after spending "minimal" time looking at it.[42] In fact, Plaintiff concedes that Dr. Schwab later retracted many of his statements at his deposition.[43] In view of these unexplained inconsistencies, the Court need not consider the affidavit for summary judgment purposes. *Hacienda Recs., L.P. v. Ramos, 718 F.*

---

[39] R. Doc. 17952 at 3.
[40] R. Doc. 17952 at 7-9.
[41] In particular, the affidavit contradicts the deposition testimony in the following regards: makes representations about the Xarelto label's adequacy and about how Dr. Schwab purportedly would have acted if the label had provided a different warning (¶¶ 9, 13–16) despite Dr. Schwab's admission that he never read or saw the label (Schwab Dep. 42:1-4, 68:23-69:5); states that Xarelto caused Mr. Nails' fatal bleed (¶ 12) despite Dr. Schwab's testimony that he cannot say that to a medical certainty (Schwab Dep. 68:1-,. 77:8-21); and assumes that Xarelto presents a risk of bleeding 48 hours or more after a patient stops using it (¶ 14) despite Dr. Schwab's admission that he has no facts to support that (Schwab Dep. 63:24-4).
[42] Schwab Dep. 31:15-32:7, 32:14-33:8.
[43] R. Doc. 17998-2 at 1.

*App'x 223, 235* (5th Cir. 2018) ("so long as inconsistent statements were made by [] the deponent and [] the affiant, the court may refuse to consider his declaration as competent evidence.")

Furthermore, at his deposition Dr. Schwab testified that he never read the Xarelto label before performing Mr. Nail's surgery.[44] Thus, regardless of what warning had been included in the label, Dr. Schwab would not have seen it. Accordingly, Plaintiff cannot demonstrate that any inadequate warning to Dr. Schwab was a cause in fact or the proximate cause of the injury. *See Hall v. Sinn, Inc.*, 102 F. App'x 846, 849 (5th Cir. 2004) (physician who "failed to read the warnings provided [] could not truthfully testify as to whether the warnings were adequate").

### *(3) Dr. Laber's Affidavit*

Plaintiff has now filed a motion seeking leave to file an untimely affidavit from a new potential expert, Dr. Laber.[45] The Court finds Plaintiff's request to introduce a new case-specific causation expert at this juncture to be problematic for several reasons.

First of all, Plaintiff's request is untimely. Plaintiff's deadline to produce a report from a case-specific causation expert pursuant to CMO 11 was January 2, 2020. In fact, this is Plaintiff's third attempt to introduce a causation expert. Plaintiff previously served a report on October 3, 2019 from Dr. Karthik Sabapathi.[46] However, Plaintiff did not provide all of the documents and materials required by CMO 11 and Fed. R. Civ. P. 26(a)(2) as they related to Dr. Sabapathi, and ultimately withdrew Dr. Sabapathi on October 28, 2020.[47] Then, in response to a motion for summary judgment, Plaintiff filed an untimely opposition and submitted an affidavit from a second case-specific causation exert, Dr. Schwab. R. Doc. 17952. The motion was continued to allow

---

[44] Schwab Dep. 42:1-18.
[45] R. Doc. 17998-2 at 1.
[46] R. Doc. 17999-1
[47] R. Doc. 17999-2.

Defendants to depose Dr. Schwab. Most recently, after conceding Dr. Schwab retracted the affidavit during his deposition, Plaintiff has found a third expert, Dr. Labor, and moves to introduce his affidavit, which is untimely.[48]

Additionally, the affidavit does not comply with Rule 26 of the Federal Rules of Civil Procedure. Rule 26 requires a written report from experts containing a complete statement of all opinions the witness will express and the basis and reasons for them and the facts or data considered by the witness in forming them. Fed. R. Civ. P. 26(a)(2)(B). Dr. Laber's affidavit clearly falls short of this requirement.

Most notably, Dr. Laber's affidavit does change the outcome of the Court's analysis of Plaintiffs' inadequate warning claim for two reasons. In the first place, Dr. Laber states the Xarelto's warning label was inadequate because "it did not warn Mr. Nails of the increased risk [of] uncontrollable bleeding if stopped longer than 24 hours prior to surgery."[49] As previously stated, under Louisiana law, drug manufacturers have a duty to sufficiently inform and warn physicians so that they may safely prescribe mediations to their patients. *See McCarthy v. Danek Med., Inc.,* 65 F.Supp.2d 410, 413 (E.D. La. 1999) ("The obligation to the consumer is fulfilled when the prescribing or treating physician is informed of any potential side effects or risks from the drug's use so that they may intelligently decide on its use and advise the patient."). The Fifth Circuit has clearly stated that in the learned intermediary context, the focus of a court's inquiry is "the treating physician's knowledge." *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 268 (5th Cir. 2002). Thus, where the Court has found that the Xarelto warning label clearly warned of the risk of serious or fatal bleeding and Dr. Stagg unequivocally stated that he was adequately

---

[48] R. Doc. 17998.
[49] R. Doc. 17998-4 ¶ 8.

informed of that risk by the warning, the manufacturer has satisfied its duty to warn under the learned intermediary doctrine. *Id.* The proffered affidavit does not impact this analysis.

Dr. Laber also contends that Xarelto's warning label was inadequate because it does not address the terminal elimination half-life for unhealthy and elderly patients and fails to warn of the risk of uncontrollable bleeding if used with Cilostazol and Effient.[50] This theory cannot survive summary judgment. At oral argument, Defendants pointed out that the Xarelto prescribing information in fact explicitly states that terminal elimination-half-life is 11 to 13 hours in the elderly.[51] In addition, the warning label also addresses the risk of bleeding when Xarelto is taken in conjunction with other medications, specifically drugs such as P2Y12 platelet inhibitors and other antithrombotic agents: "Concomitant use of other drugs that impair hemostasis increases the risk of bleeding."[52] For these reasons, the Court denies Plaintiff's motion for leave to introduce an untimely affidavit.

But even if the label was inadequate, the operating surgeon did not read it before performing surgery. Thus, regardless of what warning had been included, the operating surgeon would not have seen it.

### ii. Manufacturing and Design Defect Claims

Plaintiff also alleges that Xarelto was unreasonably dangerous under the LPLA due to manufacturing and design defects.[53] To maintain a manufacturing defect claim under the LPLA, a plaintiff must establish that at the time the product left the manufacturer's control, "the product deviated in a material way from the manufacturer's specifications or performance standards for the

---

[50] *Id.* ¶ 9.
[51] *See* R. Doc. 17940-5, Xarelto Prescribing Information, at 28.
[52] *See* R. Doc. 17940-5, Xarelto Prescribing Information, at 9.
[53] R. Doc. 4 at ¶¶ 134, 143.

product or from otherwise identical products manufactured by the same manufacturer." *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 261 (5th Cir. 2002) (quoting La. R.S. § 9:2800.55). In this case, Plaintiff offers no evidence that the Xarelto used by Mr. Nails deviated from the manufacturing process. Indeed, Plaintiff does not dispute this in her opposition. Therefore, summary judgment is appropriate on Plaintiff's manufacturing claim.

To maintain a design defect claim, a plaintiff must demonstrate at the time the product left the manufacturer's control: (1) there existed an alternative design that was capable of preventing the damage, and (2) the likelihood that the design would cause the damage and the gravity of that damage outweighed the burden on the manufacturer to use a different design. La. R.S. § 9:2800.56 Here, Plaintiff's design defect claim fails because she offers no evidence of an alternative design available capable of preventing the alleged damage. Failure to provide competent summary judgment evidence identifying an alternative design leaves no issue of fact. *McCarthy v. Danek Med., Inc*., 65 F. Supp. 2d 410, 412 (E.D. La. 1999). Moreover, Louisiana law does not allow a fact finder to presume an unreasonably dangerous design solely from the fact that injury occurred. *Grenier v. Med. Eng'g Corp.*, 243 F.3d 200, 205 (5th Cir. 2001) (quoting *Krummel v. Bombardier Corp.,* 206 F.3d 548, 551 (5th Cir. 2000). Accordingly, Plaintiff's design defect claims must be dismissed.

### iii.  Survival and Wrongful Death

Plaintiff also brings claims for wrongful death, loss of consortium, and survival damages. As stated above, the LPLA provides the exclusive theories of liability for manufacturers for *damage* caused by their products. La. R.S. § 9:2800.52 (emphasis added). The LPLA defines damages as "all damage caused by a product, including survival and wrongful death damages, for which Civil Code Articles 2315, 2315.1 and 2315.2 allow recovery." La. R.S. 9:2800.53(5). Thus,

Plaintiff's survival, wrongful death, and loss of consortium claims are derivative of her LPLA claims. Because Plaintiff's underlying Louisiana law claims fail, the derivative claims must also be dismissed. *Engles v. City of New Orleans,* 872 So.2d 1166 (La. App. 4 Cir. 2004).

### C. Non- LPLA Claims

As for Plaintiff's other claims, Plaintiff does not dispute that her separately alleged claims for strict liability, negligence, negligent misrepresentation, breach of implied warranty, fraud, and consumer protections statutes are precluded by the exclusivity provision of the LPLA. La. R.S. § 9:2800.52 (The LPLA "establishes the exclusive theories of liability for manufacturers for damage caused by their products."); *see e.g.*, *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 261-62 (5th Cir. 2002) (holding that the LPLA precludes intentional tort, negligence, and strict liability claims); *In re Vioxx Prods. Liab. Litig.*, MDL No. 1367, 2010 WL 11570867, at *12 (E.D. La. Mar. 31, 2010) (finding that the LPLA precludes claims for violations of consumer protection statutes and common law fraud); *Grenier v. Med. Eng'g Corp.*, 99 F. Supp. 2d 759, 763 (W.D. La. 2000) ("Given the exclusivity of the LPLA, all causes of action inconsistent with it must be dismissed."), *aff'd*, 243 F.3d 200 (5th Cir. 2001). Therefore, summary judgment is appropriate dismissing Plaintiff's non-LPLA claims.

## IV. CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment, R. Doc. 17940, is hereby **GRANTED**. Plaintiff's case is dismissed with prejudice.

**IT IS FURTHER ORDERED** that Plaintiff's First Motion for Leave to File Affidavit of Medical Expert, R. Doc. 17998, is **DENIED**.

New Orleans, Louisiana, this 15th day of September, 2021.

_____
UNITED STATES DISTRICT JUDGE

19