# EXHIBIT C

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of Louisiana

| | |
|---|---|
| Estate of Christine Watts ⟨br⟩ ———————————— ⟨br⟩ *Plaintiff(s)* ⟨br⟩ v. ⟨br⟩ Janssen Research & Development et al. ⟨br⟩ ———————————— ⟨br⟩ *Defendant(s)* | ) ) ) ) ) ) ) ) ) ) ) Civil Action No.  2:21-CV- 00940 L(5) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Bayer Healthcare Pharmaceuticals, Inc.
100 Bayer Boulevard
Whippany, New Jersey 07981

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Christine Watts
C/O Leah Watts
PO BOX 3633
South Bend, Indiana 46619

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Carol L. Michel
Name of clerk of court

Deputy clerk's signature

Date:  **Jul 02 2021**

Certificate of Service

I certify that copy of this Plaintiff's Civil Summons, Plaintiff's Claims, and Plaintiff's Amended Claims is served upon Defendant Bayer Healthcare Pharmaceuticals, Inc via certified USPS mail on July 21, 2021.

Bayer Healthcare Pharmaceuticals Inc.
100 Bayer Boulevard
Whippany, NJ 07981

Christine Watts
C/O Leah Watts
PO BOX 3633
South Bend, Indiana 46619

UNITED STATES DISTRICT COURT NORTHERN

DISTRICT OF INDIANA

Estate of Christine Watts,                                            Judge

Executor of Estate, and Children of Estate

Plaintiffs,                                                          Civil Action No.

versus                                                               Jury Trial Demanded

JANSSEN RESEARCH &  DEVELOPMENTLLC f/k/a
JOHNSON AND JOHNSON PHARMACEUTICAL RESEARCH AND
DEVELOPMENT LLC, JANSSEN ORTHO LLC, JANSSEN PHARMACEUTICALS,
INC. f/k/a JANSSEN PHARMACEUTICA INC. f/k/a ORTHO-MCNEIL-JANSSEN
PHARMACEUTICALS, INC., BAYER * HEALTHCARE PHARMACEUTICALS,
INC.,  BAYER PHARMA AG, BAYER CORPORATION, BAYER HEALTHCARE
LLC, BAYER HEALTHCARE AG, and BAYER AG,

Defendants.

Plaintiffs, Christine Watts, (Decedent) , Estate of the Decedent, Executor of Estate, and Children of Estate for themselves, upon information and belief, at all times, hereinafter mentioned, alleges as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this action because amount in controversy as to Plaintiff exceeds $75,000.00, exclusive of interest and costs, and because there is complete diversity of citizenship between the Plaintiff and the Defendants.

2. Venue is proper in this jurisdiction because a substantial part of the events or omissions giving rise to the claim occurred in this District, and because Defendants conduct substantial business in this District.

3. This Court has personal jurisdiction over the Defendants because they have done business in the State of Indiana, have committed a tort in whole or in part in the State of Indiana, have substantial and continuing contact with the State of Indiana, and derive substantial revenue from goods used and consumed within the State of Indiana. The Defendants actively sell, market, and promote its pharmaceutical product Xarelto to physicians and consumers in this state on a regular and consistent basis.

## NATURE OF THE CASE

4. This action is brought for Decedent Christine Watts ("Decedent") and her survivors: Five children. Decedent used Xarelto also known as rivaroxaban to reduce the risk of stroke and systemic embolism in patients with non- valvular atrial fibrillation, to treat deep vein thrombosis (hereinafter referred to as "DVT") and pulmonary embolism (hereinafter referred to as "PE"), to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

1

5. Defendants, JANSSEN RESEARCH & DEVELOPMENT LLC f/k/a JOHNSON

AND JOHNSON PHARMACEUTICAL RESEARCH AND DEVELOPMENT LLC,

JANSSEN ORTHO LLC, JANSSEN PHARMACEUTICALS, INC. f/k/a JANSSEN

PHARMACEUTICA INC. f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS,

INC., BAYER HEALTHCARE PHARMACEUTICALS, INC. BAYER PHARMA AG,

BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE

AG, and BAYER AG (hereinafter collectively referred to as "Defendants") designed,

researched, manufactured, tested, advertised, promoted, marketed, sold, and

distributed Xarelto.

6. When warning of safety and risks of Xarelto, Defendants negligently and/or

fraudulently represented to the medical and healthcare community, the Food and

Drug Administration (hereinafter referred to as the "FDA"), to Decedent and the public

in general, that Xarelto had been tested and was found to be safe and/or effective for its

indicated use.

7. Defendants concealed their knowledge of Xarelto's defects, from Decedent, the FDA,

the public in general and/or the medical community specifically.

8. These representations were made by Defendants with the intent of defrauding and

deceiving Decedent, the public in general, and the medical and healthcare community in

particular, and were made with the intent of inducing the public in general, and the

medical community, to recommend, dispense and/or purchase Xarelto for use to reduce

the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation,

to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for

prophylaxis of DVT for patients undergoing hip and knee replacement surgery, all of

which evinced a callous, reckless, willful, depraved indifference to health, safety, and

2

welfare of the Decedent herein.

9. Defendants negligently and improperly failed to perform sufficient tests, if any, on humans using Xarelto during clinical trials, forcing Decedent, and Decedent's physicians, hospitals, and/or the FDA, to rely on safety information that applies to other non-valvular atrial fibrillation treatment and DVT/PE treatment and prophylaxis, which does not entirely and/or necessarily apply to Xarelto whatsoever.

10. As a result of the foregoing acts and omissions, the Decedent was caused to suffer serious and dangerous side effects including inter alia life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life and death. Decedent herein has sustained certain of above health consequences due to Decedent's use of Xarelto.

11. Defendants concealed their knowledge of the defects in their products from the Decedent, and Decedent's physicians, hospitals, pharmacists, the FDA, and the public in general.

12. Consequently, Plaintiffs seek compensatory damages as a result of Decedent's use of the Xarelto, which has caused Decedent to suffer from life-threatening bleeding, as well as other severe and personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life and ultimately death.

**PARTY PLAINTIFFS**

13. Decedent Christine Watts, was a citizen and resident of the State of Indiana who, upon information and belief, suffered personal injuries, including death, as a result of his use of Xarelto. She resided and passed away in South Bend, Indiana.

14. Plaintiffs, Executor of Estate, is daughter of Decedent and is executor of Decedent's estate. She is citizen and resident of the State of Indiana, who, upon information and belief, has suffered loss as a result of Decedent's use of Xarelto. Decedent is survived by total of five children in Indiana, Michigan, and Missouri and also suffered loss as result of Decedent's use of Xarelto.

15. Decedent's estate shall be administered under the succession laws of Indiana.

16. Upon information and belief, Decedent was prescribed Xarelto in the State of Indiana, on or around October 2015, upon direction of her physician. She used it until around April 14, 2019.

17. Upon information and belief, Decedent first began using Xarelto on or about October 1, 2015, and used Xarelto until shortly after she was hospitalized on April 14, 2019.

18. Upon information and belief, as a direct and proximate result of the use of Defendants' Xarelto, Decedent experienced and suffered serious and dangerous side effects including an acute gastrointestinal bleeding and suffered a life-threatening, irreversible bleed from the use of Xarelto, as well as severe pain and suffering, personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including but not limited to diminished enjoyment of life, expenses for hospitalization and medical treatment and loss of earnings, and severe pain and suffering, all which cumulated into her death of April 18, 2019.

19. As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and incurred damages, including medical expenses, the loss of accumulations, funeral expenses, probate, attorney, account, and other fees and cost of administration; and other economic and non-economic damages flowing from the death of the Decedent.

4

**PARTY DEFENDANTS**

20. Upon information and belief, Defendant JANSSEN RESEARCH & DEVELOPMENT LLC f/k/a JOHNSON AND JOHNSON RESEARCH AND DEVELOPMENT LLC (hereinafter referred to as "JANSSEN R&D") is a limited liability company organized under the laws of New Jersey, with a principal place of business at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey 08933. Defendant JANSSEN R&D is the holder of the approved New Drug Application ("NDA") for Xarelto as well as the supplemental NDA.

21. As part of its business, JANSSEN R&D is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.

22. Upon information and belief, Defendant JANSSEN R&D has transacted and conducted business in the State of Indiana.

23. Upon information and belief, Defendant, JANSSEN R&D has derived substantial revenue from good and products used in the State of Indiana.

24. Upon information and belief, Defendant, JANSSEN R&D, expected or should have expected its acts to have consequences, within the United States of America and the State of Indiana, and derived substantial revenue from interstate commerce within the United States and the State of Indiana, more particularly.

25. Upon information and belief, and at all relevant times, Defendant, JANSSEN R&D, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non- valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip

and knee replacement surgery.

26. Upon information and belief, Defendant JANSSEN PHARMACEUTICALS, INC. f/k/a JANSSEN PHARMACEUTICA INC. f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. (hereinafter referred to as "JANSSEN PHARM") is a Pennsylvania corporation, having a principal place of business at 1125 Trenton-Harbourton Road, Titusville, New Jersey 08560.

27. As part of its business, JANSSEN PHARM is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.

28. Upon information and belief, Defendant, JANSSEN PHARM has transacted and conducted business in the State of Indiana.

29. Upon information and belief, Defendant, JANSSEN PHARM, has derived substantial revenue from goods and products used in the State of Indiana.

30. Upon information and belief, Defendant, JANSSEN PHARM, expected or should have expected its acts to have consequence within the United States of America and the State of Indiana, and derived substantial revenue from interstate commerce within the United States and the State of Indiana, more particularly.

31. Upon information and belief, and at all relevant times, Defendant, JANSSEN PHARM, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non- valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

32. Upon information and belief, Defendant JANSSEN ORTHO LLC (hereinafter

6

referred to as "JANSSEN ORTHO") is a limited liability company organized under the laws of Delaware, having a principal place of business at State road 933 Km 0 1, Street State Ro; Gurabo, Puerto Rico 00778. Defendant JANSSEN ORTHO is a subsidiary of Johnson & Johnson.

33.. As part of its business, JANSSEN ORTHO is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.

34. Upon information and belief, Defendant, JANSSEN ORTHO has transacted and conducted business in the State of Indiana.

35. Upon information and belief, Defendant, JANSSEN ORTHO, has derived substantial revenue from goods and products used in the State of Indiana.

36. Upon information and belief, Defendant, JANSSEN ORTHO, expected or should have expected its acts to have consequence within the United States of America and the State of Indiana and derived substantial revenue from interstate commerce within the United States and the State of Indiana, more particularly.

37. Upon information and belief, and at all relevant times, Defendant, JANSSEN ORTHO, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non- valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

38. Upon information and belief, Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. is, and at all relevant times was, a corporation organized under the laws of the State of Delaware, with its principal place of business in the State

of New Jersey.

39. Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. was formerly known as Berlex Laboratories, Inc., which was formerly known as Berlex, Inc. and BAYER HEALTHCARE PHARMACEUTICALS, INC. is the same corporate entity as Berlex, Inc. and Berlex Laboratories, Inc.

40. As part of its business, BAYER HEALTHCARE PHARMACEUTICALS, INC. is involved in the research, development, sales, and marketing of pharmaceutical products, including Xarelto and rivaroxaban.

41. Upon information and belief, Defendant, BAYER HEALTHCARE PHARMACEUTICALS, INC., has transacted and conducted business in the State of Indiana.

42. Upon information and belief, Defendant, BAYER HEALTHCARE PHARMACEUTICALS, INC., has derived substantial revenue from goods and products, used in the State of Indiana.

43. Upon information and belief, Defendant, BAYER HEALTHCARE PHARMACEUTICALS, INC., expected or should have expected its acts to have consequence within the United States of America and the State of Indiana, and derived substantial revenue from interstate commerce within the United States and the State of Indiana, more particularly.

44. Upon information and belief, and at all relevant times, Defendant, BAYER HEALTHCARE PHARMACEUTICALS, INC., was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to

8

treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

45. Upon information and belief, Defendant BAYER PHARMA AG is a pharmaceutical company domiciled in Germany.

46. Defendant BAYER PHARMA AG is formerly known as Bayer Schering Pharma AG and is the same corporate entity as Bayer Schering Pharma AG. Bayer Schering Pharma AG is formerly known as Schering AG and is the same corporate entity as Schering AG.

47. Upon information and belief, Schering AG was renamed Bayer Schering Pharma AG effective December 29, 2006.

48. Upon information and belief, Bayer Schering Pharma AG was renamed BAYER PHARMA AG effective July 1, 2011.

49. As part of its business, BAYER PHARMA AG is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.

50. Upon information and belief, Defendant, BAYER PHARMA AG, has transacted and conducted business in the State of Indiana.

51. Upon information and belief, Defendant, BAYER PHARMA AG, has derived substantial revenue from goods and products used in the State of Indiana.

52. Upon information and belief, Defendant, BATER PHARMA AG, expected or should have expected its acts to have consequence within the United States of America and the State of Indiana, and derived substantial revenue from interstate commerce within the United States and the State of Indiana, more particularly.

53. Upon information and belief, and at all relevant times, Defendant, BAYER PHARMA AG, was in the business of and did design, research, manufacture, test,

9

advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral

anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic

embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce

the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients

undergoing hip and knee replacement surgery.

54. Upon information and belief, Defendant BAYER CORPORATION is an Indiana

corporation with its principal place of business at 100 Bayer Road, Pittsburgh,

Pennsylvania 15205.

55. Upon information and belief, Defendant BAYER CORPORATION is the sole

member of BAYER HEALTHCARE LLC, which owns 100% of Schering Berlin, Inc.,

which owns 100% of Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC.

As such, Defendant BAYER CORPORATION is a parent of Defendant BAYER

HEALTHCARE PHARMACEUTICALS, INC.

56. At relevant times, Defendant BAYER CORPORATION was engaged in the business

of researching, developing, designing, licensing, manufacturing, distributing, selling,

marketing, and/or introducing into interstate commerce, either directly or indirectly

through third parties or related entities, its products, including the prescription drug

Xarelto.

57. At relevant times, Defendant BAYER CORPORATION conducted regular and

sustained business in State of Indiana, by selling and distributing its products in Indiana

and engaged in substantial commerce and business activity in the State of Indiana.

58. Upon information and belief, Defendant BAYER HEALTHCARE LLC is a limited

liability company duly formed and existing under and by the virtue of the laws of the

State of Delaware, with its principal place of business located in the State of New Jersey.

59. Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE LLC has transacted and conducted business in the State of Indiana and derived substantial revenue from interstate commerce. Defendant BAYER CORPORATION is the sole member Defendant BAYER HEALTHCARE LLC.

60. Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE LLC expected or should have expected that its acts would have consequences within the United States of America and in the State of Indiana, and derived substantial revenue from interstate commerce.

61. Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE LLC was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

62. Upon information and belief, Defendant BAYER HEALTHCARE AG is a company domiciled in Germany and is the parent/holding company of Defendants BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE PHARMACEUTICALS, INC, and BAYER PHARMA AG.

63. Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE AG has transacted and conducted business in the State of Indiana, and derived substantial revenue from interstate commerce.

64. Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE AG expected or should have expected that its acts would have

11

consequences within the United States of America, and in the State of Indiana, and derived substantial revenue from interstate commerce.

65. Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE AG exercises dominion and control over Defendants BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE PHARMACEUTICALS, INC., and BAYER PHARMA AG.

66. Upon information and belief, Defendant BAYER AG is a German chemical and pharmaceutical company that is headquartered in Leverkusen, North Rhine-Westphalia, Germany.

67. Upon information and belief, Defendant BAYER AG is the third largest pharmaceutical company in the world.

68. Upon information and belief, and at all relevant times, Defendant BAYER AG is the parent/holding company of all other named Defendants.

69. Upon information and belief, at all relevant times, Defendant BAYER AG has transacted and conducted business in the State of Indiana, and derived substantial revenue from interstate commerce.

70. Upon information and belief, at all relevant times, Defendant BAYER AG expected or should have expected that its acts would have consequences within the United States of America, and in State of Indiana, and derived substantial revenue from interstate commerce.

71. Upon information and belief, at all relevant times, Defendant BAYER AG was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial

12

fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

## FACTUAL BACKGROUND

72. At all relevant times, Defendants were in the business of and did design, research, manufacture, test, advertise, promote, market, sell and distribute Xarelto and rivaroxaban to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

73. Defendants received FDA approval for Xarelto, also known as rivaroxaban, on July 1, 2011 for the prophylaxis of DVT and PE in patients undergoing hip replacement or knee replacement surgeries (NDA 022406).

74. Defendants then received additional FDA approval for Xarelto to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation on November 4, 2011 (NDA 202439).

75. The additional indication for treatment of DVT and/or PE and the reduction in recurrence of DVT and/or PE was added to the label on November 2, 2012.

76. Defendants launched Xarelto in the United States (hereinafter referred to as the "U.S.") in 2011.

77. Xarelto is an anticoagulant that acts as a Factor Xa inhibitor, and is available by prescription in oral tablet doses of 20mg, 15mg, and 10mg.

78. Approval of Xarelto for the prophylaxis of DVT and PE in patients undergoing hip replacement or knee replacement surgeries was based on a series of clinical trials known as the Regulation of Coagulation in Orthopedic Surgery to Prevent Deep Venous

13

Thrombosis and Pulmonary Embolism studies (hereinafter referred to as the "RECORD" studies). The findings of the RECORD studies showed that rivaroxaban was superior to enoxaparin for thromboprophylaxis after total knee and hip arthroplasty (based on the Defendants' definition), accompanied by similar rates of bleeding. However, the studies also showed a greater incidence with Xarelto of bleeding leading to decreased hemoglobin levels and transfusion of blood. (Lassen, M.R., et al. Rivaroxaban versus Enoxaparin for Thromboprophylaxis after Total Knee Arthoplasty. N.Engl.J.Med. 2008;358:2776-86; Kakkar, A.K., et al. Extended duration rivaroxaban versus short-term enoxaparin for the prevention of venous thromboembolism after total hip arthoplasty: a double-blind, randomized controlled trial. Lancet 2008;372:31-39; Ericksson, B.I., et al. Rivaroxaban versus Enoxaparin for Thromboprophylaxis after Hip Arthroplasty. N.Engl.J.Med. 2008;358:2765-75).

79. Approval of Xarelto for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation in the U.S. was based on a clinical trial known as the Rivaroxaban Once Daily Oral Direct Factor Xa Inhibition Compared with Vitamin K Antagonism for Prevention of Stroke and Embolism Trial in Atrial Fibrillation study (hereinafter referred to as "ROCKET AF"). The study's findings showed that rivaroxaban was noninferior to warfarin for the prevention of stroke or systemic embolism in patients with non-valvular atrial fibrillation, with a similar risk of major bleeding. However, "bleeding from gastrointestinal sites, including upper, lower, and rectal sites, occurred more frequently in the rivaroxaban group, as did bleeding that led to a drop in the hemoglobin level or bleeding that required transfusion." (Patel, M.R., et al. Rivaroxaban versus Warfarin in Nonvalvular Atrial Fibrillation. N.Engl.J.Med. 2011;365:883-91).

80. Approval of Xarelto for the treatment of DVT and/or PE and the reduction in

recurrence of DVT and/or PE in the U.S. was based on the clinical trials known as the EINSTEIN-DVT, EINSTEIN-PE, and EINSTEIN-Extension studies. The EINSTEIN-DVT study tested Xarelto versus a placebo, and merely determined that Xarelto offered an option for treatment of DVT, with obvious increased risk of bleeding events as compared to placebo. (The EINSTEIN Investigators. Oral Rivaroxaban for Symptomatic Venous Thromboembolism. N.Engl.J.Med. 2010;363:2499-510). The EINSTEIN-Extension study confirmed that result. (Roumualdi, E., et al. Oral rivaroxaban after symptomatic venous thromboembolism: the continued treatment study (EINSTEIN-Extension study). Expert Rev. Cardiovasc. Ther. 2011;9(7):841-844). The EINSTEIN-PE study's findings showed that a rivaroxaban regimen was non-inferior to the standard therapy for initial and long-term treatment of PE. However, the studies also demonstrated an increased risk of adverse events with Xarelto, including those that resulted in permanent discontinuation of Xarelto or prolonged hospitalization. (The EINSTEIN- PE Investigators. Oral Rivaroxaban for the Treatment of Symptomatic Pulmonary Embolism. N.Engl.J.Med. 2012;366:1287-97).

81. Defendants use the results of the ROCKET AF study, the RECORD studies, and the EINSTEIN studies to promote Xarelto in their promotional materials, including the Xarelto website, which tout the positive results of those studies. However, Defendants' promotional materials fail to similarly highlight the increased risk of gastrointestinal bleeding and bleeding that required transfusion, among other serious bleeding concerns.

82. Defendants market Xarelto as a new oral anticoagulant treatment alternative to warfarin (Coumadin), a long-established safe treatment for preventing stroke and systemic embolism, in 60 years. Defendants emphasize the supposed benefits of treatment with Xarelto over warfarin, which they refer to as the Xarelto Difference –

namely, that Xarelto does not require periodic monitoring with blood tests and does not limit a patient's diet.

83. However, in its Quarter Watch publication for the first quarter of the 2012 fiscal year, the Institute for Safe Medication Practices ("ISMP") noted that, even during the approval process, FDA "[reviewers also questioned the convenient once-a-day dosing scheme of Xarelto], saying blood level studies had shown peaks and troughs that could be eliminated by twice-a-day dosing."

84. Importantly, there is no antidote to Xarelto, unlike warfarin. Therefore, in the event of hemorrhagic complications, there is no available reversal agent. The original U.S. label approved when the drug was first marketed in the U.S. did not contain a warning regarding the lack of antidote, but instead only mentioned this important fact in the overdosage section.

85. Defendants spent significant money in promoting Xarelto, which included at least $11,000,000.00 spent during 2013 alone on advertising in journals targeted at prescribers and consumers in the U.S. In the third quarter of the 2013 fiscal year, Xarelto was the number one pharmaceutical product advertised in professional health journals based on pages and dollars spent.

86. As a result of Defendants' aggressive marketing efforts, in its first full year of being on the market, Xarelto garnered approximately $582 million in sales globally.

87. Defendants' website for Xarelto claims that over seven million people worldwide have been prescribed Xarelto. In the U.S., approximately 1 million Xarelto prescriptions had been written by the end of 2013.

88. During the Defendants' 2012 fiscal year, Xarelto garnered approximately $658 million in sales worldwide. Then, in 2013, sales for Xarelto increased even further to

more than clear the $1 billion threshold commonly referred to as "blockbuster" status in the pharmaceutical industry, ultimately reaching approximately $2 million for the fiscal year. Thus, Xarelto is now considered the leading anticoagulant on a global scale in terms of sales.

89. As part of their marketing of Xarelto, Defendants widely disseminated direct-to-consumer advertising campaigns that were designed to influence patients, including Decedent, to make inquiries to their prescribing physician about Xarelto and or request prescriptions for Xarelto.

90. In the course of these direct-to-consumer advertisements, Defendants overstated the efficacy of Xarelto with respect to preventing stroke and systemic embolism, failed to adequately disclose to patients that there is no drug, agent, or means to reverse the anticoagulation effects of Xarelto, and that such irreversibility could have permanently disabling, life-threatening and fatal consequences.

91. On June 6, 2013, Defendants received an untitled letter from the FDA's Office of Prescription Drug Promotion (hereinafter referred to as the "OPDP") regarding its promotional material for the atrial fibrillation indication, stating that, "the print ad is false or misleading because it minimizes the risks associated with Xarelto and makes a misleading clam" regarding dose adjustments, which was in violation of FDA regulations. The OPDP thus requested that Defendants immediately cease distribution of such promotional material.

92. Prior to Decedent's prescription of Xarelto, Decedent became aware of the promotional materials described herein.

93. Prior to Decedent's prescription of Xarelto, Decedent's prescribing physician received promotional materials and information from sales representatives of Defendants

17

that Xarelto was just as effective as warfarin in reducing strokes in patients with non-valvular atrial fibrillation, as well as preventing DVT/PE in patients with prior history of DVT/PE or undergoing hip or knee replacement surgery, and was more convenient, without also adequately informing prescribing physicians that there was no reversal agent that could stop or control bleeding in patients taking Xarelto.

94. At all times relevant hereto, Defendants also failed to warn emergency room doctors, surgeons, and other critical care medical professionals that unlike generally-known measures taken to treat and stabilize bleeding in users of warfarin, there is no effective agent to reverse the anticoagulation effects of Xarelto, and therefore no effective means to treat and stabilize patients who experience uncontrolled bleeding while taking Xarelto.

95. At all times relevant to this action, The Xarelto Medication Guide, prepared and distributed by Defendants and intended for U.S. patients to whom Xarelto has been prescribed, failed to warn and disclose to patients that there is no agent to reverse the anticoagulation effects of Xarelto and that if serious bleeding occurs, it may be irreversible, permanently disabling, and life-threatening.

96. In the year leading up to June 30, 2012, there were 1,080 Xarelto-associated "Serious Adverse Event" ("SAE") MedWatch reports filed with the FDA, including at least 65 deaths. Of the reported hemorrhage events associated with Xarelto, 8% resulted in death, which was approximately twofold the risk of a hemorrhage-related death with warfarin.

97. At the close of the 2012 fiscal year, a total of 2,081 new Xarelto-associated SAE reports were filed with the FDA in its first full year on the market, ranking tenth among other pharmaceuticals in direct reports to the FDA. Of those reported events, 151 resulted in death, as compared to only 56 deaths associated with warfarin.

98. The ISMP referred to these SAE figures as constituting a "strong signal" regarding

18

the safety of Xarelto, defined as "evidence of sufficient weight to justify an alert to the public and the scientific community, and to warrant further investigation."

99. Of particular note, in the first quarter of 2013, the number of reported serious adverse events associated with Xarelto (680) overtook that of Pradaxa (528), another new oral anticoagulant, which had previously ranked as the number one reported drug in terms of adverse events in 2012.

100. Moreover, on a global scale, in the first eight months of 2013, German regulators received 968 Xarelto-related adverse event reports, including 72 deaths, as compared to a total of 750 reports and 58 deaths in 2012.

101. Despite the clear signal generated by the SAE data, Defendants failed to either alert the public and the scientific community or perform further investigation into the safety of Xarelto.

102. Defendants original, and in some respects current labeling and prescribing information for Xarelto:

. (a) failed to investigate, research, study and define, fully and adequately, the safety profile of Xarelto;

. (b) failed to provide adequate warnings about the true safety risks associated with the use of Xarelto;

. (c) failed to provide adequate warning regarding the pharmacokinetic and pharmacodynamics variability of Xarelto and its effects on the degree of anticoagulation in a patient;

(d) failed to provide adequate warning that it is difficult or impossible to assess the degree and/or extent of anticoagulation in patients taking Xarelto;

. (e) failed to disclose in the "Warnings" Section that there is no drug, agent or means to reverse the anticoagulation effects of Xarelto;

. (f) failed to advise prescribing physicians, such as the Decedent's physician, to instruct patients that there was no agent to reverse the anticoagulant effects of Xarelto;

19

. (g)  failed to provide adequate instructions on how to intervene and/or stabilize a
       patient who suffers a bleed while taking Xarelto;

. (h)  failed to provide adequate warnings and information related to the increased risks
       of bleeding events associated with aging patient populations of Xarelto users;

. (i)  failed to provide adequate warnings regarding the increased risk of gastrointestinal
       bleeds in those taking Xarelto, especially, in those patients with a prior history of
       gastrointestinal issues;

. (j)  failed to provide adequate warnings regarding the increased risk of suffering a
       bleeding event, requiring blood transfusions in those taking Xarelto;

. (k)  failed to provide adequate warnings regarding the need to assess renal functioning
       prior to starting a patient on Xarelto and to continue testing and monitoring of
       renal functioning periodically while the patient is on Xarelto;

. (l)  failed to provide adequate warnings regarding the need to assess hepatic
       functioning prior to starting a patient on Xarelto and to continue testing and
       monitoring of hepatic functioning periodically while the patient is on Xarelto;

. (m)  failed to include a "BOXED WARNING" about serious bleeding events
       associated with Xarelto;

. (n)  failed to include a "BOXED WARNING" about serious bleeding events associated
       with Xarelto; and

  (o) in their "Medication Guide" intended for distribution to patients to whom Xarelto
has been prescribed, Defendants failed to disclose to patients that there is no drug, agent
or means to reverse the anticoagulation effects of Xarelto and that if serious bleeding
occurs, such irreversibility could have permanently disabling, life-threatening or fatal
consequences.

103. During the years since first marketing Xarelto in the U.S., Defendants modified the

U.S. labeling and prescribing information for Xarelto, which included additional

information regarding the use of Xarelto in patients taking certain medications. Despite

being aware of: (1) serious, and sometimes fatal, irreversible bleeding events associated

with the use of Xarelto; and (2) 2,081 SAE MedWatch reports filed with FDA in 2012

alone, including at least 151 deaths, Defendants nonetheless failed to provide adequate

disclosures or warnings in their label as detailed in Paragraphs 102(a-o).

20

104. Prior to applying for and obtaining approval of Xarelto, Defendants knew or should have known that consumption of Xarelto was associated with and/or would cause the induction of life-threatening bleeding, and Defendants possessed at least one clinical scientific study, which evidence Defendants knew or should have known was a signal that life-threatening bleeding risk needed further testing and studies prior to its introduction to the market.

105. Upon information and belief, despite life-threatening bleeding findings in a clinical trial and other clinical evidence, Defendants failed to adequately conduct complete and proper testing of Xarelto prior to filing their New Drug Application for Xarelto.

106. Upon information and belief, from the date Defendants received FDA approval to market Xarelto, Defendants made, distributed, marketed, and sold Xarelto without adequate warning to Decedent's prescribing physician or Decedent that Xarelto was associated with and/or could cause life-threatening bleeding, presented a risk of life-threatening bleeding in patients who used it, and that Defendants had not adequately conducted complete and proper testing and studies of Xarelto with regard to severe side effects, specifically life-threatening bleeding.

107. Upon information and belief, Defendants concealed and failed to completely disclose its knowledge that Xarelto was associated with or could cause life-threatening bleeding as well as its knowledge that they had failed to fully test or study said risk.

108. Upon information and belief, Defendants ignored the association between the use of Xarelto and the risk of developing life-threatening bleeding.

109. Defendants' failure to disclose information that they possessed regarding the failure to adequately test and study Xarelto for life-threatening bleeding risk further rendered warnings for this medication inadequate.

21

110. By reason of the foregoing acts and omissions, the Decedent was caused to suffer from life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life and ultimately death.

111. By reason of the foregoing acts and omissions, Plaintiffs have endured and continues to suffer emotional and mental anguish, loss of support, loss of services, loss of accumulations, medical and funeral expenses, and other economic and non-economic damages stemming from the death of the Decedent, as a result of the actions and inactions of the Defendants.

## FIRST CAUSE OF ACTION AS AGAINST THE DEFENDANTS (NEGLIGENCE)

112. Plaintiffs repeat, reiterate and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

113. Defendants had a duty to exercise reasonable case in the designing, researching, manufacturing, marketing, supplying, promoting, packaging, sale and/or distribution of Xarelto into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

114. Defendants failed to exercise ordinary care in the designing, researching, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Xarelto into interstate commerce in that Defendants knew or should have known that using Xarelto created a high risk of reasonable, dangerous side effects, including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and

22

mental anguish, including diminished enjoyment of life and ultimately death.

115. The negligence of the Defendants, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

.  (a)  Manufacturing, producing, promoting, formulating, creating, and/or designing Xarelto without thoroughly testing it;

.  (b)  Manufacturing, producing, promoting, formulating, creating, and/or designing Xarelto without adequately testing it;

(c) Not conducting sufficient testing programs to determine whether or not Xarelto was safe for use; in that Defendants herein knew or should have known that Xarelto was unsafe and unfit for use by reason of the dangers to its users;

.  (d)  Selling Xarelto without making proper and sufficient tests to determine the dangers to its users;

.  (e)  Negligently failing to adequately and correctly warn the Decedent, the public, the medical and healthcare profession, and the FDA of the dangers of Xarelto;

.  (f)  Failing to provide adequate instructions regarding safety precautions to be observed by users, handlers, and persons who would reasonably and foreseeably come into contact with, and more particularly, use, Xarelto;

.  (g)  Failure to test Xarelto and/or failing to adequately, sufficiently and properly test Xarelto;

.  (h)  Negligently advertising and recommending the use of Xarelto without sufficient knowledge as to its dangerous propensities;

.  (i)  Negligently representing that Xarelto was safe for use for its intended purpose, when, in fact, it was unsafe;

.  (j)  Negligently representing that Xarelto had equivalent safety and efficacy as other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

.  (k)  Negligently designing Xarelto in a manner which was dangerous to its users;

.  (l)  Negligently manufacturing Xarelto in a manner which was dangerous to users;

.  (m)  Negligently producing Xarelto in a manner which was dangerous to its users;

23

. (n) Negligently assembling Xarelto in a manner which was dangerous to its users;

. (o) Concealing information from the Decedent in knowing that Xarelto was unsafe, dangerous, and/or non-conforming with FDA regulations;

. (p) Improperly concealing and/or misrepresenting information from the Decedent, healthcare professionals, and/or the FDA, concerning the severity of risks and dangers of Xarelto compared to other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

116. Defendants under-reported, underestimated and downplayed the serious dangers of Xarelto.

117. Defendants negligently compared the safety risk and/or dangers of Xarelto with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

118. Defendants were negligent in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing and sale of Xarelto in that they:

(a) Failed to use due care in designing and manufacturing Xarelto so as to avoid the aforementioned risks to individuals when Xarelto was used for treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

. (b) Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Xarelto;

. (c) Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Xarelto;

. (d) Failed to accompany their product with accurate warnings regarding the risks of all possible adverse side effects concerning Xarelto;

. (e) Failed to warn Decedent of the severity and duration of such adverse effects, as the warnings did not accurately reflect the symptoms, or severity of the side effects;

24

. (f) Failed to conduct adequate testing, including pre-clinical and clinical testing and post-marketing surveillance to determine the safety of Xarelto;

. (g) Failed to warn Decedent, prior to actively encouraging the sale of Xarelto, either directly or indirectly, orally or in writing, about the need for more comprehensive, more regular medical monitoring than usual to ensure early discovery of potentially serious side effects;

. (h) Were otherwise careless and/or negligent.

118. Despite the facts that Defendants knew or should have known that Xarelto caused unreasonably dangerous side effects, Defendants continued and continue to market, manufacture, distribute, and/or sell Xarelto to consumers, including the Decedent.

119. Defendants knew or should have known that consumers such as the Decedent would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care, as set forth above.

120. Defendants' negligence was the proximate cause of Decedent's injuries, harm and economic loss, which Decedent suffered.

121. As a result of the foregoing acts and omissions, the Decedent was caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, shortened life expectancy, expenses for hospitalization, loss of earnings and ultimately death.

122. As a result of the foregoing acts and omissions, Decedent's estate and Plaintiffs have suffered and incurred damages, including medical expenses; the loss of accumulations; probate, attorney, accountant, and other fees and costs of an administration; and other economic and non-economic damages flowing from the death of the Decedent.

124. By reason of the foregoing, Decedent and Plaintiffs have suffered injuries and damages as alleged herein.

## SECOND CAUSE OF ACTION AS AGAINST THE DEFENDANTS (STRICT PRODUCTS LIABILITY)

125. Plaintiffs repeat, reiterate and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

126. At all times herein mentioned, the Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, distributed, and/or have recently acquired the Defendants who have designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed Xarelto as hereinabove described that was used by the Decedent.

127. That Xarelto was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendants.

128. At those times, Xarelto was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, the Decedent herein.

129. The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Xarelto.

130. The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective in design and/or formulation, in that, when it left the hands of the Defendants, manufacturers, and/or suppliers, it was unreasonably dangerous, and it was more dangerous than an ordinary consumer would expect.

26

131. At all times herein mentioned, Xarelto was in a defective condition and unsafe, and Defendants knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendants.

132. Defendants knew, or should have known that at all times herein mentioned, their Xarelto was in a defective condition and was and is inherently dangerous and unsafe.

133. At the time of the Decedent's use of Xarelto, Xarelto was being used for the purposes and in a manner normally intended, namely, to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

134. Defendants with this knowledge voluntarily designed its Xarelto in a dangerous condition for use by the public, and in particular the Decedent.

137. Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

138. Defendants created a product unreasonably dangerous for its normal, intended use.

139. The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was manufactured defectively in that Xarelto left the hands of Defendants in a defective condition and was unreasonably dangerous to its intended users.

140. The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants reached their intended users in the same defective and unreasonably dangerous condition in which the Defendants' Xarelto was manufactured.

27

141. Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed a defective product which created an unreasonable risk to the health of consumers and to the Decedent in particular; and Defendants are therefore strictly liable for the injuries sustained by the Decedent.

142. The Decedent could not, by the exercise of reasonable care, have discovered Xarelto's defects herein mentioned and perceived its danger.

143. The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective due to inadequate warnings or instructions, as the Defendants knew or should have known that the product created a risk of serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature and the Defendants failed to adequately warn of said risk.

144. The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective due to inadequate warnings and/or inadequate testing.

145. The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective due to inadequate post-marketing surveillance and/or warnings because, after Defendants knew or should have known of the risks of serious side effects including, life-threatening bleeding, as well as other severe and permanent health consequences from Xarelto, they failed to provide adequate warnings to users or consumers of the product, and continued to improperly advertise, market and/or promote their product, Xarelto.

146. By reason of the foregoing, the Defendants have become strictly liable in tort to the Decedent for the manufacturing, marketing, promoting, distribution, and selling of a

28

defective product, Xarelto.

147. Defendants' defective design, manufacturing defect, and inadequate warnings of Xarelto were acts that amount to willful, wanton, and/or reckless conduct by Defendants.

148. That said defects in Defendants' drug Xarelto were a substantial factor in causing Decedent's injuries.

149. As a result of the foregoing acts and omissions, the Decedent was caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, diminished enjoyment of life, shortened life expectancy, expenses for hospitalization, loss of earnings and ultimately death.

150. As a result of the foregoing acts and omissions, the Decedent was caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, shortened life expectancy, expenses for hospitalization, loss of earnings and ultimately death.

151. As a result of the foregoing acts and omissions, Decedent's estate has suffered and incurred damages, including medical expenses; the loss of accumulations; probate, attorney, accountant, and other fees and costs of an administration; and economic and non-economic damages flowing from the death of the Decedent.

152. By reason of the foregoing, Decedent and Plaintiffs have suffered injuries and damages as alleged herein.


## THIRD CAUSE OF ACTIONAS AGAINST THE DEFENDANTS (BREACH OF EXPRESS WARRANTY)

153. Plaintiffs repeat, reiterate and reallege each and every allegation of this Complaint

contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

154. Defendants expressly warranted that Xarelto was safe and well accepted by users.

155. Xarelto does not conform to these express representations because Xarelto is not safe and has numerous serious side effects, many of which were not accurately warned about by Defendants. As a direct and proximate result of the breach of said warranties, Decedent and/or Plaintiffs suffered and/or will continue to suffer severe and permanent personal injuries, harm and economic loss.

156. Decedent did rely on the express warranties of the Defendants herein.

157. Members of the medical community, including physicians and other healthcare professionals, relied upon the representations and warranties of the Defendants for use of Xarelto in recommending, prescribing, and/or dispensing Xarelto.

158. The Defendants herein breached the aforesaid express warranties, as their drug Xarelto was defective.

159. Defendants expressly represented to Decedent, Decedent's physicians, healthcare providers, and/or the FDA that Xarelto was safe and fit for use for the purposes intended, that it was of merchantable quality, that it did not produce any dangerous side effects in excess of those risks associated with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, that the side effects it did produce were accurately reflected in the warnings and that it was adequately tested and fit for its intended use.

30

160. Defendants knew or should have known that, in fact, said representations and warranties were false, misleading, and untrue in that Xarelto was not safe and fit for the use intended, and, in fact, produced serious injuries to the users that were not accurately identified and represented by Defendants.

161. As a result of the foregoing acts and omissions, the Decedent was caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe and person injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, shortened life expectancy, expenses for hospitalization, loss of earnings and ultimately death.

162. As a result of the foregoing acts and omissions, Decedent's estate and Plaintiffs have suffered and incurred damages, including medical expenses; the loss of accumulations; probate, attorney, accountant, and other fees and costs of an administration; and other economic and non- economic damages flowing from the death of the Decedent.

163. By reason of the foregoing, Decedent and Plaintiffs have suffered injuries and damages as alleged herein.

## FOURTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS (BREACH OF IMPLIED WARRANTIES)

164. Plaintiffs repeat, reiterate, and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

165. At all times herein mentioned, the Defendants manufactured, compounded, portrayed, distributed, recommended, merchandized, advertised, promoted and sold Xarelto and/or have recently acquired the Defendants who have manufactured, compounded, portrayed, distributed, recommended, merchandized, advertised, promoted

31

and sold Xarelto, to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

166. At the time Defendants marketed, sold, and distributed Xarelto for use by Decedent, Defendants knew of the use for which Xarelto was intended and impliedly warranted the product to be of merchantable quality and safe and fit for such use.

167. The Defendants impliedly represented and warranted to the users of Xarelto and their physicians, healthcare providers, and/or the FDA that Xarelto was safe and of merchantable quality and fit for the ordinary purpose for which said product was to be used.

168. That said representations and warranties aforementioned were false, misleading, and inaccurate in that Xarelto was unsafe, unreasonably dangerous, improper, not of merchantable quality, and defective.

169. Decedent, and/or members of the medical community and/or healthcare professionals did rely on said implied warranty of merchantability of fitness for a particular use and purpose.

170. Decedent and Decedent's physicians and healthcare professionals reasonably relied upon the skill and judgment of Defendants as to whether Xarelto was of merchantable quality and safe and fit for its intended use.

171. Xarelto was injected into the stream of commerce by the Defendants in a defective, unsafe, and inherently dangerous condition and the products and materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

172. The Defendants herein breached the aforesaid implied warranties, as their drug Xarelto was not fit for its intended purposes and uses.

173. As a result of the foregoing acts and omissions, the Decedent was caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe and person injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, shortened life expectancy, expenses for hospitalization, loss of earnings and ultimately death.

174. As a result of the foregoing acts and omissions, Decedent's estate and Plaintiffs have suffered and incurred damages, including medical expenses; the loss of accumulations; probate, attorney, accountant, and other fees and costs of an administration; and other economic and non-economic damages flowing from the death of the Decedent.

175. By reason of the foregoing, Decedent and Plaintiffs have suffered injuries and damages as alleged herein.


## FIFTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS (FRAUDULENT MISREPRESENTATION)

176. Plaintiffs repeat, reiterate and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

177. The Defendants falsely and fraudulently represented to the medical and healthcare community, and to the Decedent, and/or the FDA, and the public in general, that said product, Xarelto, had been tested and was found to be safe and/or effective to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

33

178. That representations made by Defendants were, in fact, false.

179. When said representations were made by Defendants, they knew those representations to be false and it willfully, wantonly and recklessly disregarded whether the representations were true.

180. These representations were made by said Defendants with the intent of defrauding and deceiving the Decedent, the public in general, and the medical and healthcare community in particular, and were made with the intent of inducing the public in general, and the medical and healthcare community in particular, to recommend, prescribe, dispense and/or purchase said product, Xarelto, for use to reduce the risk of stroke and systemic embolism in patients with nonvalvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, all of which evinced a callous, reckless, willful, depraved indifference to the health, safety and welfare of the Decedent herein.

181. At the time the aforesaid representations were made by the Defendants and, at the time the Decedent used Xarelto, the Decedent was unaware of the falsity of said representations and reasonably believed them to be true.

182. In reliance upon said representations, the Decedent was induced to and did use Xarelto, thereby sustaining severe and permanent personal injuries.

183. Said Defendants knew and were aware or should have been aware that Xarelto had not been sufficiently tested, was defective in nature, and/or that it lacked adequate and/or sufficient warnings.

184. Defendants knew or should have known that Xarelto had a potential to, could, and would cause severe and grievous injury to the users of said product, and that it was inherently dangerous in manner that exceeded any purported, inaccurate, and/or down-played warnings.

34

185. Defendants brought Xarelto to the market, and acted fraudulently, wantonly and maliciously to the detriment of the Decedent.

186. As a result of the foregoing acts and omissions, the Decedent was caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe and person injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, shortened life expectancy, expenses for hospitalization, loss of earnings and ultimately death.

187. As a result of the foregoing acts and omissions, Decedent's estate and Plaintiffs have suffered and incurred damages; including medical expenses; the loss of accumulations; probate, attorney, accountant, and other fees and costs of an administration; and other economic and non-economic damages flowing from the death of the Decedent.

188. By reason of the foregoing, Decedent and Plaintiffs have suffered injuries and damages as alleged herein.

## SIXTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS (FRAUDULENT CONCEALMENT)

189. Plaintiffs repeat, reiterate, and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

190. At all times during the course of dealing between Defendants and Decedent, and/or Decedent's healthcare providers, and/or the FDA, Defendants misrepresented the safety of Xarelto for its intended use.

191. Defendants knew or were reckless in not knowing that its representations were false.

192. In representations to Decedent, and/or Decedent's healthcare providers, and/or the FDA, Defendants fraudulently concealed and intentionally omitted the following material information:

35

(a) that Xarelto was not as safe as other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

(b) that the risks of adverse events with Xarelto were higher than those with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

(c) that the risks of adverse events with Xarelto were not adequately tested and/or known by Defendants

(d) that Defendants were aware of dangers in Xarelto, in addition to and above and beyond those associated with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

(e) that Xarelto was defective, and that it caused dangerous side effects, including but not limited to life-threatening bleeding, as well as other severe and permanent health consequences, in a much more and significant rate than other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

(f) that patients needed to be monitored more regularly than normal while using Xarelto;

(g) that Xarelto was manufactured negligently

(h) that Xarelto was manufactured defectively;

(i) that Xarelto was manufactured improperly; (j) that Xarelto was designed negligently;

(k) that Xarelto was designed defectively; and (l) that Xarelto was designed improperly.

193. Defendants were under a duty to disclose to Decedent, and Decedent's physicians, hospitals, healthcare providers, and/or the FDA the defective nature of Xarelto, including but not limited to the heightened risks of life-threatening bleeding.

194. Defendants had sole access to material facts concerning the defective nature of the product and its propensity to cause serious and dangerous side effects, and hence, cause damage to persons who used Xarelto, including the Decedent, in particular.

36

195. Defendants' concealment and omissions of material facts concerning, inter alia, the safety of Xarelto was made purposefully, willfully, wantonly, and/or recklessly, to mislead Decedent, and Decedent's physicians, hospitals and healthcare providers into reliance, continued use of Xarelto, and actions thereon, and to cause them to purchase, prescribe, and/or dispense Xarelto and/or use the product.

196. Defendants knew that Decedent, and Decedent's physicians, hospitals, healthcare providers, and/or the FDA had no way to determine the truth behind Defendants' concealment and omissions, and that these included material omissions of facts surrounding Xarelto, as set forth herein.

197. Decedent, as well as Decedent's doctors, healthcare providers, and/or hospitals reasonably relied on facts revealed which negligently, fraudulently and/or purposefully did not include facts that were concealed and/or omitted by Defendants.

198. As a result of the foregoing acts and omissions, the Decedent was caused to sufferer serious and dangerous side effects including, life-threatening bleeding, as well as other severe and person injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, shortened life expectancy, expenses for hospitalization, loss of earnings and ultimately death.

199. As a result of the foregoing acts and omissions, Decedent's estate and Plaintiffs have suffered and incurred damages, including medical expenses; the loss of accumulations; probate, attorney, accountant, and other fees and costs of an administration; and other economic and non-economic damages flowing from the death of the Decedent.

200. By reason of the foregoing, Decedent and Plaintiffs have suffered injuries and damages as alleged herein.

## SEVENTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS
## (NEGLIGENT MISREPRESENTATION)

201. Plaintiffs repeat, reiterate, and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

202. Defendants had a duty to represent to the medical and healthcare community, and to the Decedent, the FDA, and the public in general that said product, Xarelto, had been tested and found to be safe and effective to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

203. The representations made by Defendants were, in fact, false.

204. Defendants failed to exercise ordinary care in the representation of Xarelto, while involved in its manufacture, sale, testing, quality assurance, quality control, and/or distribution of said product into interstate commerce, in that Defendants negligently misrepresented Xarelto's high risk of unreasonable, dangerous side effects.

205. Defendants breached their duty in representing Xarelto's serious side effects to the medical and healthcare community, to the Decedent, the FDA and the public in general.

206. As a result of the foregoing acts and omissions, the Decedent was caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe and person injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, shortened life expectancy, expenses for hospitalization, loss of earnings and ultimately death.

207. As a result of the foregoing acts and omissions, Decedent's estate and Plaintiffs have suffered and incurred damages, including medical expenses; the loss of accumulations; probate, attorney, accountant, and other fees and costs of an administration; and other

economic and non-economic damages flowing from the death of the Decedent.

208. By reason of the foregoing, Decedent and Plaintiffs have suffered injuries and damages as alleged herein.


## EIGHTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS (FRAUD AND DECEIT)

209. Plaintiffs repeat, reiterate and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

210. Defendants conducted research, or lack thereof, and used Xarelto as part of their research.

211. As a result of Defendants' research and testing, or lack thereof, Defendants blatantly and intentionally distributed false information, including but not limited to assuring the public, the Decedent, Decedent's doctors, hospitals, healthcare professionals, and/or the FDA that Xarelto was safe and effective for use as a means to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

212. As a result of Defendants' research and testing, or lack thereof, Defendants intentionally omitted certain results of testing and research to the public,-healthcare professionals, and/or the FDA, including the Decedent.

213. Defendants had a duty when disseminating information to the public to disseminate truthful information and a parallel duty not to deceive the public and the Decedent, as well as Decedent's respective healthcare providers and/or the FDA.

214. The information distributed to the public, the FDA, and the Decedent, by Defendants, including but not limited to reports, press releases, advertising campaigns, television commercials, print ads, magazine ads, billboards, and all other commercial media contained material representations of fact and/or omissions.

215. The information distributed to the public, the FDA, and the Decedent, by Defendants intentionally included representations that Defendants' drug Xarelto was safe and effective for use to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

216. The information distributed to the public, the FDA, and the Decedent, by Defendants intentionally included representations that Defendants' drug Xarelto carried the same risks, hazards, and/or dangers as other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

217. The information distributed to the public, the FDA, and the Decedent, by Defendants intentionally included false representations that Xarelto was not injurious to the health and/or safety of its intended users.

218. The information distributed to the public, the FDA, and· the Decedent, by Defendants intentionally included false representations that Xarelto was as potentially injurious to the health and/or safety of its intended users, as other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

219. These representations were all false and misleading.

220. Upon information and belief, Defendants intentionally suppressed, ignored and disregarded test results not favorable to the Defendants, and results that demonstrated that Xarelto was not safe as a means of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, and/or was not as safe as other means of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

221. Defendants intentionally made material representations to the FDA and the public, including the medical profession, and the Decedent, regarding the safety of Xarelto, specifically but not limited to Xarelto not having dangerous and serious health and/or safety concerns.

222. Defendants intentionally made material representations to the FDA and the public in general, including the medical profession, and the Decedents, regarding the safety of Xarelto, specifically but not limited to Xarelto being a safe means of reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

223. That it was the purpose of Defendants in making these representations to deceive and defraud the public, the FDA, and/or the Decedent, to gain the confidence of the public, healthcare professionals, the FDA, and/or the Decedent, to falsely ensure the quality and fitness for use of Xarelto and induce the public, and/or the Decedent to

41

purchase, request, dispense, prescribe, recommend, and/or continue to use Xarelto.

224. Defendants made the aforementioned false claims and false representations with the intent of convincing the public, healthcare professionals, the FDA, and/or the Decedent that Xarelto was fit and safe for use as treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

225. Defendants made the aforementioned false claims and false representations with the intent of convincing the public, healthcare professionals, the FDA, and/or the Decedent that Xarelto was fit and safe for use as treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, and did not pose risks, dangers, or hazards above and beyond those identified and/or associated with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

226. That Defendants made claims and representations in its documents submitted to the FDA, to the public, to healthcare professionals, and the Decedent that Xarelto did not present serious health and/or safety risks.

227. That Defendants made claims and representations in its documents submitted to the FDA, to the public, to healthcare professionals, and the Decedent that Xarelto did not present health and/or safety risks greater than other oral forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation,

reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

228. That these representations and others made by Defendants were false when made, and/or were made with a pretense of actual knowledge when knowledge did not actually exist, and/or were made recklessly and without regard to the actual facts.

229. That these representations and others, made by Defendants, were made with the intention of deceiving and defrauding the Decedent, including Decedent's respective healthcare professionals and/or the FDA, and were made in order to induce the Decedent and/or Decedent's respective healthcare professionals to rely upon misrepresentations and caused the Decedent to purchase, use, rely on, request, dispense, recommend, and/or prescribe Xarelto.

230. That Defendants, recklessly and intentionally falsely represented the dangerous and serious health and/or safety concerns of Xarelto to the public at large, the Decedent in particular, for the purpose of influencing the marketing of a product known to be dangerous and defective and/or not as safe as other alternatives, including other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

231. That Defendants willfully and intentionally failed to disclose the material facts regarding the dangerous and serious safety concerns of Xarelto by concealing and suppressing material facts regarding the dangerous and serious health and/or safety concerns of Xarelto.

232. That Defendants willfully and intentionally failed to disclose the truth, failed to disclose material facts and made false representations with the purpose and design of

43

deceiving and lulling the Decedent, as well as his respective healthcare professionals into a sense of security so that Decedent would rely on the representations made by Defendants, and purchase, use and rely on Xarelto and/or that Decedent's respective healthcare providers would dispense, prescribe, and/or recommend the same.

233. Defendants, through their public relations efforts, which included but were not limited to the public statements and press releases, knew or should have known that the public, including the Decedent, as well as Decedent's respective healthcare professionals would rely upon the information being disseminated.

234. Defendants utilized direct to consumer adverting to market, promote, and/or advertise Xarelto.

235. That the Decedent and/or Decedent's respective healthcare professionals did in fact rely on and believe the Defendants' representations to be true at the time they were made and relied upon the representations as well as the superior knowledge of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, and were thereby induced to purchase, use and rely on Defendants' drug Xarelto.

236. That at the time the representations were made, the Decedent and/or Decedent's respective healthcare providers did not know the truth with regard to the dangerous and serious health and/or safety concerns of Xarelto.

237. That the Decedent did not discover the true facts with respect to the dangerous and serious health and/or safety concerns, and the false representations of Defendants, nor could the Decedent with reasonable diligence have discovered the true facts.

238. That had the Decedent known the true facts with respect to the dangerous and

44

serious health and/or safety concerns of Xarelto, Decedent would not have purchased, used and/or relied on Defendants' drug Xarelto.

239. That the Defendants' aforementioned conduct constitutes fraud and deceit, and was committed and/or perpetrated willfully, wantonly and/or purposefully on the Decedent.

240. As a result of the foregoing acts and omissions, the Decedent was caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe and person injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, shortened life expectancy, expenses for hospitalization, loss of earnings and ultimately death.

241. As a result of the foregoing acts and omissions, Decedent's estate and Plaintiffs have suffered and incurred damages, including-medical expenses; the loss of accumulations; probate, attorney; accountant, and other fees and costs of an administration; and other economic and non-economic damages flowing from the death of the Decedent.

242 By reason of the foregoing, Decedent and Plaintiffs have suffered injuries and damages as alleged herein.


## NINTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS WRONGFUL DEATH ACTION

243. Plaintiffs repeat, reiterate and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

244. Under Indiana law, the Defendants are liable for their actions that resulted in death.


## TENTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS SURVIVAL ACTION

245. Plaintiffs repeat, reiterate and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

246. The survivors, as Plaintiffs who are detailed hereinabove, are entitled to recovery under Indiana.

## ELEVENTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS INDIANA PRODUCTS LIABILITY

247. Plaintiffs repeat, reiterate and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

248. The survivors, as Plaintiffs who are detailed hereinabove, are entitled to recovery under State of Indiana.

## TWELTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS VIOLATION OF CONSUMER PROTECTION LAW

249. Decedent used Xarelto and suffered ascertainable losses as result of Defendants actions and in violation of consumer protection laws.

250. Defendants created misunderstanding and confusion by deceptive conduct.

THIRTEENTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS
(DESIGN DEFECT)

FOURTEENTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS
(MANUFACTURING DEFECT)

PRAYER FOR RELIEF WHEREFORE,

Plaintiffs demand judgment against the Defendants on each of the above-referenced claims and Causes of Action and as follows:

1. Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, including, but not limited to, all damages sustained as a result of the death, and other non-economic damages in an amount to be determined at trial of this action;

2. Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages, including, but not limited to, all damages sustained as a result of the death in an amount to be determined at trial of this action;

3. Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiff in an amount sufficient to punish Defendants and deter future similar conduct;

4. Prejudgment interest;

5. Post judgment interest;

6. Awarding Plaintiff reasonable attorneys' fees;

7. Awarding Plaintiff the costs of these proceedings; and

8. Such other and further relief as this Court deems just and proper.

DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury as to all issues.

Respectfully submitted:

Estate of Christine Watts, Executor of Estate, and Five Children

PO BOX 3633 South Bend, Indiana 46619 (269) 426-1107

49

49

UNITED STATES DISTRICT COURT NORTHERN

DISTRICT OF INDIANA

Estate of Christine Watts,                                    Judge Jon E. DeGuilio

Executor of Estate, and Children of Estate

Plaintiffs,                                                   Civil Action No. 3:21-cv-00250

versus                                                        Jury Trial Demanded


JANSSEN RESEARCH &  DEVELOPMENTLLC f/k/a  JOHNSON AND JOHNSON
PHARMACEUTICAL RESEARCH AND DEVELOPMENT LLC, JANSSEN ORTHO LLC, JANSSEN
PHARMACEUTICALS, INC. f/k/a JANSSEN PHARMACEUTICA INC. f/k/a ORTHO-MCNEIL-
JANSSEN PHARMACEUTICALS, INC., BAYER * HEALTHCARE PHARMACEUTICALS, INC.,
BAYER PHARMA AG, BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER
HEALTHCARE AG, and BAYER AG,

Defendants.


## AMENDMENT TO CLAIMS

## PLAINTIFF SPECIFIC ALLEGATIONS

This action is brought on behalf of Plaintiff Christine Watts. Plaintiff is Decedent and is survived by Five Children. Complaint is brought by Estate of Christine Watts. Decedent ingested Xarelto approximately October 1, 2015 and used Xarelto until shortly after she was hospitalized on April 14, 2019. As a proximate result of Xarelto, Decedent suffered an acute gastrointestinal bleed and died to due to her injuries on April 18, 2019.

## THIRTEENTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS
## (DESIGN DEFECT)

251. Xarelto was not merchantable and/ or reasonably suited to the use intended and its condition when sold was the proximate cause of the injuries sustained by Decedent.

252. Defendants placed Xarelto into the stream of commerce with wanton and reckless disregard for public safety.

253. Xarelto was in an unsafe, defective, and inherently dangerous condition.

254. Xarelto contains defects in its design which render the drug dangerous to consumers such as Decedent, when used as intended or as reasonably foreseeable to Defendants. The design defects render Xarelto more dangerous than other anticoagulants and cause and an unreasonable increased risk including but not limited to life threatening bleeding events.

255. Xarelto was in a defective condition and unsafe, and Defendants knew, had reason to know, or should have known Xarelto was defective and unsafe, even when used as instructed.

256. The nature and magnitude of the risk of harm associated with the design f Xarelto, including the risk of serious bleeding that may be irreversible, permanently disabling, and life-threatening is high, in light of the intended and reasonably foreseeable use of Xarelto.

257. The risks of harm associated with the design of Xarelto are higher than necessary.

Page 1

258. It is highly unlikely that Xarelto users would be aware of the risks associated with Xarelto through either warnings, general knowledge or otherwise, and Decedent specifically was not aware of these risks, nor would they expect them.

259. The design did not conform to any applicable public or private product standard that was in effect when Xarelto left the Defendants' control.

260. Xarelto's design is more dangerous than a reasonably prudent consumer would expect when used in its intended or reasonably foreseeable manner. It was more dangerous than Decedent expected.

261. The intended or actual utility of Xarelto is not of such benefit to justify the risk of bleeding that may be irreversible, permanently disabling, and life threatening.

262. At the time Xarelto left Defendants' control, it was both technically and economically feasible to have an alternative design that would not cause bleeding that may be irreversible, permanently disabling, and life-threatening or an alternative design that would have substantially reduced the risk of these injuries.

263. It was both technically and economically feasible to provide a safer alternative product that would have prevented the harm suffered by Decedent.

264. Defendants' conduct was extreme and outrageous. Defendants risked the lives of consumers and users of their products, including Decedent, with the knowledge of the safety and efficacy problems and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, relabel, warn, or inform the unsuspecting consuming public. Defendants' outrageous conduct warrants an award of punitive damages.

265. The unreasonably dangerous nature of Xarelto caused serious harm to Decedent.

266. As a direct and proximate result of the Decedent's use of the Xarelto, which was

designed, manufactured, marketed, promoted, sold, and introduced into the stream of commerce by Defendants. Decedent suffered serious physical injury including death.

## FOURTEENTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS

### (MANUFACTURING DEFECT)

267. Xarelto was designed, manufactured, marketed, promoted, sold, and introduced into stream of commerce by Defendants.

268. When it left the control of Defendants it was expected to and did reach Decedent without substantial change from condition in which it left control of Defendant.

269. Xarelto was defective when it left Defendants' control and was placed in the stream of commerce and that there were foreseeable risks that exceeded the benefits of the product and/or that it deviated from product specifications and/or applicable federal requirements and posed risk of serious injury and death.

270. Specifically, Xarelto was more likely to cause serious bleeding that may be irreversible, permanently disabling, and life-threatening than other anticoagulants.

271. Decedent used Xarelto in the substantially same condition it was in when it left the control of the Defendants and any changes or modifications were foreseeable by the Defendants.

272. Decedent and her healthcare providers did not misuse of materially alter their Xarelto.

273. As a direct and proximate result of the use of Xarelto, Decedent suffered serious physical injury including death.

## FIFTHTEENTH CAUSE OF ACTION AS AGAINST THE DEFENDANTS

### (FAILURE TO WARN)

274. Defendants had a duty to warn Decedent and her healthcare providers regarding need for blood monitoring, dose adjustments, twice daily dosing and failed to warn of the risk of serious bleeding that may be irreversible, permanently disabling, and life-threatening, associated with Xarelto.

275. Defendants knew, or in the exercise or reasonable care should have known, about the risk of serious bleeding that may be irreversible, permanently disabling, and life-threatening.

276. Defendants failed to provide warnings or instructions that a manufacturer exercising reasonable care would have provided concerning the risk of serious bleeding that may be irreversible, permanently disabling, and life-threatening, in light of, the likelihood that its product would cause these injuries.

277. Defendants failed to update warnings based on information received from product surveillance after Xarelto was first approved by the FDA and marketed, sold, and used in the United States and throughout the world.

278. A manufacturer exercising reasonable care would have updated its warnings on the basis of reports of injuries to individuals using Xarelto after FDA approval.

279. When it left Defendants' control, Xarelto was defective and unreasonably dangerous for failing to warn of the risk of serious bleeding that may be irreversible, permanently disabling, and life-threatening.

280. Decedent used Xarelto for its approved purpose and in a manner normally intended and reasonably foreseeable by the Defendants.

281. Decedent and Decedent's healthcare providers could not, by the exercise of reasonable care, have discovered the defects or perceived their danger because the risks were not open or obvious.

282. Defendants, as the manufacturers and distributors of Xarelto, are held to the level of knowledge of an expert in the field.

283. The warnings that were given by Defendants were not accurate or clear, and were false and ambiguous.

284. The warnings that were given by the Defendants failed to properly warn physicians of the risks associated with Xarelto, subjecting Decedent to risks that exceeded the benefits to the Decedent. Decedent, individually and through her physicians, reasonably relied upon the skill, superior knowledge and judgment of the Defendants.

285. Defendants had a continuing duty to warn Decedent and her prescriber of the dangers associated with its product.

286. Had Decedent or her healthcare providers received adequate warnings regarding the risks associated with the use of Xarelto, they would not have used it or they would have used it with blood monitoring.

287. The Decedent's injuries including death, were the direct and proximate result of Defendants' failure to warn of the dangers of Xarelto.

288. Defendants' conduct, as described above, was extreme and outrageous. Defendants risked the lives of consumers and users of their products, including Decedent, with knowledge of the safety and efficacy problems and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct warrants an award of punitive damages.

DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury as to all issues.

_____

Respectfully submitted:

Estate of Christine Watts, Executor of Estate, and Five Children

PO BOX 3633 South Bend, Indiana 46619 (269) 426-1107

Page 6